No. 15-1193

In the
# United States Court of Appeals for the Federal Circuit

**SABATINO BIANCO, MD**
*Plaintiff-Appellee,*

v.

**GLOBUS MEDICAL, INC.,**
*Defendant-Appellant*

_____

*Appeal from the United States District Court for the Eastern District of Texas Case No. 2:12-CV-00147-WCB*

_____

**NON-CONFIDENTIAL OPENING BRIEF OF APPELLANT**

_____

Thomas W. Sankey
DUANE MORRIS LLP
1330 Post Oak Blvd., Ste 800
Houston, TX 77056
(713) 402-3900

Robert M. Plaumbos
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19104
(215) 979-1111

Kristina Caggiano Kelly
DUANE MORRIS LLP
505 9th St. NW, Ste. 1000
Washington, D.C. 20004
(202) 776-5284

February 9, 2015

*Counsel for Appellant
Globus Medical, Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4(a), counsel for Appellant Globus Medical, Inc. certifies the following:

1. The full name of every party or amicus represented by us is:

   Globus Medical, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   Globus Medical, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of any party represented by us are:

   None

4. The names of all law firms and the partners and associates that appeared for the parties now represented in trial court or are expected to appear in this Court are:

   Thomas W. Sankey
   Gregory M. Luck
   Diana M. Sangalli
   Corey M. Weideman
   Robert L. Byer
   Matthew A. Taylor
   Lawrence H. Pockers
   Jeffrey S. Pollack
   Robert M. Palumbos
   Kristina Caggiano Kelly

   all of DUANE MORRIS LLP


February 9, 2015                          */s/Thomas W. Sankey*
                                          Thomas W. Sankey
                                          DUANE MORRIS LLP

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF CONTENTS................................................................ ii

TABLE OF AUTHORITIES ...................................**Error! Bookmark not defined.**

INTRODUCTION .................................................................................1

STATEMENT OF RELATED CASES ..................................................3

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF THE ISSUES............................................................4

STATEMENT OF THE CASE...............................................................5

I.    Background on the Parties ........................................................5

II.   Bianco Provides Globus with an Unworkable Idea for a New Product ..........6

III.  After Setting Bianco's Drawings Aside, Globus Independently Develops Caliber, Caliber-L, and Rise ............................................9

IV.   Proceedings in the Trial Court.................................................12

      A.    Defining Bianco's Trade Secret .......................................13

      B.    Bianco's Theory of Damages ...........................................16

      C.    The Ongoing Royalty .......................................................17

SUMMARY OF THE ARGUMENT .....................................................18

STANDARD OF REVIEW ...................................................................21

ARGUMENT .........................................................................................22

I.    Globus Is Entitled to Judgment as a Matter of Law on Bianco's Claim for Trade Secret Misappropriation. ..............................................22

A. Bianco's Abstract Idea of an Adjustable Spacer Is Not a Trade Secret.........................................................................22

B. The Appropriate Mechanism to Protect a General Idea Is a Breach of Contract Claim, Which Bianco Asserted and Lost. ..........30

C. The Evidence Does Not Support Liability for Misappropriation of Trade Secrets on Any Other Basis..................................32

II. Globus Was Entitled to a Remittitur or New Trial on Damages Because Bianco's Damages Theory Was Unreliable and Legally Flawed...........................................................................33

A. The Royalty Was Not Properly Apportioned to Reflect the Value of the Information Misappropriated. ........................34

B. The Licenses Used in Calculating the Royalty Rate Were Not Comparable and Were Manipulated Through a Fundamentally Flawed Methodology...................................................39

III. The District Court Abused its Discretion by Granting Bianco an Ongoing Royalty as a Form of Equitable Relief. .........................43

A. The District Court Should Have Denied Any Future Damages Because Bianco Failed to Present a Reliable Future Damages Model at Trial.........................................................43

B. There Is No Authority Under Texas Law for Awarding Ongoing Royalties for a Misappropriation of Trade Secrets..............45

CONCLUSION ...................................................................49

---

**Confidential Information Omitted**

Confidential information, which was introduced into evidence or filed under seal in the district court, has been omitted from pages 7, 8, 13-15, 17, 32, 44 and 45. The omitted information generally relates to the content of alleged trade secrets and trial proceedings that were conducted under seal.

---

# TABLE OF AUTHORITIES

## Cases

*A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir. 1999)................................................................................39

*Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238 (5th Cir. 2005) .................21

*Astro Technology, Inc., v. Alliant Techsystems, Inc.*, 2005 U.S. Dist. LEXIS 46248 (S.D. Tex. 2005) .............................................................. Passim

*Bryan v. Kershaw*, 366 F.2d 497 (5th Cir. 1966) ............................................. 46-48

*Chaves v. M/V Medina Star*, 47 F.3d 153 (5th Cir. 1995).....................................21

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (Tex. 1996) .................22

*Daboub v. Gibbons*, 42 F.3d 285 (5th Cir. 1995) ....................................................44

*Daktronics, Inc. v. McAfee*, 599 N.W.2d 358 (S.D. 1999).....................................27

*Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444 (5th Cir. 2007).....................44

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ..............................................21

*Gonzales v. Zamora*, 791 S.W.2d 258 (Tex. App. 1990) ............................... Passim

*HDNET LLC v. North American Boxing Council*, 972 N.E.2d 920 (Ind. Ct. App. 2012) .......................................................................................24

*Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173 (2d Cir. 1993)...........27

*Hyde Corp. v. Huffines*, 314 S.W.2d 763 (Tex. 1958) ..................................... 46-48

*Johnson v. Benjamin Moore & Co.*, 788 A.2d 906 (N.J. Super. 2002)...................27

*K & G Oil Tool & Service Co. v. G & G Fishing Tool Service*, 314 S.W.2d 782 (Tex. 1958)................................................................................46

*Kuhmo Tire Company, Ltd., v. Carmichael*, 119 S.Ct. 1167 (1999) ......................41

*LaserDynamics, Inc., v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) .......................................................................................39

*MGE UPS Sys. Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361 (5th Cir. 2010) ..............................................................................44

*Microstrategy, Inc., v. Business Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) ..............................................................................21

*Mid-Michigan Computer Systems, Inc., v. Marc Glassman, Inc.*, 416 F.3d 505 (6th Cir. 2005) ....................................................... 34-35

*Nicholas v. Leavitt*, 242 F.3d 1206 (10th Cir. 2001) ..............................21

*Paice v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007) ........................ 45-46

*Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, No. 03-04-00623-CV, 2006 Tex. App. LEXIS 8841 (Tex. App.—Austin Oct. 11, 2006, no pet.) .......23

*ResQNet.com Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).....................39, 44

*Richter v. Westab, Inc.*, 529 F.2d 896 (6th Cir. 1976)..................................... Passim

*Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346 (Fed. Cir. 2003) .........21

*T-N-T Motorsports v. Hennessey Motorsports*, 965 S.W.2d 18 (Tex. App.— Houston [1st Dist.] 1998, pet. dism'd) .................................................22

*Uniloc USA, Inc. v. Microsoft Corporation*, 632 F.3d 1292 (Fed. Cir. 2011) ........34

*University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974) ...................................................................... Passim

*Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142 (2d Cir. 1996)...... 34-35

**Statutes**

28 U.S.C. § 1295(a)(1)..............................................................................3

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1338(a) ................................................................................3

28 U.S.C. § 1367 and § 1338(b) ...............................................................3

Tex. Civ. Prac. & Rem. Code § 16.010 .....................................................43

**Other Authorities**

1 Roger M. Milgrim, MILGRIM ON TRADE SECRETS § 1.02 (2014) ........................23

Restatement (First) of Torts § 757. ....................................................................23, 29

Restatement (Third) of Unfair Competition § 39 cmt. h. ........................... 27-28, 30

Restatement (Third) of Unfair Competition § 45 ...................................................37

## INTRODUCTION

The issue in this appeal is whether Texas trade secret law protects a general idea for a new product. The plaintiff, Sabatino Bianco, M.D., communicated the concept of an expandable intervertebral spacer implant to Globus Medical, Inc. in 2007. He did not disclose a workable device or provide any concrete details about how to make his idea a reality. It took Globus years of independent development, with no contribution from Bianco, to develop a functioning product.

A general idea for a new product is not a trade secret under Texas law. The district court upheld the jury verdict against Globus based on the mistaken view that a new product idea is protectable under Texas trade secret law. Because the only trade secret that Bianco contended was actually misappropriated was the general idea of an expandable implant, and any not concrete information on how to implement that concept, Globus cannot be liable for trade secret misappropriation. Globus is entitled to judgment as a matter of law.

Having erroneously upheld the verdict, the district court then erred by upholding the jury's award for past damages and granting an ongoing royalty. Bianco's damages model was fundamentally flawed. As Bianco's damages expert admitted, the model made no attempt to apportion the royalty base to reflect the value of Bianco's contribution. The model also ignored comparable licenses and relied instead on obviously non-comparable ones, with no rational basis for either

1

choice. Because the damages model was unreliable and should have been excluded, the judgment was excessive and should be vacated.

Before trial, the district court held that Bianco's evidence of future damages was unreliable, and therefore inadmissible. Having failed to present a reliable theory of future damages by trial, Bianco should have been denied relief for future damages. The district court nonetheless permitted Bianco (over Globus's objection) to seek future damages through an ongoing royalty in a post-verdict bench proceeding. The decision to sever improperly gave Bianco "a second bite at the apple" on future damages. Moreover, there is no authority under Texas law for awarding ongoing royalties for misappropriation of trade secrets. The district court erred by providing a remedy not permitted by Texas law.

## STATEMENT OF RELATED CASES

Globus is not aware of any cases related to the present appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action for correction of inventorship under 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a), and supplemental jurisdiction over Bianco's state law claims under 28 U.S.C. § 1367 and § 1338(b).

The district court entered judgment on July 17, 2014. That judgment was made appealable on October 27, 2014, when the court denied post-judgment motions. Globus filed its notice of appeal on November 20, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.      Texas law provides trade secret protection only to concrete information and not to general ideas or new product ideas. Bianco provided only a new product idea to Globus, not concrete information. Can Globus be held liable for trade secret misappropriation under Texas law?

2.      If Globus can be held liable for trade secret misappropriation of a new product idea, is the jury's award of a reasonable royalty for past damages supported by sufficient evidence where it was based entirely on a flawed damages model that failed to apportion the royalty to the value of Bianco's contribution and relied on non-comparable licenses?

3.      Did the district court err by awarding Bianco an ongoing royalty after he failed to present a reliable model for future damages at trial and no authority under Texas law supports the award of an ongoing royalty for misappropriation of trade secrets as a post-verdict form of equitable relief?

## STATEMENT OF THE CASE

### I.    Background on the Parties

Globus Medical, Inc. is a leading musculoskeletal implant company primarily focused on advancing spinal surgery through technological advancements in orthopedic products. *See* http://www.globusmedical.com/. From its facilities in Pennsylvania, Globus researches, engineers, manufactures, and sells medical devices for patients with debilitating spinal conditions. *Id.* One of Globus's leading product lines includes spinal implants for use in spinal fusion surgery. A107.

"Spinal fusion surgery is used to treat conditions such as degenerative disc disease, in which the space between two vertebrae in the patient's spine become compressed." A107. To correct this condition, a surgeon may implant a device called an intervertebral spacer between the two vertebrae. *Id.*; A6506-07. The spacer replaces the degenerated disc tissue and maintains proper alignment and spacing of the vertebrae, allowing the spine to heal. A107. As the spine heals, the vertebrae on either side of the spacer fuse together, as reflected in the name, "spinal fusion surgery." A108; A6507.

Dr. Sabatino Bianco is a neurosurgeon in Arlington, Texas who regularly performs spinal fusion surgery. A6494-95; A6512-13. Bianco testified that, in March 2007, he was approached by two Globus sales representatives, Gregg Harris

5

and Steve Anthony, who invited Dr. Bianco to take a tour of Globus's facility and learn more about the company's exciting new products. A6517. Bianco accepted the invitation. *Id.*

Bianco testified that during his visit, he told Globus representatives that he had some ideas for new products that he wanted for them "to potentially consider." A6517-18. He received a very brief explanation that Globus had a protocol for doctors wanting to submit unsolicited new product ideas. A6521.

## II.    Bianco Provides Globus with an Unworkable Idea for a New Product

According to Bianco, he again mentioned to Gregg Harris that he had an idea for a new product after the trip to Globus's facility. A6522. Harris asked Bianco if his ideas were written down, and Bianco offered some drawings. A6522. Harris, and later Steve Anthony, suggested that Bianco have the drawings notarized, believing it to be a responsible practice. A6522-23; A6534; A10345.

Bianco met with Harris again in June 2007 to discuss Bianco's practice and ideas. A6522-24; A6532. Bianco gave his notarized sketches to Harris at the meeting. A6532. Harris told Bianco that he would pass along the drawings to Globus's new product committee. A6533; A6536. He also had Bianco fill out a "New Idea Submission Form" to attach to his sketches. A10307-13; A10345.

Harris said that he would let Bianco know if the committee decided to use the drawings. A6533; A6536. He also told Bianco that if Globus decided to use the

6

Confidential Material Redacted

idea, Bianco would be compensated in an amount "standard for a doctor presenting an idea." A6702.

Bianco's materials included a sketch entitled "Adjustable Interbody Spacer." A112; A6525; A10316. This drawing depicted a scissor jack element connected to a long shaft with a dial at end. A112. The scissor jack element resembled two crossed arms connected by a pivot, like the letter X. The arms supported two parallel plates, the distance between which could be increased or decreased by rotating the arms about the pivot. Bianco explained that his scissor jack element was expandable and contractible continuously. A6525-28; A7006; A3156-57.



A10316.

7

Confidential Material Redacted

At the time Bianco provided Globus with his drawings, Globus sold a variety of spinal fusion spacers, but not an adjustable-height spacer. A111; A6520. Historically, intervertebral spacers for spinal fusion surgeries came in a variety of fixed sizes, and surgeons would select the size appropriate for their patient when performing a surgery. A108; A3156; A6523; A6527-28; A7007-08. Globus had other types of expandable spinal implants, but they were not indicated for spinal fusion surgery, which required a more robust design.  A7238; A7249; A7280-81. Adjustable-height spacers were a logical improvement to the traditional product.

Although developing an adjustable-height spacer was a logical goal, Bianco's "relatively crude" idea and sketches did not accomplish it. A91; A115.

███████████████████████████████████████████

████████████████████ The drawings reflected an unworkable device and none of the details, specifications, dimensions, or other information that might have made them useful to a design team. A9185-87; A9207-08. Bianco admitted that no one ever told him "that an instrument or implant, based on the drawings that [he] gave to Globus, would work." A6599.

Globus's engineering manager, Bill Rhoda, and its technical fabrication manager, Andy Lee, reviewed Bianco's drawings in August 2007 to determine whether they depicted anything worth pursuing. A36; A10323-28. They thought that the sketches depicted an expansion *instrument*, not an interbody *implant*. A36;

8

A6562-63; A6767-68; A10328-30. Rhoda and Lee and concluded that the sketches did not disclose any promising designs because a scissor jack could not be made strong enough to push vertebrae apart. A6768. Bianco's own expert agreed that Bianco's design was not strong or robust enough to function as an expansion instrument or a spacer implant. A7070.

Andy Lee posed the alternate idea of a ramp-based expansion instrument, and even built a prototype that was itself determined to be unworkable. A36; A115; A6767-68; A6772-73; A10323-37; A7033-34. Globus shelved the concept of an expansion instrument based on Bianco's drawings and put the sketches aside. A115; A6772-73.

## III.    After Setting Bianco's Drawings Aside, Globus Independently Develops Caliber, Caliber-L, and Rise

David Paul, Globus's chairman and CEO, testified that Globus began a project to develop expandable cages in 2004. A7238; A7249; A7280-81. The first product Globus developed along those lines was X-Pand®, an expandable corpectomy device commercialized in 2005 that was designed to replace two discs and the vertebral body between them. A36; A7249; A7255; A7280. The patent filed for X-Pand® in 2005 reflected both ramp and scissor-jack mechanisms of expansion for interbody cages. A7250-54.

Once sufficient resources became available, Globus began working on an expandable interbody cage. A7255. In October 2007, engineering manager Bill

9

Rhoda tasked engineer Ed Dwyer to come up with a few concepts for ways to expand an implant. A37; A7618. Rhoda did not give Dwyer any drawings or suggest any particular mechanisms or features. A7618-19. Dwyer had never seen or heard of Bianco's sketches. A7620-21. Dwyer developed his own sketches "that illustrated several different ways that an implant could be made expandable, including the use of ramps." A37; A7258-59.

The specific project that ultimately led to the development of the Caliber® and Rise® products began in early 2008. A7255. By early 2009, Chad Glerum had begun the Caliber® development project as its lead project engineer. A36; A116; A7071; A7620. Glerum was given the concepts developed during the X-Pand® project and the sketches that Ed Dwyer had developed for an expandable cage. A37; A7257-59. He was not given Bianco's drawings. A37; A7239; A7335-36.

The development of Rise® was independent from Caliber®. A7335. Mark Weiman, another Globus engineer, headed the Rise® project. A37; A7259; A7335. The Rise® product is an endoscopic implant, and is much smaller than the Caliber® products. It is inserted into a patient's body through a tube roughly the diameter of a straw. A6560; A7039; A7335; A7517. The only feature it has in common with the Caliber® products is a ramp-based expansion mechanism activated by a screw. A7039. As with Chad Glerum, there was no evidence that Mark Weiman saw Bianco's drawings. A38; A7239.

10

The development processes for the Caliber® and Rise® products lasted over two-and-a-half years. It involved many Globus employees and eight surgeons on the Caliber® design team, five on the Caliber-L® team, and five on the Rise® team. These surgeons had licenses with Globus that provided for royalty payments that generally conformed to Globus's standard rate of 0.5% of net sales. A7309-10; A11191-311; A11312-77; A15143-224. The development processes produced nearly 100,000 pages of documents that comprised 50 boxes of paper. A7315. The processes included extensive cadaver labs and required FDA approval. A6550.

Chad Glerum conceived of the idea to use ramps in what ultimately became the Caliber® device. A37; A7071; A7331-32. Mark Weiman conceived of using ramps in the Rise® product. A7530-33. Bianco admits that he did not invent the idea for using sliding ramps in the Caliber® or Rise® line of products, depict them in his sketches, or even discuss the idea with Globus. A6596-98.

While those developments were underway, Bianco met with various other Globus employees on other matters. A6537-38. He provided input on other products, and was compensated pursuant to an agreement. *Id.* Occasionally, he inquired to Harris about the status of the new product committee's review of his drawings. A6536-37. But he took no part in the development and design process of the Caliber® or Rise® products. A6604-05. Bianco's drawings were never shown

11

to the Globus employees who worked on the Caliber® or Rise® products, nor was his idea ever communicated to them. A6599-602.

The Caliber® and Rise® products both involved very different concepts than the device depicted in Bianco's drawings. As the district court found, "the engineering of the products, including the use of ramp-based expansion mechanism, involved substantial departures from the mechanisms depicted in the relatively crude drawings supplied by Dr. Bianco, which included a scissor-jack expansion mechanism." A91. The district court recognized that the two expansion mechanisms "are quite different." A33. Furthermore, the district court found that "the combination of features that made it possible for the Caliber® and Rise® products to be both small and robust were contributed by Globus's engineers, and were not part of any specific suggestions contributed by Dr. Bianco." A91.

Harris returned Bianco's sketches to him in late 2009 or early 2010. A6540-42. Harris told Bianco that Globus was not interested in pursuing the technology depicted in the drawings. A6541. It was not until early 2011, four years after Bianco's disclosure, that Globus began marketing the Caliber® product. A114.

## IV.    Proceedings in the Trial Court

Over a year after Globus began marketing Caliber®, Bianco sued Globus in the Eastern District of Texas. A204. He brought claims for (1) misappropriation of trade secrets, (2) breach of contract, (3) correction of inventorship of two of

Confidential Material Redacted

Globus's patents relating to ramp-based adjustable intervertebral spacers, (4) unfair competition under Texas law, (5) common law fraud, (6) unjust enrichment, (7) misappropriation of confidential information, (8) disgorgement of profits, (9) exemplary damages, and (10) injunctive relief. A1454-59.

Bianco alleged that Globus used his idea to develop and patent the Caliber®, Caliber-L®, and Rise® products. Bianco asserted that he was entitled to ownership of Globus's patents and disgorgement of all of Globus's profits relating to the products. He argued in the alternative that he was entitled to a reasonable royalty, under either a breach of contract or misappropriation of trade secrets theory.

### A. Defining Bianco's Trade Secret



Bianco's technical expert, Dr. Carl McMillin, identified ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ as constituting Bianco's trade secret. A3155-61; A7006-15. Globus moved for summary judgment on Bianco's trade secret claim on the ground that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ In response, Bianco argued that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. A6162-63. The district court denied summary judgment on the basis that Bianco's combination of elements may have been a protectable trade secret. A186; A6165. The parties proceeded to trial.

Confidential Material Redacted

The way in which Bianco characterized his trade secret evolved over the course of the trial. As it became clear that his ███████████ combination was never effectively communicated to Globus, A7061; A7066-67; A7068, and that his combination of features bore little resemblance to the accused products, A6527; A6588-89; A6591; A6593-94, Bianco stopped arguing that his trade secret resided in the ██████████ combination that he used to survive summary judgment. A6163-64. Instead, Bianco refocused his attention to the general idea of an adjustable spacer, which he alleged was also his trade secret. A6591; A6496-97.

Bianco's expert, Dr. McMillin, took the same approach at trial. Instead of emphasizing the ██████████ combination, he testified that what Bianco had done was provide Globus with a problem to solve—the creation of an adjustable spacer—and "inspired" Globus to develop the ramp concept to do so. A7070-71; 7065. Bianco had "spark[ed] the idea" behind the final products. A7079.

After the close of arguments, but before submitting the case to the jury, the district court granted judgment as a matter of law in favor of Globus on Bianco's claims for fraud, exemplary damages, and unfair competition. A7228; A7949; A7957. The court denied judgment as a matter of law on Bianco's trade secret claim. Bianco withdrew his claim for misappropriation of confidential information. A7237. The district court severed Bianco's claims for correction of inventorship, unjust enrichment, injunction, and future damages. A24-25; A47. The breach of

14

Confidential Material Redacted

contract and trade secret claims were submitted to the jury. A7957. The jury found Globus liable on Bianco's claim for misappropriation of trade secrets but not liable for breach of contract. A6410-11.

In several post-verdict opinions, the district court relied on Bianco's characterization of his trade secret as the general idea of an adjustable spacer, rather than the specific ███████████ combination from the summary judgment stage. For example, in denying Bianco's claims for correction of inventorship and unjust enrichment, the district court held that Bianco's drawing "reflected only a general idea for an expandable spacer," provided only "the germ of an idea," and that his drawings "were largely aspirational in nature." A43.

Likewise, in denying Globus's Rule 50(b) motion for a judgment as a matter of law on Bianco's trade secret claim, the district court characterized Bianco's trade secret as the "general idea," "basic concept," "core concept," and "fundamental concept" of an adjustable intervertebral spacer. A112; A114; A124. According to the district court, Bianco's contribution was to provide "the motivation for Globus to make an adjustable spacer" and to be "the motivating factor behind Globus's decision to begin that project." A114; A115. It was on this basis that the district court upheld the jury's verdict and denied Globus's motion for judgment as a matter of law. A121-24.

## B.    Bianco's Theory of Damages

Bianco proposed a damages theory based on disgorgement, and, in the alternative, a royalty based on the entire value of the products. A116. With regards to his royalty theory, Bianco's damages expert, Dr. Stephen Becker, conceded that "some apportionment . . . would be appropriate if at least a portion of the Globus products were independently developed." A7208-10. Becker admitted, however, that he did not apportion the royalty base to reflect the value of Globus's independent contribution to the products. A7184; A7186. Bianco's royalty rate was, by design, greater than the combined total of all other royalties that Globus paid to every other contributor of each accused product. A7191-93.

Bianco contended that this royalty rate was justified because he contributed the general idea for the products, rather than any of the details on how to implement it. He contended that the idea for a product was worth more than the sum total of all other kinds of contributions to a product. A117. He therefore calculated his proposed royalty rate by adding up the royalty rates that Globus paid to all of the other contributors to the accused products, and then adding an additional 1% to reflect the commercial success of the products to come up with a royalty of 5% of net sales. A7190-91.

The jury awarded a reasonable royalty of $4,295,760, the equivalent of a 5% royalty rate on net sales of the Caliber® and Rise® products up to trial. A109;

16

Confidential Material Redacted

A6411. Globus sought a new trial or remittitur of damages, arguing that Bianco's

royalty rate relied on (1) the unreliable methodology of adding up all the royalty

rates that Globus paid to other contributors to the products, (2) non-comparable

licenses relating to fully developed products from other companies, not new

product ideas from individuals, and (3) a 1% "kicker" in the royalty rate that

lacked any rational basis. The district court denied the motion. A135-51.

### C.    The Ongoing Royalty

Becker's expert report included a model for future damages based on █

████████████████████████████████████. Before trial, the

district court excluded Becker's model for future damages as unreliable because

████████████████████████████████████████████

████████████████████████████████████████████

█████. A22-23. Lacking an evidentiary basis to seek future damages from the jury,

Bianco asserted a claim for ongoing royalties as a form of equitable relief. The

district court agreed to sever proceedings on a future royalty (over Globus's

objection) and conduct a bench trial in a post-verdict proceeding. A7107-10.

The district court denied Bianco's request for a permanent injunction but

granted an ongoing royalty of 5% of the net sales on the accused products, "or

products that are not colorably different from those products." A2. The district

court denied Globus's motion challenging the ongoing royalty. A151-56.

## SUMMARY OF THE ARGUMENT

New product ideas, undeveloped ideas, and business goals or plans are not trade secrets under Texas law. Bianco's purported trade secret was a general idea for an adjustable spacer that lacked any specific, workable designs to implement that idea. Because such a general idea for a new product is not, as a matter of law, a trade secret, Globus cannot be liable for trade secret misappropriation. Globus is entitled to judgment as a matter of law.

There is no dispute that Bianco disclosed only a general and completely undeveloped product idea. After trial, the district court repeatedly described the misappropriated trade secret as not being a particular combination of features or a complete design, but rather as a "core idea" or a "fundamental concept." A123-24. Bianco himself described his trade secret as the "sparkle" for Globus's pursuit of an adjustable spacer, not concrete information on how to accomplish that goal.

The district court incorrectly held that Bianco could claim trade secret protection over his general idea based on a flawed interpretation of the relevant case law. In particular, the district court distinguished the primary case on which Globus relied based on an inapposite portion of a treatise. But Texas case law clearly establishes that a trade secret cannot be a mere idea, and that proposition is well supported by authority from other jurisdictions and treatises. The district court did not cite a single case in support of its conclusion that ideas, "whether 'mere' or

otherwise," are eligible for trade secret protection. A123. The relevant case law from Texas and other jurisdictions establishes just the opposite.

Once it is established that the general idea of an adjustable spacer cannot be a trade secret, there is no basis left on which to sustain the jury verdict. There is no evidence that Globus misappropriated any concrete information disclosed by Bianco. None of the developers of the accused products knew anything about Bianco or his ideas or designs. None of the information communicated by Bianco was relayed to anyone involved with the accused products. And the accused products do not resemble the adjustable spacer that Bianco envisioned. The only connection between the accused products and Bianco's concept is that they both relate to the general idea of adjustable spacers. The Court should therefore enter judgment in favor of Globus on Bianco's trade secret claim.

Even if new product ideas, undeveloped ideas, or general ideas are protected under Texas law, the district court abused its discretion by denying Globus's motion for a new trial or remittitur of damages. A jury's award of damages is properly vacated in favor of a remittitur or new trial where the award is consistent with a damages model that is based on non-comparable licenses and fails to properly apportion the royalty.

The district court upheld the damages award based on the flawed reasoning that the value of a trade secret is commensurate with its breadth. But the value of a

19

trade secret is the value of the information that the trade secret contains. That a general idea can be articulated broadly enough to encompass an entire product does not mean that the information in the idea is worth as much as the combined design, details, engineering, and innovations within the product.

The district court discounted evidence showing that Bianco's ideas and materials were never communicated to any of the product developers, and that Globus did not learn or derive any information from these materials. The court erroneously concluded that once liability was established, there was no need for Bianco to show an economic nexus between the material he disclosed and the extent to which it was used or the actual usefulness of it. The district court imposed no requirement that Bianco apportion the proposed royalty to reflect the value of the misappropriated information.

Finally, the district court erred by awarding Bianco an ongoing royalty. The award was procedurally improper because Bianco had failed to present a viable theory of future damages at trial. He was not entitled to correct his error after trial. Moreover, there is simply no authority under Texas law for a judge awarding ongoing royalties as a form of equitable relief for misappropriation of trade secrets. In so doing, the district court conflated patent law with trade secret law.

## STANDARD OF REVIEW

The district court's denial of Globus's motion for judgment as a matter of law for trade secret misappropriation is reviewed de novo. *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1352 (Fed. Cir. 2003) (stating that the Federal Circuit reviews the denial of a motion for judgment as a matter of law under the law of the regional circuit); *Arsement v. Spinnaker Exploration Co.*, 400 F.3d 238, 248 (5th Cir. 2005) (stating that the Fifth Circuit reviews a motion for judgment as a matter of law denial de novo). This Court must reverse the denial of a motion for judgment as a matter of law "if a reasonable jury could only rule in favor of the movant" under a correct application of the law. *Microstrategy, Inc., v. Business Objects, S.A.*, 429 F.3d 1344, 1349 (Fed. Cir. 2005).

The district court's denial of Globus's motion to order a remittitur or new trial on damages is reviewed for abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136 (1997). A district court abuses its discretion "when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995).

The district court's legally erroneous conclusion that it has discretion to award ongoing royalties as a form of equitable relief is reviewed de novo. *See Nicholas v. Leavitt*, 242 F.3d 1206, 1209 (10th Cir. 2001) (citing *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 577-79 (1984)).

# ARGUMENT

**I.    Globus Is Entitled to Judgment as a Matter of Law on Bianco's Claim for Trade Secret Misappropriation.**

The only trade secret that the district court identified as potentially supporting the jury verdict was Bianco's general idea of an adjustable spacer. Such general ideas are not subject to trade secret protection under Texas law. Since there is no evidence that any other alleged trade secret existed or was misappropriated, Globus cannot be liable for trade secret misappropriation as a matter of law.

## A.    Bianco's Abstract Idea of an Adjustable Spacer Is Not a Trade Secret.

A trade secret may consist of any formula, pattern, device, or compilation of information that is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). There are two basic categories of information that have been afforded trade secret status: (1) technical information (patentable or not), such as formulas, processes, designs, devices, software, and R&D; and (2) business information, including business methods, strategic plans, customer lists, pricing information, and other empirical facts. *T-N-T Motorsports v. Hennessey Motorsports*, 965 S.W.2d 18, 22 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd).[1]

---

[1] The factors relevant to determining whether information is a trade secret are:

A trade secret, by its nature, must be concrete, usable information. *See* Restatement (First) of Torts § 757 cmt. b (1939). The notion of a trade secret having some modicum of concreteness and utility excludes abstract or general ideas from trade secret protection. *See* 1 Roger M. Milgrim, MILGRIM ON TRADE SECRETS § 1.02 (2014) (noting that the use requirement in the First Restatement of Torts definition of a trade secret distinguishes trade secrets from idea submission cases, and acknowledging the difference between submission of a mere idea and the disclosure of information that can be put to productive use). Abstract or general ideas may inspire or motivate the development of a new product, but they do not constitute concrete information that one can actually use in gaining a competitive advantage. *Id.* The Texas common law that governs here reflects these traditional limitations on the definition of a trade secret.

---

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Parker Barber & Beauty Supply, Inc. v. Wella Corp.*, No. 03-04-00623-CV, 2006 Tex. App. LEXIS 8841, at *52 (Tex. App.—Austin Oct. 11, 2006, no pet.).

The definition of a trade secret under Texas law does *not* include "marketing concepts and new product ideas, business possibilities or goals, and undeveloped ideas and plans." *Astro Technology, Inc., v. Alliant Techsystems, Inc.*, 2005 U.S. Dist. LEXIS 46248 at \*21 (S.D. Tex. 2005) (citing *Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App. 1990)). As such, an undeveloped new product idea, in itself, is not eligible for trade secret protection. *Id.* at \*45-\*46 (granting summary judgment because plaintiff failed to show it possessed a trade secret).

The Sixth Circuit reached the same conclusion under Ohio's definition of a trade secret, which is indistinguishable from the definition under Texas law. *See Richter v. Westab, Inc.*, 529 F.2d 896, 900 (6th Cir. 1976). The court excluded a new product idea from the definition of a trade secret, observing that:

> [The] act of suggesting should not establish an exclusive right to exploit the idea. Perhaps the [plaintiff] design firm will not be sufficiently competent to produce good designs based upon the concept. A concept is of little use until solidified into a concrete application. The idea of fashion designs is useless unless good designs are obtained. If the design firm is incapable of producing good designs the public should not be denied the benefit of the idea if another designer could produce good designs. Thus the principle denying legal protection to abstract ideas has important social interests behind it.

*Id.* at 902. *See also HDNET LLC v. North American Boxing Council*, 972 N.E.2d 920, 921, 924 (Ind. Ct. App. 2012) (distinguishing trade secret misappropriation from misappropriations that fall short of trade secret status, such as "idea

24

misappropriation") (citing *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, 235 P.3d 310, 319 (Haw. 2010)).

Bianco's act of suggesting that Globus design a continuous expandable and retractable spacer does not give him the exclusive right to exploit every incarnation of adjustable spacers. While Bianco could conceivably have trade secret rights in his particular design based on that concept—the scissor jack—that design was not appropriated by Globus because it was unworkable. A7066.

Indeed, the mere idea of an adjustable spacer is useless absent a good design. Regardless of whether Bianco's suggestion to design an adjustable spacer motivated Globus to improve upon the spacers already known in the art, that suggestion did not contain any concrete or usable information that actually gave Globus a competitive advantage in developing its ramp-based products. A91; A115; A133; A6599; A7066; A9185-87; A9207-08. Bianco does not dispute that his ideas did not accelerate or assist in Globus's research and development in any way, and that he provided nothing more than a basic product idea. A133.

Texas trade secret law follows the rule set out in *Richter*, as Globus argued to the district court. *See* A6369, A9607 (citing *Gonzales v. Zamora*, 791 S.W.2d 258 (Tex. App. 1990)). The definition of a trade secret under Texas common law explicitly *excludes* "marketing concepts and new product ideas, business possibilities or goals, and undeveloped ideas and plans" like the basic product idea

of spacer that is somehow adjustable. *Astro Technology, Inc., v. Alliant Techsystems, Inc.*, 2005 U.S. Dist. LEXIS 46248 at *21 (S.D.Tex. 2005) (citing *Gonzales*, 791 S.W.2d at 264) (internal quotes omitted).

The court in *Astro Technology* granted summary judgment because the plaintiff had proposed only a general idea. As the court explained, "[t]he trade secret claimed by Plaintiff is, at best, a statement of the goal of using fiber optics in solid rocket motors and general concepts about how to accomplish that goal. Such undeveloped ideas or plans do not rise to the level of a trade secret. *Id.* at *45. As support for this holding, *Astro Technology* quotes the same language from *Gonzales v. Zamora* that Globus quoted to the district court here: "We do not consider the statement that a trade secret may be only an idea to be a correct statement of the law." *Id.* at *45-46.

Like the plaintiff in *Astro Technology*, the trade secret claimed by Bianco is, at best, a statement of the goal of creating a continuously adjustable intervertebral spacer and general concepts about how to accomplish that goal, such as using a scissor jack and other known features. Even if Bianco's scissor jack drawings had been workable, the "fundamental concept" of an adjustable spacer is still nothing more than an undeveloped idea or plan that does not rise to the level of a trade secret. *See id.* at *45-46; A124.

The articulation of Texas law in *Gonzales* and *Astro Technology* is not unique. There is wide-spread agreement that mere ideas do not fall within the common law definition of a trade secret. *See, e.g.*:

- *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173 (2d Cir. 1993) ("It is critical to note, however, that the commonly accepted common law definition of a trade secret 'does not include a marketing concept or new product idea' submitted by one party to another.") (applying New York law) (citing 2 R. Milgrim, MILGRIM ON TRADE SECRETS § 8.03, at 8-31 (1992 & Supp. 1992)).

- *Johnson v. Benjamin Moore & Co.*, 788 A.2d 906 (N.J. Super. 2002) ("[T]he definition of trade secret does not include a marketing concept or a new product idea . . . . Misappropriation of ideas is a separate area of law from both patent law and trade secret law.") (applying pre-UTSA New Jersey common law).

- *Daktronics, Inc. v. McAfee*, 599 N.W.2d 358 (S.D. 1999) ("[S]imply possessing a non-novel idea or concept without more is generally, as a matter of law, insufficient to establish a trade secret.") (applying South Dakota common law).

The Third Restatement of Unfair Competition also distinguishes "idea submission cases," in which "suggestions for new or improved products" are protected from misappropriation under the "law of ideas" through "express or implied-in-fact" promises to pay for such ideas, as opposed to trade secret misappropriation. *See* Restatement (Third) of Unfair Competition § 39 cmt. h. Texas likewise recognizes this dichotomy between trade secret law and the "law of ideas." *See University Computing*, 504 F.2d at 538. "To sustain a claim in tort for the appropriation of an idea, most courts require the submitted idea to be 'novel' in

the sense of not being generally known . . . and sufficiently 'concrete' to permit an assessment of its value and the fact of its use by the recipient . . . ." Restatement (Third) of Unfair Competition § 39 cmt. h.

Bianco's new product idea of an adjustable spacer is precisely the kind of new product idea that is not afforded protection under common law. Bianco's idea disclosure is even more undeveloped than the idea disclosures found not to constitute trade secrets in *Astro Technology* and *Richter*, and was not "concrete," as required under the rubric of the Third Restatement of Unfair Competition. As such, the only protection from misappropriation of new product ideas under Texas law is through express or implied-in-fact agreements. Restatement (Third) of Unfair Competition § 39 cmt. h.

The district court mistakenly held that *Gonzales* does not, in fact, stand for the proposition for which Globus cites it. A121-23. The district court's conclusion is contrary to *Astro Technology* and the extensive authority showing that new product ideas, undeveloped ideas, plans, and goals do not rise to the level of trade secrets. But the district court's analysis also fails on its own terms.

In declining to follow the *Gonzales* court's conclusion that a trade secret may not only be an idea, 791 S.W.2d at 264, the district court relied on Comment a of Section 757 of the First Restatement of Torts. A122. Contrary to the district court's assertion, that comment was *not* cited in *Gonzales*, and addresses an

28

unrelated controversy about whether the source of the exclusive right to a trade secret is property right in the idea (such as the exclusive right granted by a patent), or a claim created through behavior in using the secret, maintaining its secrecy, and recognizing its competitive advantage. *Compare* A122 *with Gonzales* 791 S.W.2d at 264 (citing Comment b for an unrelated proposition). Comment a does not address whether a particular idea rises to the level of a trade secret. The First Restatement of Torts does not undermine the clear language of *Gonzales* or suggest that secrecy is the only criterion for protecting an idea as a trade secret.

The district court repeatedly recognized that the trade secret Bianco presented at trial was a "general idea," "basic concept," "core concept," or "fundamental concept" for an adjustable intervertebral spacer, along with some unspecified "key features." A112; A114; A124. Bianco's purported trade secret was precisely the type of idea that *Gonzales*, *Astro Technology*, *Richter*, and the other authority discussed above establish is unprotected by Texas trade secret law. The district court cited no authority to include a general idea for a new product within the definition of a trade secret. Bianco's idea of an adjustable spacer is not protected as a trade secret.

Because the new product idea of an adjustable spacer falls outside the definition of a trade secret under Texas law, Globus is entitled to judgment as a matter of law on Bianco's claim for misappropriation of trade secrets.

29

**B.     The Appropriate Mechanism to Protect a General Idea Is a Breach of Contract Claim, Which Bianco Asserted and Lost.**

That general ideas do not rise to the level of trade secrets does not imply that individuals in Bianco's situation lack any legal recourse. Recovery for misappropriation of the general idea of an improved spacer is appropriately the subject of a breach of contract theory. *See Richter*, 529 F.2d at 901-902 (citing *Brookins v. National Ref. Co.*, 26 Ohio App. 546, 160 N.E. 97 (1927)); Restatement (Third) of Unfair Competition § 39 cmt. h (noting that most jurisdictions require recovery for misappropriation of ideas under breach of express or implied-in-fact promise to pay for the idea).

According to Bianco, the parties had a contract protecting the disclosure of any of Bianco's ideas and prohibiting their use by Globus without compensation. A130. Bianco claimed that Globus breached this contract by developing an adjustable spacer product. That claim was precisely the kind of claim that the Third Restatement of Unfair Competition and the case law detailed above describe as the proper cause of action for misappropriation of an idea. The jury, however, found Globus not liable for breach of contract. Bianco did not appeal that finding.

Bianco has attempted to moot the consequences of his unsuccessful breach of contract claim by characterizing his trade secret so broadly that it preempts all of Globus's future work in the entire field of adjustable intervertebral spacers. This Court should not allow Bianco's defunct scissor jack disclosure to preempt all

30

development by Globus in the intervertebral spacer industry. Because the district court included within Bianco's trade secret exclusivity the Caliber®  and Caliber-L® (despite them being very different from Bianco's sketches), the even more distinguishable Rise® endoscopic implant, and all future products "not colorably different" from the general idea of an adjustable implant, Bianco will control a large portion of Globus' sales and product development for the forseeable future.

Affording Bianco such sweeping relief would be overcompensation even under the "law of ideas" that properly applies to this case. *University Computing*, 504 F.2d at 538.  Bianco provided Globus with an undeveloped idea and a drawing that showed an unworkable device. By contrast, Globus spent two-and-a-half years and involved three teams of surgeons and many Globus employees in developing Caliber, Caliber-L, and Rise. Globus's development process included cadaver labs, produced nearly 100,000 pages of documents that comprised 50 boxes of paper, and required FDA approval. A6550; A7315. Bianco contributed nothing to that process. A6604-05.

Texas trade secret protection does not extend so broadly as to preclude a party from independently developing a product based on a general idea. To hold otherwise violates the clear holdings in *Gonzales* and *Astro Technology* and defeats the social interests that *Richter* identified as limiting trade secret protection. This Court should enter judgment as a matter of law in favor of Globus because

31

undeveloped or new product ideas, like the idea Bianco presented to Globus, are not trade secrets under Texas law, and the jury found Globus not liable for breach of contract.

### C.    The Evidence Does Not Support Liability for Misappropriation of Trade Secrets on Any Other Basis.

The district court sustained the verdict solely on the basis that the jury could have found that Globus misappropriated Bianco's trade secret in the general idea of an adjustable spacer. A123; A133-35. The district court did not identify any alternative trade secret on which the jury could have found liability for trade secret misappropriation. Indeed, the record supports none.

In the context of summary judgment, Bianco characterized his trade secret as comprising ███ features. A6163-64. He admitted that each of those features was in the public domain individually, but that his trade secret resided in the particular combination of those features. The evidence at trial conclusively showed that Bianco never fully communicated his allegedly unique ██████ combination to Globus, and that Globus did not misappropriate that ██████ combination. A7061; A7066-67; A7068.

The undisputed evidence of record further establishes that none of Bianco's materials were ever shown to Ed Dwyer, Chad Glerum, or any of the other developers of the accused products, and that his ideas did not assist or accelerate the development of the accused products in any way. A133. The ramp-based

32

expansion mechanism—the defining feature of the accused products—bears no resemblance to Bianco's scissor-jack. A6527; A6588-89; A6591; A6593-94. The undisputed evidence thus establishes that the accused products were not derived from or inspired by any of the information in Bianco's disclosures. There is therefore no alternate basis in this record to find trade secret misappropriation once the general idea of an adjustable spacer is properly eliminated from the definition of a protectable trade secret.

## II.    Globus Was Entitled to a Remittitur or New Trial on Damages Because Bianco's Damages Theory Was Unreliable and Legally Flawed.

Even if this Court holds, on *de novo* review, that the mere idea of an adjustable spacer rises to the level of a trade secret under Texas common law, the award of damages must still be vacated and the issue of damages remanded for a remittitur or new trial. Bianco's damages model was legally flawed in two respects and should never have been submitted to the jury for consideration.

First, Bianco's damages calculation was unreliable because it made no attempt to tie the royalty to the value of the information misappropriated using the facts of the case. Instead, his royalty was based on the entire market value of the accused products, with no attempt to apportion the royalty base or rate to reflect the role of the misappropriated trade secret in the development of the products. Second, Bianco's royalty rate relied on non-comparable licenses, and was calculated using flawed methodology.

33

**A.   The Royalty Was Not Properly Apportioned to Reflect the Value of the Information Misappropriated.**

The need to apportion a royalty to reflect the value of the thing actually misappropriated is well established in trade secret law, and is confirmed by the aspects of patent damages jurisprudence that have been adopted by trade secret law. *See University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974) (applying patent law reasonable royalty principles, including the *Georgia-Pacific* factors, in the context of trade secret misappropriation royalty claims); *see also Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 151-52 (2d Cir. 1996) (noting that "the royalty that the plaintiff and defendant would have agreed to for the use of the trade secret made by the defendant may be one measure of the approximate portion of the defendant's profits attributable to the use"). As such, the same hypothetical negotiation that defines the patent reasonable royalty also defines the trade secret reasonable royalty. *Mid-Michigan Computer Systems, Inc., v. Marc Glassman, Inc.*, 416 F.3d 505, 510-11 (6th Cir. 2005).

A fact-intensive and rational apportionment of a royalty is a strict requirement of all intellectual property damages theories. *See Uniloc USA, Inc. v. Microsoft Corporation*, 632 F.3d 1292, 1318 (Fed. Cir. 2011). Just as in patent cases, the measure of a reasonable royalty in a trade secret case is "the value to the defendant of what he *actually obtained* from the plaintiff." *University Computing*, 504 F.2d at 539 (emphasis added). If the defendant has appropriated a general idea

34

or fundamental concept, then that general information is the "what" that has been appropriated, and the royalty should be apportioned accordingly. *Id.* at 537 (citing *Vitro Corporation of America v. Hall Chemical Co.*, 292 F.2d 678, 683 (6th Cir. 1961). Although general ideas and fundamental concepts are broad in scope, their value and the role that they play in reducing a product to practice is very small and preliminary. *Cf. Richter*, 529 F.2d at 902 (observing that a general concept that is not solidified into a concrete application is of little use). The fact that a large sector of technological development may fall within the broad scope of a general concept does not mean that the information conveyed by describing the concept is valuable. This is especially true where huge volumes of detailed information separate the general concept from the concrete application.

Bianco's damages expert, Dr. Stephen Becker, conceded at trial in response to questioning by the district court that "some apportionment . . . would be appropriate if at least a portion of the Globus products were independently developed." A7208-10. Nonetheless, Becker admitted that he did not apportion Globus's revenues in arriving at his royalty base. A7184; A7186. As discussed below, his royalty rate did not reflect any rational apportionment either.

One way to arrive at a royalty that is properly apportioned to the value of the thing misappropriated is by recreating a hypothetical negotiation. *See University Computing*, 504 F.2d at 535; *Vermont Microsystems*, 88 F.3d at 151-52; *Mid-*

*Michigan*, 416 F.3d at 510-11. Here, a reliable starting point for the hypothetical negotiation is readily available because it essentially happened. When Bianco offered to submit his new product ideas for consideration, Gregg Harris explained that all idea submitters needed to sign a new idea submission form and submit notarized documents. A6522-23; A6534; A10345. Harris explained that if Bianco's idea was used, he would be compensated at the standard rate for a doctor submitting a new idea. A6702. After receiving this explanation, Bianco followed Harris's instructions, and submitted his materials accordingly. A10307-13; A10345. There is no evidence that Bianco would have insisted on a compensation amount *ten times higher* than the standard rate he was offered, even if the hypothetical negotiation took place two years after this preliminary offer and acceptance.

Becker rejected this hypothetical negotiation approach, opting instead to try to value Bianco's idea based on its relationship to the accused product. Importantly, Bianco does not dispute that his ideas did not accelerate or assist in Globus's research and development in any way, and that he provided nothing more than a basic product idea. A133. Both the district court and Bianco himself describe his contribution to the accused products as "sparkle" and not substance. A136; A6496-97. Becker estimated that the value of that sparkle was very large, simply because the idea is so broad and vague as to apply to all solutions to the

known problem that existing spacers did not expand like other spinal implants. There is no legal, factual, or logical basis to treat the *breadth* of an idea as denoting its monetary *value*. The subject matter relationship between an idea and a product does not necessarily reflect the contribution to the development of that product that the idea represents.

Contrary to the district court opinion, the form of the royalty awarded (a reasonable royalty rather than profit disgorgement) is not a substitute for properly apportioning a royalty to the value of the information misappropriated. *Compare* A148 *with* Restatement (Third) of Unfair Competition § 45 (comment f) (explaining that where a disgorgement would be unjust, and a reasonable royalty is appropriate, the royalty should be a measure of the approximate portion of the profits attributable to the use made of the trade secret). That profit disgorgement was an available remedy that the jury found inappropriate is not a license to inflate the royalty beyond an accurate measure of the minimal role of Bianco's idea in the development of the accused products.

There is no factual nexus between the scope of Bianco's basic product idea and the market value that Bianco's expert attributed to that idea. It is very difficult to make a spacer that expands continuously and is retractable and yet is stable and robust enough to function. A6768; A7070. The idea to try to accomplish this difficult task has minimal worth without any concrete or workable proposition of

37

*how* to do it. Plaintiff's methodology of adding up all the royalties of all the other

doctors that made concrete contributions is flawed, because it is completely

divorced from any attempt to value the *information* that Globus "actually obtained

from [Bianco]." *University Computing*, 504 F.2d at 539. Instead, it tries to value

the sum-total of the technology that falls within the scope of a broad concept. That

broad concept does not confer independent economic value commensurate with its

scope, because it comprises no concrete or usable information.

The district court rejected these challenges to Bianco's lack of

apportionment by noting that the entire products were the "smallest salable units"

that embodied the overall spacer idea, and that no further apportionment was

necessary under the law. A145-46. That interpretation of damages law misses the

point of apportionment as it has been applied in the trade secret context long before

the "smallest salable unit" rule was even articulated in the patent context. The

purpose of apportionment is to tie the royalty to the value of the information

appropriated, and the role that information played in the profits made from the

resulting products. It is not to construe the scope of the technology encompassed

by the idea, as though the idea were a patent claim.

As *Richter* observed, a concept is of little value without a concrete

application. Bianco does not dispute that the information he conveyed to Globus

did not assist or accelerate the development of the accused products. There can be

no value in his contribution to the accused products other than the nominal value of the initial motivation to solve a known problem. Bianco is not excused from the requirement of apportionment as a matter of law simply because his idea is broad enough to implicate the entire accused products. The district court's holding otherwise should be reversed and the damages award vacated and remanded.

### B. The Licenses Used in Calculating the Royalty Rate Were Not Comparable and Were Manipulated Through a Fundamentally Flawed Methodology.

Just as in patent cases, past licenses are the most persuasive evidence of reasonable royalties in trade secret cases. Where there are no comparable past licenses, courts proceed with great caution in awarding reasonable royalties. *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208-09 (3d Cir. 1999). There were both comparable and non-comparable licenses admitted in this case, and the district court erred in allowing Bianco's expert to present opinions based on non-comparable licenses, and in conflict with much more informative royalty agreements. *See ResQNet.com Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010) (instructing a district court on remand to appropriately weigh the most comparable licenses in the record); *LaserDynamics, Inc., v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (vacating a damages award and remanding for a retrial where the plaintiff's expert considered non-comparable licenses).

The record in this case contains undisputed evidence of that Globus's standard royalty rate for meaningful contributions to products is 0.5% of net sales. A136-37; A7194; A7877; A11191-311; A11312-77; A15143-224. That rate is also in line with the industry standard royalty rate for consulting relationships like the one between Bianco and Globus. A9248-49. The comparable licenses in the record included royalty agreements between Globus and various individual contributors (surgeons and biomedical engineers) who worked on the development of the accused products. These licenses generally conformed to the standard rate of 0.5% of net sales. A11191-311; A11312-77; A15143-224. These licenses, and the existence of a standard royalty rate, are the most informative and reliable pieces of evidence on which to base a reasonable royalty in this case.

Rather than use the standard royalty or the comparable licenses as a starting point for his royalty calculation, Bianco's damages expert, Becker, speculated that the general idea of an adjustable spacer was worth more than the standard royalty payment. He declared that Bianco's general idea was worth not only more than any other contributor to the accused products, but more than the sum-total of the combined royalties that Globus paid for each of the accused products.

Becker arrived at the starting point for his proposed royalty by adding up the royalty rates from all of the other royalty agreements pertaining to the accused products to reach 4%. The methodology of simply adding up every other royalty

40

rate for a particular device has no basis in fact or law. There is no evidence that this methodology is generally accepted by licensing experts, nor is it tied to the facts of this case. *See Kuhmo Tire Company, Ltd., v. Carmichael*, 119 S.Ct. 1167, 1175 (1999) (adopting admissibility standards for acceptable expert methodology). The number of contributors on a particular product (and thus the number of times one can add .5% to itself) has no bearing on the value of the general idea for the product or the amount of development needed to take a product from general concept to practice. This method of simply adding up all of the royalties that Globus paid to other contributors is arbitrary, unreliable, and designed to inflate the royalty rate otherwise supported by the evidence.

Becker then added to his flawed royalty starting point an additional 1%, purportedly to account for the commercial success of the products—something that no other royalty agreement in the record or in Globus's history of licensing had ever included. Becker pointed to no empirical evidence or data that justified this upward adjustment of the royalty rate. A7190-91. The resulting royalty rate of 5% was thus a ten-fold increase over the standard royalty for an individual contributor like Bianco; the royalty that Harris mentioned before Bianco submitted his idea.

Becker purported to corroborate this inflated royalty by comparing it with distinguishable licenses for other products. Specifically, Becker cited 5% and 6% royalties that Globus had paid to competing medical device companies for

41

completed products, in the process of acquiring those companies. These licenses did not pertain to contributions by individuals to Globus's development of new products, but rather involved the purchase of fully developed product lines and accompanying technical know-how for established products in the industry. A7176; A7194; A7875-78. Becker's flawed explanation for his use of these licenses was simply that he felt that the general premise for an undeveloped product was worth as much as a fully-developed product, rather than being an incremental contribution. A137.

It is conceptually backwards to treat broader and more general (and therefore less useful) trade secrets as more valuable than concrete, detailed, substantive (and therefore more useful) trade secrets. Bianco's methodology of repeatedly adding to the royalty rate ignores this Court's mandates of using accepted methodology and relying on the most comparable and reliable licenses available. Becker's faulty royalty rate calculation and his use of non-comparable licenses to fully-developed products should have been excluded from the jury's consideration.

The district court abused its discretion by allowing the jury to consider a damages model that made no attempt to apportion the royalty to the value of the thing misappropriated, manipulated comparable licenses in unprecedented ways, and used non-comparable licenses to justify a royalty that was ten times the standard rate. If the district court's judgment on liability for trade secret

Confidential Material Redacted

misappropriation is upheld, then the award of damages should be vacated and

remanded for remittitur or a new trial.

## III.    The District Court Abused its Discretion by Granting Bianco an Ongoing Royalty as a Form of Equitable Relief.

### A.    The District Court Should Have Denied Any Future Damages Because Bianco Failed to Present a Reliable Future Damages Model at Trial.

Even if this Court were to hold that Globus can be liable for trade secret

misappropriation of a general new product idea as a matter of Texas law, and even

if this Court were to find no error in allowing Becker to devise an unapportioned

royalty that was ten times higher than the standard rate, this Court would still have

to vacate the district court's award of future damages in the form of ongoing

royalties, on de novo review.

Unlike patent infringement, which is a continuing tort, trade secret

misappropriation is a one-time tort. *See* Tex. Civ. Prac. & Rem. Code § 16.010.

Although a one-time tort may result in continuing damages, the cause of action

(and therefore a court's power to address that cause of action) is not perpetuated by

continued use of a past-misappropriated trade secret or continued profits from a

past use. *See Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 452 (5th Cir.

2007); *Daboub v. Gibbons*, 42 F.3d 285, 291 & n.9 (5th Cir. 1995).

Bianco presented a future damages model through Dr. Becker's expert

report. ██████████████████████████████████

43

Confidential Material Redacted

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████ He lacked a reliable methodology on which to

conclude that his royalty period was reasonable for the products or to project

Globus's likely revenue for that period. *Id.* The district court found that Becker's

entire projection of future revenues was "simply too unreliable to be admissible at

trial" and excluded ████████████████████████████████

████████████████████████████████████████████

A22-23. Becker had proposed no alternative method of calculating future damages.

It was Bianco's burden to present a reliable model for future damages at

trial. *MGE UPS Sys. Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 369-70

(5th Cir. 2010); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir.

2010). Bianco's failure to do so ended his opportunity to recover future damages as

a matter of law.

Notwithstanding the exclusion of his future damages theory, Bianco

proposed a new methodology for calculating future damages in the middle of trial.

Bianco requested that the court sever the issue of future damages from the trial and

direct the parties to follow the procedure set forth in *Paice v. Toyota Motor Corp.*,

504 F.3d 1293 (Fed. Cir. 2007), to determine an ongoing royalty rate as an

equitable, rather than legal remedy. A7106-07. Up to that point, Bianco had relied

Confidential Material Redacted

solely on Becker's lump-sum calculation of future damages (███████

██████████) and had never suggested that the issue be severed. Globus

objected to Bianco's mid-stream shift in damages methodology, A7107-08, and

argued that ongoing royalties pursuant to *Paice* were not even available as a form

of relief. A151.

The district court legally erred in agreeing to sever the issue of future

damages from the jury trial. The district court thereby relieved Bianco of his

burden to prove future damages as a remedy at law and gave him a second bite at

the apple.

### B.    There Is No Authority Under Texas Law for Awarding Ongoing Royalties for a Misappropriation of Trade Secrets.

There is no authority for the district court's award of ongoing royalties as a

form of equitable relief. The district court's decision to hold a post-verdict hearing

to determine ongoing royalties was based on an erroneous application of patent law

principles to a non-analogous aspect of trade secret law. *See Paice LLC v. Toyota

Motor Corp.*, 504 F.3d 1293, 1314 n.13, 1315 (Fed. Cir. 2007) (holding that the

award of ongoing royalties as an equitable remedy is justified by ongoing

infringement). A patentee's right to exclude is violated anew each time an infringer

sells a product found to infringe, and a court has equitable authority to enjoin or

condition payment for each subsequent violation. *See id.* at 1314-15. A trade secret

holder's right is violated only once, by the acquisition of the trade secret in breach

of confidence or by improper means. *K & G Oil Tool & Service Co. v. G & G Fishing Tool Service*, 314 S.W.2d 782, 787 (Tex. 1958). Where the acquisition and use of the trade secret is an isolated past event, there is nothing to enjoin. This difference distinguishes from the trade secret context both the rationale and the equitable authority articulated in *Paice*.

Importantly, neither Bianco nor the district court cited any decision under Texas law in which a plaintiff was granted ongoing royalties for misappropriation of trade secrets, as an equitable remedy *or* a remedy at law. Instead, the district court relied on *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 778-79 (Tex. 1958), and *Bryan v. Kershaw*, 366 F.2d 497 (5th Cir. 1966), to hold more generally that that it had equitable authority to enjoin ongoing sales of accused products. A152-53. Those cases dealt with injunctions, not ongoing royalties, and the equitable authority for awarding injunctions articulated in those cases does not translate to the reasonable royalty context.  The district court's reliance on those cases was legal error.

*Hyde* and *Bryan* both dealt with the limited use of an injunction to offset the "head start" to the marketplace that the defendant enjoyed due to trade secret misappropriation prior to the trade secret being disclosed by the plaintiff in a patent application. *Hyde*, 314 S.W.2d at 777-778; *Bryan* 366 F.2d at 501. Both cases noted that the continuing behavior that could be enjoined was the use of the trade

secret, and that the court's equitable authority to enjoin the defendant's ability to benefit from knowing the trade secret ended at the point that the defendants would have legitimately developed the product on their own. *Id.* Under the specific facts of that case, which dealt with product development timing rather than sales volumes, a remedy at law was not available and the equitable remedy of a limited injunction was justified.

Bianco contends that Globus used his trade secret as inspiration to develop the accused products. The inspiration to take a course of action is a finite event. Once Globus decided to pursue its own adjustable spacer, its "use" of Bianco's trade secret ended.[2] There is no continuing use to enjoin, and Bianco did not provide any of the head start analysis on which the Texas Supreme Court and Fifth Circuit relied to justify the equitable relief of an injunction. There is absolutely no evidence of how long it would have taken Globus—a company whose research and development is entirely focused on spinal fusion surgery devices—to come up with the idea of improving upon known expandable spacers. *Hyde* and *Bryan* simply

---

[2] The Uniform Trade Secrets Act provides statutory authority for injunctive relief, § 2(a), and ongoing royalties, § 2(b), independently. That act is not controlling here, but it is noteworthy that reasonable royalty payments under the UTSA cannot extend beyond the time that it would have taken the defendant to have come up with the idea on its own. *See* U.T.S.A. § 2(b). Thus, the district court's award here of ongoing royalties for 15 years—a duration that is unrelated to the time it would have taken Globus to develop the product on its own—would be inappropriate even under the authority granted by the UTSA—an authority that courts do not inherently have under Texas common law.

47

provide no authority for fashioning any equitable relief untethered from a fact-based head start analysis, much less authority for perpetual royalty payments as the form of equitable relief.

The district court rejected Globus's argument because it did not want to limit Bianco to past damages that "depend arbitrarily on the date of the jury's verdict," A152, and because it would be "perverse" for the court to deny an injunction on the basis that monetary damages were adequate to compensate Bianco, and then not give Bianco a corresponding monetary award. A153. Both of these reasons are at odds with Texas law and the procedural history of this case. Future damages *were* available to Bianco as a remedy at law, but his future damages evidence was "simply too unreliable to be admissible at trial." A22-23. Bianco's failure to prove future damages at trial does not justify an award of ongoing royalties as a form of post-trial equitable relief, especially where no such award has ever been sanctioned by a Texas court.

## CONCLUSION

For the foregoing reasons, the Court should <u>reverse</u> the judgment and enter judgment of no liability as a matter of law in favor of Globus. In the alternative, this court should <u>vacate</u> the award of damages and <u>remand</u> the case with instructions to conduct a new trial on damages excluding from consideration Bianco's unreliable royalty calculation, and to confine any future damages to that which can be proven as a remedy at law.

Respectfully submitted,

/s/ Thomas W. Sankey
Thomas W. Sankey
Duane Morris LLP
1330 Post Oak Boulevard, Suite 800
Houston, Texas 77056
twsankey@duanemorris.com

Robert M. Palumbos
Duane Morris LLP
30 S. 17th Street
Philadelphia, PA 19104
rmpalumbos@duanemorris.com

Kristina Caggiano Kelly
Duane Morris LLP
505 9th St. NW, Ste. 1000
Washington, D.C. 20004
kcaggiano@duanemorris.com

*Counsel for Appellant*
*Globus Medical, Inc.*

February 9, 2015

DM1\5368287.1

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 11,138 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14 pt. Times New Roman, a proportionally spaced typeface, using Microsoft Office Word 2010.

/s/ Thomas W. Sankey
Thomas W. Sankey
Duane Morris LLP
1330 Post Oak Boulevard, Suite 800
Houston, Texas 77056
(713) 402-3900
twsankey@duanemorris.com

February 9, 2015

# CERTIFICATE OF SERVICE

I certify that I filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system on February 9, 2015, and thereby served a copy by email to all registered participants.

/s/ Thomas W. Sankey
Thomas W. Sankey
Duane Morris LLP
1330 Post Oak Boulevard, Suite 800
Houston, Texas 77056
(713) 402-3900
twsankey@duanemorris.com

ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

SABATINO BIANCO, M.D., §
§
    Plaintiff, §
§
    v. §     Case No. 2:12-CV-00147-WCB
§
GLOBUS MEDICAL, INC., §
§
    Defendant. §

## FINAL JUDGMENT

This action was tried to a jury, with the undersigned presiding, and the jury returned a verdict on the legal claims submitted to it. The Court conducted a bench trial during the same period and with some additional evidence submitted on certain equitable claims and made findings of fact and conclusions of law with respect to those equitable claims.

In consideration thereof, it is ORDERED, ADJUDGED, and DECREED that:

1. The defendant is found to have misappropriated the plaintiff's trade secrets (First Amended Complaint ("FAC") Count I). The plaintiff is awarded $4,295,760 in damages for the misappropriation, the amount found by the jury in its verdict.

2. In accordance with the jury's verdict and the Court's legal rulings during trial, the defendant is found not to be liable for breach of contract (FAC Count II), unfair competition (FAC Count IV), fraud (FAC Count V), misappropriation of confidential information (FAC Count VII), disgorgement of profits (FAC Count VIII), and exemplary damages (FAC Count IX).

1

3.  In accordance with the Court's findings of fact and conclusions of law, the plaintiff is found not to be entitled to correction of inventorship (FAC Count III), and the defendant is found not to be liable for unjust enrichment (FAC Count VI).

4.  In accordance with the Court's findings of fact and conclusions of law, the plaintiff's request for a permanent injunction against the defendant (FAC Count X) is denied.

5.  In accordance with the Court's prior rulings, the defendant's two counterclaims for attorney fees are denied.

6.  Pursuant to the equitable proceeding held before the Court to determine an ongoing royalty in lieu of an injunction, the plaintiff is awarded an ongoing royalty of 5% of the net sales of the defendant's Caliber, Caliber-L, and Rise products, or products that are not colorably different from those products.  The covered sales will be those made starting on January 18, 2014, and the royalty period will extend for a period of 15 years from July 1, 2007, i.e., until June 30, 2022.  "Net sales" will be defined to  mean "total sales price invoiced and received for Caliber, Caliber-L, and Rise products sold, after deducting (a) cost of goods sold and sales commissions, (b) federal, state, local and foreign sales, excise or other taxes or tariffs, (c) freight, transportation, shipping, and insurance charges, (d) allowances, rebates, credits and refunds, (e) charge back payments and rebates (or the equivalent thereof) (f) trade and quantity discounts, retroactive price reductions, or other allowances, (g) license fees, royalties, or other similar payments to third parties in connection with the sale of Caliber, Caliber-L, or Rise products, and (h) any import or export duties, tariffs, or similar charges."  Any ongoing royalty payments will be made on a quarterly basis with a right to periodic accounting of the royalty-bearing sales.

It is further ORDERED, ADJUDGED, and DECREED that the defendant is liable to the plaintiff for prejudgment interest for the period from January 18, 2014, to July 17, 2014, at the rate of 5% simple interest, the current rate set by the Texas Consumer Credit Commissioner, on the verdict amount of $4,295,760. Under Texas law, if the case is not one in which prejudgment interest is mandated by statute, the decision whether to impose prejudgment interest turns on common-law equitable principles. See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 528 (Tex. 1998). In cases such as this one, involving only economic injury flowing from a business tort, prejudgment interest is not mandated by the Texas statute, which requires prejudgment interest in wrongful death, personal injury, and property damage cases. See Tex. Fin. Code § 304.102, Johnson & Higgins, 962 S.W.2d at 530 ("[P]urely economic losses stemming from . . . breach of contract . . . do not fall within the scope of 'property damage cases,' which only include claims for damage to tangible property, not economic loss or loss of economic opportunity.").[1] Under common-law equitable principles that govern cases such as this one, the court may exercise discretion in deciding whether to award

_____

[1]    Dr. Bianco cites Retractable Technologies, Inc. v. Occupational & Medical Innovations, Ltd., 2010 WL 3199624, at *4 (E.D. Tex. Aug. 11, 2010), which interpreted the "property damage" category of the Texas statute to include trade secret cases. However, Texas cases, including the decision of the Texas Supreme Court in Johnson & Higgins, interpret business tort cases involving only economic injury as falling outside the scope of that statute. See, e.g., Johnson & Higgins, 962 S.W.2d at 530 (breach of contract); Total E & P USA, Inc. v. Mo-Vac Serv. Co., 2012 WL 3612505, at *8 (Tex. App. Aug. 23, 2012) (breach of confidentiality); Formosa Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436, 465 (Tex. App. 2006) (fraud); Welder v. Green, 985 S.W.2d 170, 179-80 (Tex. App. 1998) (breach of fiduciary duty); see also Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278 F.3d 494, 499-500 (5th Cir. 2002) (breach of contract); Giddy Up, LLC v. Prism Graphics, Inc., 2007 WL 3125312, at *1 (N.D. Tex. Oct. 24, 2007) (breach of contract, fraud, deceptive trade practices); Based on that consistent line of authority, the Court declines to follow the decision in Retractable Technologies.

prejudgment interest. Citizens Nat'l Bank and Lender Asset Recovery, Inc. v. Allen Rae Investments, Inc., 142 S.W.3d 459, 487 (Tex. App. 2004).

The jury returned an award of damages which, according to the Court's instructions, was what the jury found to be "the amount Dr. Bianco has lost." The verdict thus constituted full compensation for the injury to Dr. Bianco up to the time of trial. Under these circumstances, the Court considers that it would be an inequitable form of double counting to impose an award of prejudgment interest for the period between the filing of the lawsuit and the date of the judgment, as Dr. Bianco requests. See Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 939 F.2d 1176, 1198 (5th Cir. 1991).

Even if the jury's verdict is viewed as not including the time-value of accruing royalty payments, Dr. Bianco's method of calculating prejudgment interest would still overcompensate him for sales made during the time the case was pending. That is because Dr. Bianco's method would impose prejudgment interest on the entire verdict amount from the date the action was filed even though many of the sales of the relevant product occurred after that date. Therefore, the Court exercises its discretion, based on the governing standards applied under Texas law, to deny prejudgment interest for the period between the filing of suit and the jury's verdict. However, because the plaintiff is not entitled to recover postjudgment interest under 28 U.S.C. § 1961 for the period between the verdict and the judgment, see Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990), the Court deems it equitable to award prejudgment interest for that period. Accordingly, the Court awards Dr. Bianco prejudgment interest in the amount of $105,922.80.

It is further ORDERED, ADJUDGED, and DECREED that the plaintiff was the prevailing party in this action and that costs are therefore taxed against the defendant. See Shum v. Intel Corp., 629 F.3d 1360, 1367-70 (Fed. Cir. 2010). However, because the plaintiff was unsuccessful on all but one of his legal claims and all three of his equitable claims, and because the plaintiff's recovery that was awarded by the jury was significantly less than the amount the plaintiff sought in the form of a disgorgement award, the award of costs will be reduced by half from the taxable amount of $51,217.74. See Shum, 629 F.3d at 1370 ("It was not unreasonable for the district court to consider which claims the parties respectively won, or to reduce the prevailing party's costs award to reflect the extent of its victory (i.e., the claims it lost)."). Accordingly, the plaintiff will be awarded one-half of his taxable costs, in the amount of $25,608.87.

If either party chooses to seek postjudgment relief under Rule 50 or Rule 59 of the Federal Rules of Civil Procedure, all such requests shall be filed in the form of a single motion per party not more than 25 pages in length. The motion shall be filed no later than 28 days after the date of the entry of this judgment. The Court will strictly enforce those page and time limitations.

IT IS SO ORDERED.

SIGNED this 17th day of July, 2014.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER
ON EQUITABLE CLAIMS**

This case was tried to a jury between January 13, 2014, and January 17, 2014. At the conclusion of the trial, the jury returned a verdict finding the defendant Globus Medical, Inc., ("Globus") liable for misappropriation of trade secrets, but not liable for breach of contract. The jury awarded the plaintiff, Dr. Sabatino Bianco, $4,295,760 in damages for past trade secret misappropriation. The jury based its damages award on Globus's sales of three products that are used as "intervertebral spacers" or "intervertebral implants" in spinal surgery. The Globus products, known as Caliber, Caliber-L, and Rise, are designed to be inserted between spinal vertebrae in place of damaged spinal disc material. The spacer is first placed between the vertebrae in collapsed form. A surgeon then uses a tool to expand the spacer until it is at the proper height to maintain the correct distance between the vertebrae. The spacer is left permanently in the patient's body, where it takes the place of the damaged disc and ideally promotes fusion of the two adjacent vertebrae.

1

Dr. Bianco's trade secret misappropriation claim was based on his assertion that Globus's Caliber, Caliber-L, and Rise products were based on an idea he gave Globus in June 2007 in the form of a set of drawings. In addition to seeking damages on trade secret misappropriation and several other legal theories, Dr. Bianco claimed that he was entitled under 35 U.S.C. § 256 to be named as an inventor on three of Globus's patents, U.S. Patent Nos. 8,062,375 ("the '375 patent"), 8,518,120 ("the '120 patent"), and 8,491,659 ("the '659 patent").[1] The correction of inventorship issue was left for resolution by the Court. See Shum v. Intel Corp., 499 F.3d 1272, 1279 (Fed. Cir. 2007) (inventorship is an equitable issue triable to the court). This order addresses Dr. Bianco's claim seeking correction of inventorship and his equitable claim of unjust enrichment.

In addressing the correction of inventorship issue, the Court has considered all the evidence that was presented at the portion of the trial that was tried to the jury. In addition, the Court allowed the parties to submit additional materials for the Court to consider in making its findings of fact and conclusions of law on the inventorship question. The parties have now filed those additional materials, which has given rise to objections from each party as to the admissibility of certain portions of the evidence submitted by the other. After having received further briefing on the evidentiary objections, the Court now is prepared to rule on those

---

[1] Dr. Bianco asserts that he is an inventor of at least claims 1-20 of the '375 patent, claims 1, 10, and 17 of the '120 patent, and claims 1 and 4 of the '659 patent. However, if a person qualifies as an inventor or co-inventor on at least one claim of a patent, that person is entitled to be named as an inventor on the entire patent. 35 U.S.C. § 116(a); Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n, 383 F.3d 1352, 1381 (Fed. Cir. 2004) ("co-inventors need not contribute to the subject matter of every claim of the patent"); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 859 F.2d 878, 888 (Fed. Cir. 1988).

2

objections and to enter findings of fact and conclusions of law on Dr. Bianco's claim for correction of inventorship.

### I. Evidentiary Objections on Inventorship

As its evidentiary submission on the inventorship issue, Globus filed a declaration of its expert, Dr. Boyle C. Cheng, along with various supporting exhibits. For his part, Dr. Bianco filed a declaration of his expert, Dr. Carl McMillin, along with various supporting exhibits.

### A. Dr. Bianco's Objections

Dr. Bianco objects to Dr. Cheng's declaration on several grounds. First, Dr. Bianco objects to the admission of Dr. Cheng's pretrial reports as hearsay (Dr. Bianco objection 1). As the Court previously advised the parties in this case, expert reports, such as those prepared by Dr. Cheng and Dr. McMillan prior to trial, are hearsay and, absent agreement to their admission, are inadmissible. See Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 729 (6th Cir. 1994); Mahnke v. Wash. Metro. Area Transit Auth., 821 F. Supp. 2d 125, 154 (D.D.C. 2011); Skyline Potato Co. v. Hi-Land Potato Co., 2013 WL 311846, at *15 (D.N.M. Jan. 18, 2013). Such reports are out-of-court statements by witnesses offered for their truth, and therefore fall within the definition of hearsay in Federal Rule of Evidence 801(c). Although expert witnesses are permitted to rely on hearsay to form their opinions, "their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced." Presly v. Commercial Moving & Rigging, Inc., 25 A.3d 873, 893 (D.C. 2011). In this case, however, Dr. Cheng has incorporated his pretrial reports by reference as part of his declaration. Therefore, for purposes of the inventorship dispute, the Court will treat Dr. Cheng's expert reports as part of his declaration,

which overcomes the hearsay problem stemming from the fact that the reports are witness statements made out of court.

Second, Dr. Bianco objects to Dr. Cheng's analysis in paragraphs 39-56 of his declaration and, in particular, to Dr. Cheng's opinions that various limitations of the '375 patent are not found in Dr. Bianco's June 2007 drawings, and to Dr. Cheng's ultimate conclusion that the drawings do not support Dr. Bianco's claim that he should be a named inventor on the '375 patent (Dr. Bianco objection 2).  Dr. Bianco contends that Dr. Cheng failed to include that analysis and the accompanying opinions and conclusion in his pretrial expert reports and that the portions of his declaration that go beyond the scope of his pretrial reports should be excluded. Although Dr. Cheng's declaration contains a more detailed explanation of his reasons for asserting that Dr. Bianco's drawings do not evince inventorship of the '375 patent, the Court will not exclude paragraphs 39-56 of Dr. Cheng's declaration, because that material consists almost entirely of quotations from and descriptions of the '375 patent.  There is little, if anything, in that portion of the declaration that is not readily apparent from simply examining the patent and comparing the patent with Dr. Bianco's drawings.  As for Dr. Cheng's opinion that Dr. Bianco's 2007 drawings do not establish that Dr. Bianco should be named as an inventor of the '375 patent, that opinion is contained in Dr. Cheng's September 23, 2013, pretrial report and therefore will not be excluded now.

Third, Dr. Bianco objects that Dr. Cheng's declaration contains a legal opinion that Dr. Bianco is not an inventor of the '375, '120, and '659 patents (Dr. Bianco objection 3).  He argues that legal conclusions and opinions are not a proper subject of expert testimony.  See Owen v. Kerr-McGee Corp., 698 F.2d 236, 240 (5th Cir. 1983).  Although Federal Rule of Evidence 704

4

A37

provides that an expert's opinion "is not objectionable just because it embraces an ultimate issue," the Fifth Circuit has distinguished between ultimate issues to be decided by the trier of fact, to which an expert may testify, and questions of law, to which an expert may not testify. United States v. Izydore, 167 F.3d 213, 218 (5th Cir. 1999); United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977) ("Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact.  By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law."); Raytheon Co. v. Indigo Sys. Corp., 598 F. Supp. 2d 817, 821 (E.D. Tex. 2009).

Although the distinction between opinions on ultimate issues to be decided by the trier of fact and opinions on issues of law can sometimes be a subtle one, it is not necessary for the Court in this case to tease apart the permissible and impermissible opinions offered by Dr. Cheng (and, for that matter, by Dr. Bianco's expert witness, Dr. McMillin) because the inventorship issue is being tried to the Court, not to a jury.  The Court is free to ignore any legal opinions by the expert witnesses that do not accord with the Court's understanding of the legal principles that govern the issue of correction of inventorship under 35 U.S.C. § 256.  Therefore, the Court will not strike any portion of Dr. Cheng's declaration (or Dr. McMillin's) on this ground, but will simply disregard legal conclusions by those witnesses in ruling on the inventorship claims.

Fourth, Dr. Bianco objects that Dr. Cheng mischaracterized Dr. McMillin's testimony in three respects (Dr. Bianco objections 5, 6, and 7).  In particular, Dr. Bianco denies that Dr. McMillin testified (1) that Dr. Bianco did not invent an implant that is "mechanically elevated with sliding ramps"; (2) that Dr. Bianco "simply presented Globus with a problem that Globus

5

A28

then solved by developing a new sliding ramp-based mechanism of expansion"; and (3) that the device in Dr. Bianco's 2007 drawings would not work.   Disagreement with Dr. Cheng's characterization of Dr. McMillin's testimony, however, is not a ground for excluding Dr. Cheng's statements.   To the extent that it matters, the Court can decide for itself whether Dr. Cheng's interpretation of Dr. McMillin's testimony is accurate.

Finally, Dr. Bianco objects to Dr. Cheng's statement that he saw no evidence that Dr. Bianco "collaborated with or was in any manner working with the named inventors" (Dr. Bianco objection 10).   According to Dr. Bianco, that conclusion is inconsistent with the evidence that Dr. Bianco "collaborated with Globus's named inventors through their use of his Invention Disclosure to develop" the Globus instruments.   Once again, the disagreement between the parties as to the interpretation of the evidence may be a ground for choosing one version of the facts over another, but it is no basis for altogether excluding the evidence offered by Globus on this issue.[2]

## B. Globus's Objections

Globus objects to Dr. McMillin's declaration on a number of grounds.   First, Globus objects that Dr. McMillin's analysis of the three patents in his declaration was not found in his pretrial reports and therefore cannot be introduced as evidence at this juncture (Globus objections 1-3).   Like Dr. Cheng's declaration, Dr. McMillin's declaration expands considerably upon his expert reports in characterizing the respective contributions of Dr. Bianco and the named inventors to the disputed patents.   However, the statements in his declaration are based in part on trial testimony from Globus's witnesses, and the core elements of his analysis are found

---

[2]   Dr. Bianco has withdrawn his objections 4, 8, 9, and 11 in order to narrow the dispute between the parties as to the admissibility of the respective declarations.

in his pretrial expert reports.  Because Dr. McMillin's discussion of the inventorship issue with respect to the three patents in dispute consists largely of a summary of the evidence from Dr. Bianco's point of view, there is no reason to exclude the portions of his declaration that are directed to those patents.

Second, Globus argues that the portion of Dr. McMillin's declaration stating that Dr. Bianco's conception date is "no later than May 2007" should be struck as ungrounded in the evidence (Globus objection 4).  At his deposition, Dr. Bianco testified that he came up with the idea for his invention no later than May 2007.  While Dr. Bianco has not pointed to any trial testimony setting May 2007 as the conception date for his invention, the evidence showed that he produced the final copy of his drawings to Globus on or about June 28, 2007, and that he had notified Globus of his desire to pass along his ideas at some time before that date.  The question whether his conception occurred in May rather than June of 2007 is immaterial to the disposition of the inventorship issue, so the Court need not rely on the challenged portion of Dr. McMillin's declaration with respect to the issue of conception.

Third, Globus objects to Dr. McMillin's statement that "Globus recognized that Dr. Bianco significantly contributed to the claimed inventions of the Globus patents" (Globus objection 5).  That statement appears to be a new opinion from Dr. McMillin, not reflected in his pretrial reports.  Dr. Bianco's response to Globus's objection is that Dr. McMillin testified at trial that Dr. Bianco referred to his drawing as an "adjustable interbody spacer," and Globus referred to the Caliber product in its engineering drawings as an "adjustable interbody spacer" or an "expandable spacer."   That testimony falls far short of being equivalent to Dr. McMillin's broad statement in his declaration that Globus "recognized that Dr. Bianco significantly contributed to

7

the claimed inventions of the Globus patents." In his report, Dr. McMillin relies on evidence that Globus representative Gregg Harris promised to compensate Dr. Bianco if Globus decided to commercialize his idea and that, after the launch of Caliber, Mr. Harris admitted that Dr. Bianco had "intellectual property in this" and that Globus would "make this right." That evidence does not establish that "Globus recognized that [Dr.] Bianco significantly contributed to the claimed inventions of the Globus patents," since Mr. Harris made no reference to patent rights or any contribution by Dr. Bianco to the Globus patents. The Court will therefore disregard Dr. McMillin's opinion on that point. However, the factual assertions in paragraph 20 of Dr. McMillin's declaration, which consist of references to the evidence, are not objectionable and will be considered.

Fourth, Globus objects to Dr. McMillin's statement that the Globus patents incorporate concepts developed based on Dr. Bianco's invention disclosure, and that Dr. Bianco contributed to the conception of the claimed subject matter, on the ground that those statements represent new opinions (Globus objections 6 and 7). Dr. McMillin's statement, however, simply parallels his trial testimony that in his opinion the Caliber and Rise products would not have been developed without Dr. Bianco's disclosure. Because that testimony was admitted without objection, there is no reason to prohibit Dr. Bianco from relying on it now.

Finally, Globus argues that the Court should strike Dr. McMillin's statements that some of the named inventors and the Globus design team doctors did not contribute significantly to the conception of the inventions in the patents at issue (Globus objections 8, 9, 10, and 12). The Court will not strike all of those portions of Dr. McMillin's declaration. In his reports, Dr. McMillin stated that Mr. Suh did not contribute any unique ideas to the Caliber project and that

8

the only person who could have contributed to Mr. Weiman's use of ramps was Mr. Glerum. The evidence cited by Dr. McMillin in his declaration, moreover, was mainly evidence introduced at trial, which the Court is familiar with and is able to weigh on its own. The Court will, however, disregard Dr. McMillin's opinion that Mr. Glerum did not undertake "extensive experimentation" in connection with the Caliber project, as that opinion was not contained in his pretrial reports.[3]

## II. Findings of Fact and Conclusions of Law on Inventorship

The Court now turns to the merits of the dispute over correction of inventorship. In so doing, the Court was required by Seventh Amendment principles to try the legal issues to the jury first. See Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962); Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959); Shum v. Intel Corp., 499 F.3d 1272, 1279 (Fed. Cir. 2007). The findings of the jury, as expressed in its verdict, are to be given binding effect to the extent that they apply to the equitable issues subsequently decided by the Court. See Ward v. Tex. Emp't Comm'n, 823 F.2d 907, 908-09 (5th Cir. 1987); Fogg v. Ashcroft, 254 F.3d 103, 110 (D.C. Cir. 2001); Miller v. Fairchild Indus., Inc., 885 F.2d 498, 507 (9th Cir. 1989); Bouchet v. Nat'l Urban League, Inc., 730 F.2d 799, 803 (D.C. Cir. 1984) (Scalia, J.).

### A. Findings of Fact

1. The jury found that Globus misappropriated Dr. Bianco's trade secret, which was represented by the drawings Dr. Bianco gave to Globus in June 2007. Those drawings depict what Dr. Bianco characterizes as an expandable and retractable interbody spacer using a so-

_____

[3] Dr. Bianco has withdrawn the portion of Dr. McMillin's declaration relating to Globus employee Andy Lee's contribution to the disputed patents. Accordingly, Globus's objections 11 and 13 are moot.

called "scissor-jack" means for expansion, i.e, an expansion means similar to that used in an automobile jack, in which two elements, which are attached to upper and lower plates and are attached to one another by a pivot, swivel about the pivot to increase or decrease the distance between the upper and lower plates.

2. Based on its damages award, it is clear the jury found that the device and features depicted in Dr. Bianco's drawings constituted a trade secret and that Globus exploited that trade secret in some manner in connection with the process leading to the design and creation of the Caliber, Caliber-L, and Rise products. The Court takes those findings as the starting point for its analysis of the inventorship issue.

3. Globus's Caliber, Caliber-L, and Rise products are not identical to the inventions claimed in the '375, '120, and '659 patents, but there are substantial similarities between the products and the inventions recited in those patents. Thus, the jury's finding that Globus misappropriated Dr. Bianco's trade secret for purposes of the creation of its three commercial products supports Dr. Bianco's contention that Globus made use of that trade secret in some manner in the process that ultimately led to the issuance of the three patents in dispute.

4. Dr. Bianco contends that he is a co-inventor of all the claims of the '375 patent. The Court finds, however, that while those claims address the same general subject matter as Dr. Bianco's drawings, there are significant differences between the inventions claimed in the '375 patent and the disclosure in the June 2007 drawings. The principal difference is in the mechanism that is used to expand and contract the spacer, or implant. Dr. Bianco's drawings depict a scissor-jack mechanism, while the claims of the '375 patent recite a ramp-type structure to expand and contract the implant. The two are quite different. The scissor-jack mechanism,

10

which was used in certain previously available devices, such as a Medtronic tool that was the focus of much attention at trial, causes the device to expand and contract by rotating the two "scissor" members from a horizontal position, where the device is fully contracted, to a more vertical position, where the device is fully expanded.  In the ramp structure, in its simplest form, one inclined plane or wedge is attached to the bottom of the device and faces upward; a second inclined plane or wedge, which is inverted, is attached to the top of the device and faces downward.  When the two inclined planes engage one another, the top and bottom of the device are forced apart.  When the ramps are not engaged, the device is in its contracted state, and when they are fully engaged, it is in its maximum expanded state.

The claims of the '375 patent make clear that the devices described and recited in the patent are quite different from the device depicted in Dr. Bianco's drawings.  Claim 1 of the '375 patent recites that movement of a "translation member," which is received within the body portion of the implant, causes the device to expand and contract.  There is no such "translation member" depicted in Dr. Bianco's drawings.

The claims of the '375 that depend on claim 1 add other features, none of which is found in Dr. Bianco's drawings.  Thus, claim 2 recites that the movement of the translation member back and forth within the device causes the device to expand and contract by moving pins along slots cut into the device.  Claim 3 recites in detail the structure and operation of the ramped surfaces that cause the expansion and contraction, and claim 4 recites a threaded actuation member connected to the translation member that is received in a threaded opening in the body portion of the device.   The remaining dependent claims (5-17) add further details regarding the operation of the device, none of which are depicted in Dr. Bianco's drawings.

11

A34

Independent claim 18 recites the method of installing the implant. The method entails rotating the actuation member to cause the translation member to move, which in turn forces the ramped surfaces of the translation member against the ramped surfaces of the upper and lower endplates of the device, resulting in the vertical expansion of the implant. Independent claim 20 recites an implant comprising a translation member featuring ramped portions, a threaded actuation member connected to the translation member and received within the body portion of the device, and a plurality of pins and slots that control the expansion and contraction of the device. None of those features are found in Dr. Bianco's drawings.

5. The claims of the '120 patent as to which Dr. Bianco asserts inventorship are similar to those of the '375 patent, in that they require a translation member with angled surfaces that engage the endplates, i.e., a ramp-based system that causes the expansion and contraction of the device. As is the case with the '375 patent, those features are not found in Dr. Bianco's drawings.

6. Dr. Bianco also claims that he is entitled to the status of co-inventor with respect to claims 1 and 4 the '659 patent, which recite methods of installing an intervertebral implant. But again, those claims recite structure that is quite different from the devices depicted in his drawings. They recite placing an implant down an endoscopic tube and rotating the actuation member to expand the device by using a complex set of ramp structures that interact to push the endplates of the device outward. Claim 4 of that patent recites a similarly complex set of ramp structures that interact to expand and contract the device. None of that complex structure is depicted in Dr. Bianco's drawings.

12

A35

7.  It is clear from the evidence that Dr. Bianco did not "collaborate" with the named inventors of the three patents in the conventional sense of that term.  Dr. Bianco had no direct contact with any of the named inventors during the process leading to the filing of the three patent applications, and he had no role in the development of the inventions after turning over his drawings to Globus.  His role in the development of those patents came only indirectly, by having his drawings reviewed by certain Globus employees who conveyed some of the concepts depicted in the drawings to the persons responsible for the projects that gave rise to the three patents.

8.  In the months following Dr. Bianco's disclosure of his drawings to Globus, a number of persons at Globus saw the drawings.  Bill Rhoda, Globus's vice president of product development, and Andy Lee, Globus's group manager of technology fabrication, met in early August 2007 to discuss plans to make a prototype custom instrument, or "trial," based on Dr. Bianco's drawings.  At that meeting, Andy Lee suggested that they substitute a ramp-type structure for the scissor-jack mechanism shown in Dr. Bianco's drawings as the means for expansion and contraction of the device.  They directed the Globus machine shop to make a prototype of the instrument based on their design.  The prototype was made, but it was never shown to Dr. Bianco.

9.  Globus had previously developed an expandable corpectomy device known as X-Pand, which was commercialized as early as 2005.  X-Pand was designed to replace two discs and the vertebral body between them.  Prior to 2007, however, Globus had never developed an expandable interbody spacer as a commercial product.

13

A36

10. In October 2007, Globus began work on an expandable interbody spacer or implant that was intended to be inserted between adjacent vertebra in place of a single disc. Bill Rhoda asked Globus employee Ed Dwyer to work on concepts for expanding an intervertebral implant. Mr. Dwyer prepared a set of drawings that illustrated several different ways that an implant could be made expandable, including the use of ramps.

11. In early 2009, Globus assigned engineers to work on projects that culminated in the development of Globus's Caliber, Caliber-L, and Rise products. Globus employee Chad Glerum was the lead project engineer on the Caliber project. He began working on that project in early 2009 and continued to work on it for about 18 months. His work on that project led to the application for the '375 patent on which Mr. Glerum was a named co-inventor. Mr. Glerum was also a named inventor on the '120 patent. Mr. Glerum testified that he had no direct input from Dr. Bianco with respect to his work on the Caliber project. At the time Mr. Glerum began working on the Caliber project, however, he was given a prototype of an interbody spacer, and he saw a sketch or had a discussion with Bill Rhoda in which Mr. Rhoda suggested the use of the ramp concept. Mr. Glerum also received drawings made by Ed Dwyer when Mr. Dwyer was working on the expandable spacer project beginning in October 2007.

Having been directed by his supervisors to come up with a design for an "expandable spacer," Mr. Glerum considered a "scissor-jack" mechanism to operate the expansion mechanism of the spacer. Ultimately, however, he settled on using sets of ramps sliding against one another to raise and lower the profile of the spacer. The spacer could be expanded or contracted by using a rotating component, driven by a tool, that would force the ramps together (causing the spacer to expand) or apart (causing the spacer to contract).

14

12. Globus employee Mark Weiman was the lead project engineer on the Rise project and a named inventor on the '120 and '659 patents. He began working on that project in early 2009. The Rise project was intended to develop an endoscopic expandable intervertebral spacer, i.e., a spacer that could be delivered to the proper location in the spine through an endoscopic tube. Weiman testified at trial that he had originally tried to use a "scissor-jack" design, but ultimately used a type of ramp design in which the ramps overlapped in a manner that allowed the spacer to expand from a minimum of 6.8 millimeters in height to a maximum of 14 millimeters. As in the case of Mr. Glerum, there was no evidence that Mr. Weiman saw Dr. Bianco's drawings. However, Mr. Weiman was aware of work done by Mr. Glerum on the Caliber project.

## B. Conclusions of Law

Section 256 of the Patent Act has been interpreted to create a cause of action for interested parties seeking to correct the misjoinder or nonjoinder of an inventor in an issued patent. Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004); Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1471 (Fed. Cir. 1997). The burden of showing misjoinder or nonjoinder of inventors is a heavy one; the error must be proved by clear and convincing evidence. Vanderbilt Univ. v. ICOS Corp., 601 F.3d 1297, 1305 (Fed. Cir. 2010); Univ. of Pittsburgh v. Hedrick, 573 F.3d 1290, 1297 (Fed. Cir. 2009); Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997).

In order to be entitled to be named as a co-inventor on a patent, a person must "contribute[] to the conception of the claimed invention." Eli Lilly, 376 F.3d at 1359. Conception, which is "the touchstone of inventorship," Burroughs Wellcome Co. v. Barr Labs.,

15

Inc., 40 F.3d 1223, 1227 (Fed. Cir. 1994), is "the formation in the mind of the inventor, of a

definite and permanent idea of the complete and operative invention," Hybritech Inc. v.

Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed. Cir. 1986).  "Conception is complete

only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be

necessary to reduce the invention to practice."  Burroughs, 40 F.3d at 1228.  "Conception

requires both the idea of the invention's structure and possession of an operative method of

making it."  Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 1206 (Fed. Cir. 1991).

Joint inventorship requires "some element of joint behavior, such as collaboration or

working under common direction, one inventor seeing a relevant report and building upon it or

hearing another's suggestion at a meeting."  Kimberly-Clark Corp. v. Procter & Gamble

Distributing Co., 973 F.2d 911, 917 (Fed. Cir. 1992).  Although each of several joint inventors

"need not 'make the same type or amount of contribution' to the invention," Ethicon, Inc. v. U.S.

Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) (quoting 35 U.S.C. § 116), that

contribution must be "not insignificant in quality, when . . . measured against the dimension of

the full invention," Fina Oil, 123 F.3d at 1473.  "Contributions to realizing an invention may not

amount to a contribution to conception if they merely explain what was 'then state of the art,' if

they are too far removed from the real-world realization of an invention, or if they are focused

solely on such realization."  Eli Lilly, 376 F.3d at 1359 (citations omitted).

A person does not become entitled to be named as a joint inventor on a patent merely by

suggesting a desired goal or result without conceiving of the means by which that goal can be

attained.  See Garrett Corp. v. United States, 422 F.2d 874, 881 (Ct. Cl. 1970) ("One who merely

suggests an idea of a result to be accomplished, rather than the means of accomplishing it, is not

16

a joint inventor."). A request to another to create a product that will fulfill a certain function is not conception. See Ethicon, Inc. v. U.S. Surgical Corp., 937 F. Supp. 1015, 1035 (D. Conn.), aff'd, 135 F.3d 1456 (Fed. Cir. 1998). Likewise, it is not sufficient "to show that a party claiming an invention has conceived a result to be obtained; the patentable thing is the means provided and disclosed by him to accomplish that result." Land v. Dreyer, 155 F.2d 383, 387 (C.C.P.A. 1946). "The suggestion or conception of an idea or appreciation of a result to be accomplished, rather than the means of accomplishing it, particularly when the means constitute an essential part of the invention, does not constitute joint or sole inventorship." Huck Mfg. Co. v. Textron, Inc., 1975 WL 21108, at *26 (E.D. Mich. May 2, 1975).

Several of the Federal Circuit's recent joint inventorship cases illustrate the difficulty of proving that an individual should be added as a co-inventor after the issuance of a patent. In Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352 (Fed. Cir. 2004), for example, the Federal Circuit reversed a jury verdict that one of Lilly's doctors was a co-inventor of Aradigm's patent. The court found that there was no clear and convincing evidence that Lilly's doctors had contributed to the conception of an inventive method of "improving the bioavailability of insulin delivered via the lung."

The patented method in Eli Lilly consisted of aerosolizing the insulin analog lispro, which was known to be more speedily absorbed by the body than normal insulin. The claims at issue recited a limitation "wherein the inhaled insulin analog is insulin lispro which rapidly dissociates in a monomeric form producing a relative bioavailability greater than twice that seen after the inhalation of a similar amount of" normal insulin. 376 F.3d at 1356.

17

Aradigm's business focused on drug delivery through the inhalation of aerosols.  Prior to the issuance of the disputed patent, Lilly and Aradigm held a series of meetings "to discuss a possible collaboration that would take advantage of Lilly's expertise in insulin compounds and Aradigm's expertise in aerosolized drug delivery."  376 F.3d at 1356.  During those meetings, Lilly's doctors suggested that Aradigm try lispro in its aerosol delivery devices, presumably because lispro was known to be absorbed into the blood faster when administered subcutaneously.  Despite testimony that Lilly's doctors made the recommendation to try lispro, the court found that the doctors had not "mention[ed] that aerosolized lispro should be used to produce a relative bioavailability greater than twice that seen after inhalation of human insulin." Id. at 1364.  Without some suggestion that lispro should be used to double the bioavailability relative to normal insulin, the Court held that the mere suggestion to try lispro was not enough to establish that any of the Lilly doctors were joint inventors.  See id. at 1363-64.

In Caterpillar Inc. v. Sturman Industries, Inc., 387 F.3d 1358 (Fed. Cir. 2004), Mr. Sturman claimed to be the sole inventor of Caterpillar's patent.  After a bench trial on the correction-of-inventorship claims, the district court found that Sturman had presented clear and convincing evidence to rebut the presumption that the Caterpillar engineers named on Caterpillar's patent were the true and only inventors, and it directed that Mr. Sturman be named the sole inventor.  Id. at 1365.

The Federal Circuit reversed, holding that Mr. Sturman had not met his burden of proof on the inventorship issue.  The claims in Caterpillar's patent "generally cover[ed] a three-way, dual-solenoid, integrated spool valve used to control the flow of working fluid" in a fuel injector unit.  387 F.3d at 1380.  The Federal Circuit did not dispute that Mr. Sturman had conceived of a

18

two-way integrated spool valve. However, the court rejected the district court's finding that Sturman had revealed an idea for a three-way spool valve configuration to Caterpillar in a presentation given to Caterpillar. Id. at 1379, 1380. Although Mr. Sturman's presentation slides did "mention both a '2-way valve' and '3-way valve'" the slides did not "refer to an integrated spool valve. Nor is there any reference to such a valve elsewhere in the presentation." Id. at 1380. Consequently, the court found clear error in the district court's finding that Mr. Sturman had disclosed the idea for a three-way integrated spool valve in his presentation. Id.

Finally, in Nartron Corp. v. Schukra U.S.A., Inc., 558 F.3d 1352 (Fed. Cir. 2009), the district court held that one Benson was a co-inventor of the patent in dispute. The patent was directed to a seat-control module that could be used to introduce massage functionality into existing automobile seats with lumbar support adjustors. One of Benson's arguments was that he had contributed to the inventive controller that was claimed in the patent. As in this case, Benson had given the patentee, "a description detailing the ultimate functions of the control module," and he contended that the patentee "simply carried out the invention by building that control module." Id. at 1359.

Citing Garrett and Eli Lilly, the Federal Circuit reversed. It held that "one who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." Id. The court also approvingly cited to the district court's statement in Ethicon, Inc. v. U.S. Surgical Corp., 937 F. Supp. 1015, 1035 (D. Conn. 1996), that "[a]n entrepreneur's request to another to create a product that will fulfill a certain function is not conception—even if the entrepreneur supplies continuous inputs on the acceptability of offered products." Nartron, 558 F.3d at 1359.

19

As the cases discussed above make clear, inventorship requires more than just providing the germ of an idea or the incentive to others to conceive of an invention and reduce it to practice. In this case, even assuming that Dr. Bianco's drawings depicted an expandable spacer or implant, as opposed to an expandable tool, the Court finds that Dr. Bianco's drawings reflected only a general idea for an expandable spacer; they did not embody "a definite and permanent idea of the complete and operative invention," Hybritech, 802 F.2d at 1376, in whole or even in part. Furthermore, the devices disclosed in the Globus patents are significantly different from the device disclosed in Dr. Bianco's drawings.

There is no inconsistency between the jury's finding that Globus misappropriated Dr. Bianco's trade secrets and the Court's ruling that Dr. Bianco is not entitled to be named as an inventor on the '375, '120, and '659 patents. Assuming that the evidence supports a finding that Globus used Dr. Bianco's ideas as a starting point for its Caliber, Caliber-L, and Rise products, that does not mean that his contribution to the patents associated with those products was sufficient to render him a co-inventor.

While Dr. Bianco's drawings depict several features that were ultimately incorporated into the inventions of the '375, '120, and '659 patents, the drawings were largely aspirational in nature, depicting the desired features of the device, not the details of the specific means by which those desired features would be implemented in an actual product. In his declaration, Dr. McMillin itemizes a number of features allegedly shown in Dr. Bianco's drawings that he characterizes as being found in the claims of the disputed patents. In fact, however, while the drawings and the patents both disclose a continuous expandable and retractable spacer, many of the other features referred to by Dr. McMillin are either not clearly specified in the drawings or

20

A43

are not carried forward into the patents.  Thus, the dial and markings shown on the drawings are not claimed in the patents; the threaded screw mechanism that is claimed in the patents is not clearly shown in the drawings; and a locking feature that is claimed in one of the patents is described in the drawings, but only in the most general terms ("opening and closing dial with locking and unlocking mechanism").

To be sure, Dr. Bianco's drawings went farther than "merely telling the result he wanted" and then leaving to Globus "the discovery of the means by which it was to be attained."  Int'l Carrier-Call & Television Corp. v. Radio Corp. of Am., 142 F.2d 493, 496 (2d Cir. 1944).  Dr. Bianco's drawings and the description of the device that he gave to Mr. Harris contained some detail about the structure of the device he had in mind.  But under well-established patent law principles, more than that is required in order for a would-be inventor to be credited with the conception of the invention necessary to qualify as a sole or joint inventor.

In sum, while the jury's verdict indicates that it found that Dr. Bianco's drawings at least motivated the Globus engineers to design an operative device, the path from the drawings to the specific, operable designs disclosed in the patents was a lengthy one.  The drawings thus did not demonstrate conception of the inventions claimed in the three patents, as that term is used in patent law.  Accordingly, notwithstanding the jury's verdict on the trade secret misappropriation issue, the Court concludes that Dr. Bianco has not met his burden of showing, by clear and convincing evidence, that he is entitled to be named a co-inventor on any of the disputed patents.

On a final point, Dr. Bianco challenges the right of Mr. Weiman to be named as sole inventor on the '659 patent and Mr. Suh to be named as a co-inventor on the '375 and '120 patents.  To the extent that Dr. Bianco's argument is that if Mr. Weiman and Mr. Suh qualify as

inventors, Dr. Bianco must have been at least a co-inventor on the disputed patents, the Court is not persuaded by that argument.  In any event, Dr. Bianco does not have standing to object to the inclusion of Mr. Weiman and Mr. Suh as inventors on the disputed patents.  In order to seek correction of inventorship under section 256, an individual must have standing to do so, which means that the individual must have a stake in the outcome that he seeks.  See Larson v. Correct Craft, Inc., 569 F.3d 1319, 1325-26 (Fed. Cir. 2009); Chou v. Univ. of Chicago, 254 F.3d 1347, 1355-59 (Fed. Cir. 2001).  While Dr. Bianco clearly has a stake in his claim to be a co-inventor, once that issue is decided against him he has no stake whatsoever in whether Mr. Weiman or Mr. Suh are entitled to remain as named inventors on the disputed patents.

### III.  Unjust Enrichment

At trial, the Court declined to submit Dr. Bianco's claim of unjust enrichment to the jury on the ground that it was an equitable claim for the Court and would be decided by the Court following the jury's verdict.  The jury subsequently found that Globus had misappropriated Dr. Bianco's trade secrets and that Dr. Bianco was entitled to damages in the amount of a reasonable royalty.  However, the jury denied Dr. Bianco's request for a larger recovery by refusing to grant him the remedy of disgorgement.  Based on the jury's decision on that issue, the Court concludes that Dr. Bianco is not entitled to a larger recovery under the theory of unjust enrichment than the jury granted him in the form of a reasonable royalty.  Moreover, the Court's independent judgment is that the award of damages in the amount of a reasonable royalty does not result in an inequitably low recovery for Dr. Bianco.  For that reason as well, the Court denies relief under Dr. Bianco's unjust enrichment claim.

IT IS SO ORDERED.

SIGNED this 6th day of March, 2014.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

A46

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

A jury awarded the plaintiff, Sabatino Bianco, M.D., reasonable royalty damages in the amount of $4,295,760 against defendant Globus Medical, Inc., for misappropriating Dr. Bianco's trade secrets. Dr. Bianco has now moved for a permanent injunction barring Globus from making, using, or selling the three products that Dr. Bianco has accused of incorporating his trade secrets (Globus's Caliber, Caliber-L, and Rise products) and all other Globus products that are not more than colorably different from those three products (Dkt. No. 250). In the alternative, Dr. Bianco asks the Court to render judgment setting a running royalty on the future sales of those products. The Court DENIES the motion for a permanent injunction but GRANTS Dr. Bianco's request that the Court consider instead an ongoing royalty on the Caliber, Caliber-L, and Rise products (and products not more than colorably different from those products). The Court agrees with Dr. Bianco that the parties should be given an opportunity to negotiate an ongoing royalty for future sales. Accordingly, the Court will give the parties 30 days from the

1

date of this order to negotiate an ongoing royalty rate. If, at the conclusion of that period, the parties cannot reach agreement, the Court will determine the appropriate royalty rate.

## I. Permanent Injunction

A permanent injunction is an extraordinary remedy. Nken v. Holder, 556 U.S. 418, 428 (2009); R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500 (1941). A successful plaintiff is not entitled to injunctive relief as a matter of course, but must make a showing that the circumstances require the Court to enter an injunction. Salazar v. Buono, 559 U.S. 700, 714 (2010); Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 337-38 (1933). "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982), quoting Cavanaugh v. Looney, 248 U.S. 453, 456 (1919).

Courts have developed a four-factor test to determine whether the remedy of an injunction is warranted in a particular case. The plaintiff bears the burden of showing: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390 (2006); i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 861 (Fed. Cir. 2010), aff'd, 131 S. Ct. 2238 (2011). In this case, Dr. Bianco has combined his arguments on the first two factors, which are closely related. The Court will analyze those two factors together as well. See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1337 (Fed. Cir.

2

A48

2012) ("[T]he issues of irreparable harm and adequacy of remedies at law are inextricably intertwined."); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008) (treating "the first two factors, irreparable harm and lack of an adequate remedy at law, in connection with each other"); MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 569 n.11 (E.D. Va. 2007) ("The irreparable harm inquiry and remedy at law inquiry are essentially two sides of the same coin . . . .").[1]

### A. Irreparable Injury With No Adequate Remedy At Law

Dr. Bianco argues that he has suffered irreparable injury and will continue to suffer such injury if his request for a permanent injunction is denied. He further contends that there is no adequate remedy at law available to him, because a monetary award will not be adequate to compensate him for the ongoing injury he will suffer in the absence of an injunction. The Court concludes that Dr. Bianco has failed to show that, in the absence of an injunction, he has suffered, and is likely to continue suffering, irreparable injury for which there is no adequate remedy at law.

---

[1] Both parties appear to accept that federal law, as expressed in the Supreme Court's eBay decision and its progeny, dictates the procedure to be employed in determining whether an injunction should issue in this case. It is therefore unnecessary for the Court to decide whether the standard for determining whether to grant an injunctive remedy for the state tort of trade secret misappropriation is a question that is governed by state law, rather than federal law, under the principles of Erie R.R. Co. v. Tomkins, 304 U.S. 64 (1938). See 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2943 (2013); see generally DSC Commc'ns Corp. v. Next Level Commc'ns, 107 F.3d 322, 328 (5th Cir. 1997) (applying federal standards for injunctive relief to a state law claim of misappropriation of trade secrets in a case in federal court based on diversity of citizenship). In any event, it appears that the standards for granting permanent injunctions under Texas law are not materially different from those under federal law. See Computek Computer & Office Supplies, Inc. v. Walton, 156 S.W.3d 217, 220 (Tex. App. 2005); F.S. New Prods., Inc. v. Strong Indus., Inc., 129 S.W.3d 606, 631 (Tex. App. 2004); Triantaphyllis v. Gamble, 93 S.W.3d 398, 401-02 (Tex. App. 2002).

The issues of irreparable harm and the adequacy of monetary relief in the absence of an injunction came up earlier in this litigation.  In response to Dr. Bianco's motion for a preliminary injunction, Judge Gilstrap ruled that Dr. Bianco "has not demonstrated why monetary damages would not be an adequate remedy in this case." (Dkt. No. 45, at 5).  Judge Gilstrap added that Dr. Bianco "is not affiliated with an operating entity and it is clear that Bianco and Globus are not competitors in the marketplace.  Any harm suffered to Bianco and caused by Globus' continued exploitation of the '375 patent during the pendency of this case can be remedied by an award of monetary damages" (Dkt. No. 45, at 5). See also id. at 6 ("The irreparable harm prong does not weigh in Bianco's favor because monetary damages are an adequate remedy due to the nature of the relationship between Bianco and Globus.").  Although Judge Gilstrap explained that he was not deciding whether a permanent injunction would be appropriate if Dr. Bianco prevailed at trial, his analysis of the question whether there is an adequate remedy at law is instructive, and it supports this Court's conclusion that monetary relief is sufficient to compensate Dr. Bianco for any future injuries caused by Globus's misappropriation.

Most of the authorities on which the parties rely are patent cases.  This is not a patent case, and although some of the principles applied in patent injunction cases are applicable in the trade secret context, some are not.  One important difference between the two is that the patent right is explicitly defined as a right of the patent owner to exclude others from practicing the invention protected by the patent.  35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention . . . ."); Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011) (courts should not "entirely ignore the fundamental nature of patents as

4

property rights granting the owner the right to exclude"); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008) (in view of the right to exclude, "infringement may cause a patentee irreparable harm not remediable by a reasonable royalty"). Although the Supreme Court in eBay made it clear that the statutory right to exclude does not justify a general rule favoring injunctions in patent cases, 547 U.S. at 392, the right to exclude is frequently invoked as being a significant factor supporting the grant of injunctive relief in particular cases. The Texas common law of trade secret protection provides for injunctions to issue in appropriate cases, but the core right in the case of trade secrets is not the right to exclude others from practicing the trade secret. For example, the owner of a trade secret, unlike a patentee, has no right to bar a party from practicing the technology that is the subject of the trade secret, as long as the party has not obtained access to that technology by misappropriating the trade secret. Thus, the core right that attaches to a trade secret is the right against misappropriation, not the right to exclude a user of the technology.[2]

In patent and well as nonpatent cases, a district court's decision to grant or deny an injunction is discretionary and depends on the facts of each case. See Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1002 (Fed. Cir. 1986); Bailey v. Patterson, 323 F.2d 201, 209 (5th Cir. 1963); Hynix Semiconductor Inc. v. Rambus Inc., 609 F. Supp. 2d 951, 966 (N.D. Cal. 2009) ("a court must structure injunctive relief based on each case's granular facts"). Accordingly, the specific facts of this case are highly significant to the Court's decision on the injunction issue.

---

[2] Texas has recently enacted statutory protections for trade secrets. See Tex. Civil Prac. & Rem. Code § 134A. The new statute provides for the issuance of injunctions. See id. § 134A.003 ("Actual or threatened misappropriation may be enjoined.). The statute, however, does not apply to cases in which the misappropriation of a trade secret occurred before the effective date of the Act, September 1, 2013. In any event, the statutory provisions largely codify prior Texas law.

The Court begins its inquiry into those case-specific factors with the jury's verdict. The jury found that Globus misappropriated Dr. Bianco's trade secrets. That issue is settled for purposes of this proceeding. The jury was instructed that it should award Dr. Bianco disgorgement of profits if it regarded that remedy as fair and equitable, but that otherwise the jury should use the reasonable royalty method of calculating damages. The jury was further told that it should determine "what Dr. Bianco would have gained from his trade secrets if Globus had not misappropriated them." Court's Final Jury Instructions (Dkt. No. 226, at 6). Significantly the jury rejected Dr. Bianco's request for disgorgement of profits. Instead, it determined that a proper remedy for past misappropriation of his trade secrets is a reasonable royalty. The jury selected five percent of the past net sales of the Caliber, Caliber-L, and Rise products as the appropriate royalty. The jury's determination that disgorgement would not be fair and equitable, and that a five percent royalty was an appropriate measure of "what Dr. Bianco would have gained from his trade secrets" in the absence of Globus's misappropriation serves as the starting point for the Court's determination of whether to exercise its equitable authority in this case.

The verdict indicates that in the jury's view the award of a reasonable royalty is sufficient to compensate Dr. Bianco for the injury he has suffered in the past. See i4i Ltd. P'ship, 598 F.3d at 861-62. It also provides a sound basis from which to conclude that a continuing royalty would have the same effect on any continuing injury into the future.

Of particular significance in this regard is the evidence of the arrangement that Dr. Bianco sought to enter into with Globus in 2007. The evidence showed that Dr. Bianco offered Globus the right to use his trade secrets with the expectation that if Globus used his trade secrets

6

A52

it would compensate him appropriately. Dr. Bianco's position at trial was that he sought and expected to obtain monetary compensation from Globus in exchange for the use of his ideas. That expectation was not conditioned on any temporal limitation on Globus's use of the trade secrets. Thus, the jury's verdict as to the proper compensation for past injury, and the evidence on which it was based, strongly support Globus's argument that monetary relief in the form of an ongoing royalty will provide full compensation for any future injury attributable to Globus's misappropriation. See High Tech Med. Instrumentation v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995) (willingness of patentee to enter into a licensing agreement is evidence that monetary relief is adequate to compensate for future infringement); MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556.582-83 (E.D. Va. 2007) (denying injunction because patentee's willingness to license its patent indicates patentee was not exercising its right to exclude to help it practice the patent or further develop the patented technology).

Dr. Bianco contends that Globus's misappropriation of his trade secrets led to the creation and success of the Caliber line of products, and that "Globus's misappropriation of Dr. Bianco's ideas, and subsequent patenting, deprives Dr. Bianco from working with other companies to bring products incorporating his ideas to market." (Dkt. No. 250, at 3). According to Dr. Bianco, Globus's continuing activities with respect to the Caliber line of products will result in irreparable harm to him "because Globus can use the patents it has obtained to prevent Dr. Bianco from taking his idea to others and because Globus has already introduced Caliber into the market and established it as a market leader" (Dkt. No. 250, at 3).

To the extent that Dr. Bianco contends that he is being deprived of the opportunity to offer other companies the ideas encompassed within his 2007 disclosure, the argument is unpersuasive. As noted above, if Globus had agreed to use Dr. Bianco's ideas in connection with its work on the Caliber line of products, Dr. Bianco and Globus would likely have agreed to some form of monetary compensation for Dr. Bianco; the jury's verdict effectively sets the appropriate amount of that compensation for the period up to the time of trial. Presumably, Globus would then have proceeded just as it actually did, by designing and engineering the Caliber line of products and obtaining patent protection for its inventions. This Court has already ruled that Dr. Bianco is not entitled on the facts of this case to be named a co-inventor of the three patents related to the Caliber line of products. Therefore, Globus would have obtained those patents in the names of its own employees, even if it had not misappropriated Dr. Bianco's trade secrets. Once the Caliber products were on the market, other parties either would have been free to copy those devices, to the extent they were not covered by the patents and in the public domain, or would have been barred from copying them by the patent protection that Globus obtained for them.[3] Either way, third parties would have had no incentive to enter into

---

[3] Dr. Bianco argues that "there are many other medical device companies that are interested in developing expandable inter-vertebral implants," and that but for Globus's actions Dr. Bianco could "take his idea to one or more of those companies, and they will be able to develop alternative expandable devices" (Dkt. No. 250, at 7). Here again, however, the difference between patents and trade secrets is important. To the extent that the Caliber products embody the essence of Dr. Bianco's 2007 disclosure, other companies are free to copy those products that are in the public domain without needing Dr. Bianco's permission. That release of ideas into the public domain would have occurred had Globus and Dr. Bianco entered into a licensing agreement, and therefore is compensable with money damages. The only barriers to other companies' participation in the market would be Globus's patents. Dr. Bianco has not sought to enjoin Globus from enforcing those patents, a remedy to which he would not likely be entitled in any event. That barrier would therefore remain in place even if Globus were enjoined from selling its Caliber line of products.

8

licensing agreements with Dr. Bianco from which he could profit. In short, if Globus had obtained a license for Dr. Bianco's ideas, as Dr. Bianco hoped it would, he would not be in any better position than he is now with respect to his ability to shop his 2007 trade secrets to other medical device manufacturers.

To the extent that Dr. Bianco is arguing that Globus's conduct deprives him of the ability to work with other companies with respect to ideas other than his 2007 trade secrets, the argument is unconvincing. Nothing about Globus's conduct prevents Dr. Bianco from "working with other companies to bring products incorporating his ideas to market." (Dkt. No. 250, at 3). In fact, the evidence shows that, even during the pendency of this lawsuit, Dr. Bianco has worked with Biomet, Inc., another medical device manufacturer, and that he has offered ideas for spinal surgical devices to that company. The evidence, moreover, does not suggest that in his dealings with Biomet Dr. Bianco has sought anything other than monetary compensation for his ideas. Accordingly, the evidence at trial supports the conclusion that a monetary award in the form of a reasonable royalty would be an appropriate substitute for what Dr. Bianco sought from Globus, and what he believes Globus denied him by misappropriating his trade secrets.

An important consideration bearing on whether an injunction should issue in this case is the fact that Dr. Bianco and Globus are not competitors in the medical device market. Instead, the relationship between Dr. Bianco, Globus, and other medical device manufacturers is typical of inventors in other fields who do not themselves commercialize their inventions, but obtain compensation for those inventions by selling or licensing them to others. Like most such inventors, Dr. Bianco has never been in a position to produce medical devices himself, and the

9

only way available to him to benefit from his trade secrets was to sell or license them to an entity

such as Globus, which would design, manufacture, and market an operative device.

Dr. Bianco argues that he competes with Globus in developing ideas for such devices, but

even assuming that is true, that form of competition does not affect the analysis of irreparable

harm.  Because Dr. Bianco does not produce and sell products, he will not lose profits, he will

not lose market share to a competitor, and he is not subject to the loss of brand recognition or

good will in the market as a result of the misappropriation of his trade secrets.  Injuries of that

sort are the type that typically need to be shown to demonstrate the type of irreparable injury that

gives rise to the right to injunctive relief in patent infringement cases.  See i4i Ltd. P'ship, 598

F.3d at 862; z4 Techs., Inc. v. Microsoft Corp., 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006).

It is true that the Supreme Court in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388,

393 (2006), rejected any bright-line rule that a noncompeting plaintiff could never obtain

injunctive relief in a patent case.  However, nothing in the Court's opinion indicate that the

patent owner's status as a competitor or a nonpracticing entity should not be considered when a

court decides whether to issue an injunction.  In fact, in his concurring opinion Justice Kennedy

suggested that the analysis of the four-factor test for permanent injunctions would be different

for parties whose business is based on licensing their patents rather than practicing them.  Id. at

396 (Kennedy, J., concurring).

Since the decision in eBay, numerous courts have been called on to decide whether to

issue injunctions in cases involving patentees who compete with the alleged infringers and

patentees who do not compete with the infringers.  Those courts have held that the plaintiff's

status as a competitor or noncompetitor of the defendant weighs heavily in the court's

10

determination whether to grant injunctive relief. In fact, with only a few exceptions, courts have denied injunctive relief in cases in which the patentee does not practice the patent and compete with the alleged infringer.

The reasoning of this line of cases is straightforward. Where the inventor's expectation is that the compensation for his invention will come in the form of some kind of royalty from the manufacturer to whom he licenses the invention, it is sensible to conclude that monetary relief provides full compensation for the inventor and is a proper substitute for the royalty payments the inventor expected to receive.

The leading case in this line is the Federal Circuit's decision in <u>ActiveVideo Networks, Inc. v. Verizon Communications, Inc.</u>, 694 F.3d 1312 (Fed. Cir. 2012). In that case, the district court granted an injunction to the patentee, ActiveVideo, against the accused infringer, Verizon, which incorporated the infringing features in its FIOS-TV product. The Federal Circuit reversed the injunction, holding that a monetary award would be sufficient to compensate ActiveVideo for its injury. The appeals court began the critical portion of its analysis by pointing out that ActiveVideo and Verizon were not competitors: ActiveVideo sold hardware and software to providers of video services, while Verizon sold video servicers to end users. Although ActiveVideo's customer, Cablevision, competed with Verizon and was at risk of losing end-use customers to Verizon because of Verizon's infringement, the court found that the harm to ActiveVideo consisted of the infringing sales made by Verizon. The number of those sales was easily calculable, and ActiveVideo could be fully compensated for the ongoing infringement by Verizon's payment of a royalty for each end-use customer who used ActiveVideo's invention. 694 F.3d at 1338.

The court in ActiveVideo distinguished the Federal Circuit's decision in Robert Bosch, LLC v. Pylon Manufacturing Corp., 659 F.3d 1142, 1153-54 (Fed. Cir. 2011), on the ground that in that case the parties were direct competitors, the patentee was at risk of losing market share, and there was uncertainty about whether the infringer could satisfy a monetary judgment.  The ActiveVideo court explained that it was not holding "that there can be no irreparable harm absent direct competition," 694 F.3d at 1338, but it made clear that the absence of competition—and the resulting absence of any risk of loss of market share, brand recognition, or other intangible benefits—was an important factor in the court's analysis.

Numerous district court cases have followed the same analysis, ruling that the absence of competition between the patentee and the accused infringer is a significant factor in favor of finding an absence of irreparable harm and the adequacy of monetary damages.  See, e.g., Cordance Corp. v. Amazon.com, Inc., 730 F. Supp. 2d 333, 339-41 (D. Del. 2010) (injunction denied; infringer did not directly compete with patentee, nor was it responsible for patentee's financial difficulties); Humanscale Corp. v. CompX Int'l Inc., 2010 WL 1779963, at *3-*4 (E.D. Va. Apr. 29, 2010) (injunction denied because patentee failed to show that it competed directly with accused infringer or how infringer's sales injured patentee); Ricoh Co. v. Quanta Computer, Inc., 2010 WL 1607908 (W.D. Wis. Apr. 19, 2010) (injunction denied where plaintiff did not practice its patent and was not competing with the defendants for the same customers); Amgen, Inc. v. F. Hoffmann La-Roche Ltd., 581 F. Supp. 2d 160, 210 (D. Mass. 2008) (observing that eBay "has allowed courts to decline requests for injunctive relief where the plaintiff" is a nonpracticing entity), aff'd in part and vacated in part, 580 F.3d 1340 (Fed. Cir. 2009); Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc., 579 F. Supp. 2d 554, 558 (D.

12

Del. 2008) ("Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor."). See generally George M. Newcombe et al., Prospective Relief for Patent Infringement in a Post-eBay World, 4 N.Y.U. J.L. & Bus. 549 (2008).

Cases from this district are to the same effect. While acknowledging the Supreme Court's disapproval in eBay of a rigid rule that a nonpracticing entity can never obtain the remedy of an injunction, decisions from this district have stated that the question whether a plaintiff is a direct competitor of the defendant in a patent infringement case "weighs heavily" in the analysis. Synqor, Inc. v. Artesyn Techs., Inc., 2011 WL 238645, at *3 (E.D. Tex. Jan 24, 2011); Visto Corp. v. Seven Networks, Inc., 2006 WL 3741891, at *4 (E.D. Tex. Dec. 19, 2006). And where the patentee and the accused infringers are not competitors, the courts in this district have generally refused requests for injunctive relief. See VirnetX Inc. v. Apple, Inc., 925 F. Supp. 2d 816, 846 (E.D. Tex. 2013) (denying permanent injunction to a noncompetitor); Fractus, S.A. v. Samsung Elecs. Co., 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012) (in the absence of direct competition between Fractus and Samsung, "Samsung's use of Fractus's technology does not inhibit Fractus from selling or licensing its products in the market, and Fractus's damages can be calculated with reasonable certainty"); LaserDynamics, Inc. v. Quanta Computer, Inc., 2010 WL 2574059, at *2 (E.D. Tex. June 22, 2010) ("Because LaserDynamics is not competing with QCI, it is more difficult for LaserDynamics to argue that it will be irreparably harmed without an injunction. This factor weighs heavily in the Court's analysis."); Paice LLC v. Toyota Motor Corp., 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16, 2006) ("[B]ecause Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name

13

recognition and market share . . . are not implicated."), aff'd in part, vacated in part, and remanded, 504 F.3d 1293 (Fed. Cir. 2007).

Dr. Bianco relies principally on a single case from this district, Commonwealth Scientific & Industrial Research Organization v. Buffalo Technology Inc., 492 F. Supp. 2d 600 (E.D. Tex. 2007) ("CSIRO"), in support of his contention that he was not required to practice his invention in order to show that an award of damages would not be sufficient to remedy the injury he will suffer from Globus's continuing sales of the Caliber line of products. The plaintiff in that case, CSIRO, is the Australian government's research organization that operates its own laboratories and is active in a number of research fields. Judge Davis noted that CSIRO uses revenue from its licensing operations to fund its research programs, that it competes with other research groups worldwide. He further found that litigation challenging CSIRO's patents, and delays in receiving compensation for infringement, result in delay and injury to its research projects as well as to its reputation. Id. at 604. Those unique circumstances, Judge Davis concluded, justified a finding that in the absence of an injunction CSIRO would suffer irreparable harm that would not be adequately remedied by an award of money. Id. at 605-06.

Recitation of the facts of CSIRO makes clear how different this case is from that one. The evidence at trial showed that although Dr. Bianco makes suggestions to medical device manufacturers from time to time, he is not engaged in the full-time business of research and development of surgical devices, and certainly not one that requires substantial ongoing funding to maintain. Although Dr. Bianco notes that he has participated as a member of surgeon design teams in the past, there was no evidence at trial that Dr. Bianco has ever sold or licensed one of his inventions to a medical device manufacturer. Nor was there any evidence that the absence of

14

an injunction in this case would cause reputational injury to Dr. Bianco, as was found to be true in CSIRO.[4]

A post-CSIRO decision by Judge Davis is instructive in demonstrating the limits of the ruling in the CSIRO case. In Soverain Software LLC v. Newegg Inc., 836 F. Supp. 2d 462 (E.D. Tex. 2010), the plaintiff patentee sought a permanent injunction, making arguments similar to those made by the plaintiff in CSIRO. Judge Davis distinguished his earlier opinion in CSIRO on various grounds, including that CSIRO's harm was "not merely financial," that the plaintiff in Soverain did not substantially compete with the defendant, and that the infringement in CSIRO "related to the essence of the technology" represented by CSIRO's patent. Id. at 481-82. This case is much closer to Soverain than it is to CSIRO. The harm here is merely financial; Dr. Bianco does not directly compete with Globus; although the jury found that Dr. Bianco's idea was misappropriated and used in connection with the Caliber line of products, the structure of the Caliber products and patents varies significantly from the structures depicted in Dr. Bianco's 2007 drawings; and substantial value was added by Globus to the products that were ultimately commercialized. Dr. Bianco seeks to bring himself within the rationale of the CSIRO case by

---

[4] Dr. Bianco cites two other cases in support of his contention that an injunction can issue even if the patentee does not compete with the accused infringer, BarTex Research, LLC v. FedEx Corp., 611 F. Supp. 2d 647 (E.D. Tex. 2009), and Eon Corp. IP Holdings, LLC v. Skytel Corp., 2009 WL 8590963 (E.D. Tex. Apr. 29, 2009). But injunctions were not entered in those cases. The court in each case simply made the observation, consistent with eBay, that an injunction may be entered even when the parties are not competitors. In a third case on which Dr. Bianco relies, Acticon Technologies v. Heisei Electronics Co., 2008 WL 356872 (S.D.N.Y. Feb. 5, 2008), the court granted an injunction against a defaulting defendant, explaining that because of the default, damages were difficult to ascertain and there was serious doubt whether the plaintiff would be able to collect any monetary award. The point is that even though courts frequently (and appropriately) acknowledge that there is no hard and fast rule against entering injunctions in cases in which the patentee does not compete with the accused infringer, such injunctions are seldom granted.

15

arguing that Globus's conduct has "prevented him from completing additional research, accelerating existing projects, or beginning new projects based on his 2007 design for an expandable inter-body spacer" (Dkt. No. 250, at 5).  The evidence at trial, however, does not support his claim that Globus's misappropriation of his trade secrets interfered with other research or projects on which he was working or which he would have initiated.[5]

Dr. Bianco relies on several trade secret cases that have held that irreparable injury is presumed when a trade secret has been misappropriated.  See, e.g., Verizon Commc'ns Inc. v. Pizzirani, 462 F. Supp.  2d 648, 658 (E.D. Pa. 2006); Lumex, Inc. v. Highsmith, 919 F. Supp. 624, 628 (E.D.N.Y. 1996); PepsiCo, Inc. v. Redmond, 1996 WL 3965, at *30 (N.D. Ill. Jan 2, 1996).  It is questionable, however, whether those cases have survived eBay and the Supreme Court's subsequent decision in Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008).  See Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118-19 (2d Cir. 2009) (holding that no presumption of irreparable harm arises in trade secret misappropriation cases where defendant uses trade secret without disseminating it and the injury is in the form of lost income from sales and is therefore compensable in damages); see also Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011) (holding that for patent cases, "eBay jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief"); Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 981 (9th Cir. 2011) (holding that for copyright cases, a presumption of irreparable harm "'is clearly irreconcilable with the reasoning' of the Court's decision in eBay and has therefore been 'effectively overruled'");

---

[5]  In two other post-CSIRO cases, Judge Davis denied injunctive relief after finding that the patentee did not compete with the accused infringer.  See VirnetX Inc. v. Apple Inc., 925 F. Supp. 2d 816, 844-46 (E.D. Tex. 2013); Fractus, S.A. v. Samsung Elecs. Co., 876 F. Supp. 2d 802, 853-54 (E.D. Tex. 2012).  This case is much closer to those cases than it is to CSIRO.

Salinger v. Colting, 607 F.3d 68, 76-78 (2d Cir. 2010) (same);  N. Am. Med. Corp. v. Axiom

Worldwide, Inc., 522 F.3d 1211, 1227-28 (11th Cir. 2008) (eBay "calls into question whether

courts may presume irreparable harm merely because a plaintiff in an intellectual property case

has demonstrated a likelihood of success on the merits"; holding that eBay is applicable to a

trademark infringement case arising under the Lanham Act).

Moreover, the trade secret cases cited by Dr. Bianco are distinguishable in that each was

an action between direct competitors or involved a party's former employee who went to work

for the party's direct competitor.  As noted, Dr. Bianco is not a direct competitor of Globus's in

the medical device market and therefore is not at risk of suffering ongoing competitive

disadvantage as a result of the misappropriation of his trade secret.  Accordingly, even if this

Court were to conclude that a presumption of irreparable harm applies in the context of a trade

secret violation, the Court would find that the presumption was overcome in this case.  In short,

because the evidence in this case shows that Dr. Bianco has sought monetary compensation for

his invention from the beginning and is in a position to recover such compensation in the form of

reasonable royalty payments on the Caliber line of products, the Court is satisfied that Dr.

Bianco will not suffer irreparable injury if injunctive relief is denied.

To be sure, an injunction could prove to be of benefit to Dr. Bianco in one respect: it

could give him leverage that could allow him to enhance his negotiating stance.  But that is not a

permissible reason for a court to issue an injunction.  See eBay, 547 U.S. at 396 (Kennedy, J.,

concurring) (an injunction is not meant to be employed "as a bargaining tool to charge exorbitant

fees" or to allow for "undue leverage in negotiations"); Foster v. Am. Mach. & Foundry Co., 492

F.2d 1317, 1324 (2d Cir. 1974) (an injunction "is not intended as a club to be wielded by a

17

patentee to enhance his negotiating stance"); Hynix Semiconductor Inc. v. Rambus Inc., 609 F.

Supp. 2d 951, 983 n.29 (N.D. Cal. 2009)  (denying injunction where patentee's "motivation in

seeking an injunction is less about preventing irreparable harm and more about extracting

punishment or leverage in negotiating with" infringer); MercExchange, 500 F. Supp. 2d at 582

("Utilization of a ruling in equity as a bargaining chip suggests both that such party never

deserved a ruling in equity and that money is all that such party truly seeks, rendering monetary

damages an adequate remedy in the first instance."); Ricoh Co. v. Quanta Computer, Inc., 2010

WL 1607908, at *4 (W.D. Wis. Apr. 19, 2010) (denying injunction where it "would [not] serve

any purpose other than to increase [patentee's] leverage in negotiations for a higher licensing

fee").  The loss of the opportunity to exercise this kind of leverage (sometimes referred to

unflatteringly as "hold-up") is not an injury that can be considered irreparable for purposes of

determining whether an injunction should issue.  See Fed. Trade Comm'n, The Evolving IP

Marketplace 26 (2011) ("An injunction's ability to cause patent hold-up can support withholding

injunctive relief in some situations.").

   After careful consideration of the specific facts of this case, the Court concludes that Dr.

Bianco has failed to satisfy his burden of showing that he has suffered irreparable injury, and that

he has failed to show that, in the absence of a permanent injunction, he will continue to suffer

irreparable injury that cannot be fully compensated for by monetary relief.

### B.  Balance of Hardships

   The next factor that the Court must consider in assessing the request for injunctive relief

is the respective hardships that the grant or denial of an injunction would visit on the respective

parties.  The Court's determination that monetary relief is adequate to compensate Dr. Bianco for

18

A64

any future injury he is likely to suffer largely decides that issue, as it indicates that denial of an injunction would not work any undue hardship on him with respect to his entitlement to meaningful and complete relief on his claim.  See ActiveVideo, 694 F.3d at 1341 ("It is certainly true that ActiveVideo would suffer substantial hardship if it was not compensated for Verizon's infringement.  But there is no evidence that an injunction is necessary to avoid hardship to ActiveVideo."); XpertUniverse v. Cisco Sys., Inc., 2013 WL 6118447, at *13 (D. Del. Nov. 20, 2013) ("As explained in the context of [the patentee's] claim of irreparable injury, [the patentee] has not shown that it would substantially benefit from an injunction, nor that it would suffer additional harm without one."); Soverain Software LLC v. Newegg Inc., 836 F. Supp. 2d 462, 482 (E.D. Tex. 2010) ("Because Soverain has not shown irreparable harm in the absence of a permanent injunction, any harm Soverain might suffer can be adequately remedied through the recovery of monetary damages . . . .").  Beyond that, Dr. Bianco has not pointed to any other considerations particular to this case that would indicate that denial of an injunction would result in a hardship to him.

On the other hand, an injunction would have substantial adverse effects on Globus.  The evidence at trial showed that the Caliber line of products makes up a substantial portion of Globus's business.  In his testimony at trial, Dr. Bianco's damages expert called Caliber a "key differentiating product for Globus that's letting them grow."  An injunction against the sale of those products would have an immediate and severely disruptive effect on Globus.  Moreover, Globus has ongoing contractual relationships with numerous surgeons and hospitals to supply expandable implants; those arrangements would be extinguished by an injunction against the continuing sales of the Caliber products.  See CardSoft, Inc. v. VeriFone Holdings, Inc., 2013

19

WL 5862762, at *1 (E.D. Tex. Oct. 30, 2013) ("The Court finds that the cost and burden associated with switching Defendants' customers to non-infringing systems weighs against granting a permanent injunction."); VirnetX Inc. v. Apple Inc., 925 F. Supp. 2d 816, 846-47 (E.D. Tex. 2013) (Apple "bears a considerable burden to comply with the proposed injunction . . . . [A]n injunction would not only harm Apple, but also its customers and other third parties."); Fractus, S.A. v. Samsung Elecs. Co., 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012) ("Fractus's requested injunction will severely hamper Samsung's cell phone business, but most importantly, it will significantly disrupt related third-party businesses such as Samsung's suppliers and customers."); LaserDynamics, Inc. v. Quanta Computer, Inc., 2010 WL 2574059, at *3 (E.D. Tex. June 22, 2010) ("[A]n injunction would not only interrupt [defendant's] business but also that of related businesses, including suppliers and customers of [the defendant].").

Although hardships to customers and patients are not the focus of the balance of hardships inquiry, see Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1330 (Fed. Cir. 2008), the impact on customers and patients bears on the related factor of the impact that an injunction would have on the public interest, discussed below.  For present purposes, even setting aside for the moment the effects that an injunction would have on customers and patients, the Court is persuaded that the balance of hardships weighs substantially in favor of Globus.[6]

---

[6] Quoting from the Federal Circuit's decision in Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986), Dr. Bianco argues that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  Taken to its logical limits, that proposition would effectively preempt consideration of the "balance of hardships" factor in any case in which infringement (or misappropriation) has been found.  Recognizing that point, the Federal Circuit has qualified that broad language from Windsurfing, stating that the quoted

20

## C. Public interest

The last factor that the Court must consider in determining whether to issue a permanent injunction is the effect that such an injunction would have on the public interest.  The Court determines that granting an injunction in this case would have an adverse effect on the public interest and that the public-interest factor therefore cuts against issuance of an injunction.

In his order denying a preliminary injunction earlier in this litigation, Judge Gilstrap addressed the public interest factor and found that it cut against granting injunctive relief.  He stated:  "While the Court is mindful of the strong public interest served by protecting trade secrets and intellectual property rights, the Court concludes that this factor does not weigh in Bianco's favor.  The public's interest is better served by not depriving it of this medical advance, especially where money damages can fairly compensate Bianco if he prevails on his underlying claims."  (Dkt. No. 45, at 6).  The Court finds this analysis persuasive.

There is a strong public interest in vindicating the rights of owners of intellectual property.  See i4i Ltd. P'ship, 598 F.3d at 863; Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1547 (Fed Cir. 1995) (en banc).  However, the vindication of those rights can be achieved without the

---

language "does not overcome the equities of a case.  Nor can Windsurfing be applied mechanically."  Standard Havens Prods., Inc. v. Gemcor Indus., Inc., 897 F.2d 511, 515 (Fed. Cir. 1990) ; see Hynix Semiconductor Inc. v. Rambus Inc., 609 F. Supp. 2d 951, 970 (N.D. Cal. 2009) (To ignore the harm to the infringer because "it cannot be heard to complain" runs contrary to eBay's mandate to "consider[] the balance of hardships between the plaintiff and defendant.") (citation omitted).  The language from Windsurfing has come to stand for the more modest and unsurprising proposition that a party "should not be permitted to prevail on a theory that 'successful exploitation of infringing technology shields [that] party from injunctive relief,'" Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008), and thus that successful exploitation of an infringing product does not itself justify freeing the infringer from the burden of an injunction.  See i4i Ltd. P'ship, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief.  [The defendant] is not entitled to continue infringing simply because it successfully exploited its infringement.") (citations omitted).

21

need for an injunction if, as in this case, an award of damages can provide full relief to the property owner. On the other side of the ledger are the negative effects that an injunction would have on the public, In this case, the evidence shows that there are significant public health concerns that would be raised by granting an injunction.

Globus has offered evidence that Caliber is the leading product in the expandable-spacer market, and Dr. Bianco's evidence at trial supports that assertion. Dr. Bianco testified that he expected in the next ten years that "expandable fusion device[s] are going to significantly increase the market share in the spinal implant arena," but that "at the present time only Globus's Caliber is an effective device in this field." Dr. Bianco's infringement expert similarly testified that other companies had tried to make expandable interbody spacers, but that Globus was the only company that was able to "make it work to then commercialize it and sell a bunch of them."

With its response brief, Globus offered five physician declarations, in which the surgeons each stated that the Caliber line of products have significant advantages over other interbody implants (static and expandable), because they are both expandable and robust. In addition, according to the surgeons, the Caliber line of devices can be used during minimally invasive procedures, which lessen the trauma to patients and shorten recovery times. The surgeons each stated that Caliber, Caliber-L, and Rise are the most effective and reliable minimally invasive implants in the marketplace, and they each stated that it would be extremely disruptive to their practices and harmful to their patients if the Caliber line of products were removed from the market. Dr. Bianco has not contradicted any of that evidence.

Even before eBay, the Federal Circuit recognized that the effect of an injunction on public health is an important factor to be weighed in determining whether to enjoin continuing

22

patent infringement. See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988) (sale of cancer and hepatitis test kits not enjoined for public health reasons); Datascope Corp. v. Kontron, Inc., 786 F.2d 398, 401 (Fed. Cir. 1986) (injunction denied because evidence showed that some physicians preferred defendant's intra-aortic balloon catheters); Roche Prods., Inc. v. Bolar Pharm. Co., 733 F.2d 858, 865-66 (Fed. Cir. 1984) (case remanded to consider claims that requested injunctive relief would have a "catastrophic" effect on American public health system); Cordis Corp. v. Boston Sci. Corp., 99 F. App'x 928, 935-36 (Fed. Cir. 2004) (public would be harmed by an injunction because some doctors prefer infringing product over patentee's product, and a "strong public interest supports a broad choice of drug-eluting stents").

Other courts as well have recognized that the public interest factor weighs heavily when an injunction would have a potentially adverse effect on public health. See Conceptus, Inc. v. Hologic, Inc., 2012 WL 44064, at *3 (N.D. Cal. Jan. 9, 2012) ("Enjoining the sale of [defendant's product] would leave only one product for transcervical hysteroscopic sterilization. Public health has benefitted, and will continue to benefit, from having a choice of products for transcervical hysteroscopic sterilization. This is especially important because the products are different. Removing [the product] from the market would have eliminated an important alternative for patients."); Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 2009 WL 920300, at *9 (D. Ariz. Mar. 31, 2009) ("Placing Gore's infringing [vascular surgery] products out of reach of the surgeons who rely on them would only work to deny many sick patients a full range of clinically effective and potentially life saving treatments."); Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 2008 WL 4647384, at *11 (N.D. Cal. Oct. 20, 2008) (denying injunction in light of evidence that defendant's stent was favored by cardiologists); Novo

23

A69

Nordisk A/S v. Pfizer Inc., 2006 WL 3714312, at \*6-7 (S.D.N.Y. Dec. 14, 2006) (denying

injunction based on "strong public interest" in not removing inhalable insulin from market); ICU

Med. Inc. v. Alaris Med. Sys., Inc., 2004 WL 1874992, at \*26 (C.D. Cal. July 30, 2004)

("Placing the public health in jeopardy, by removing potentially life-saving medical devices like

the SmartSite valve [a valve used in delivering fluids to a patient through intravenous injection]

from the marketplace, is a legitimate factor supporting denial of a preliminary injunction.);

Neuromedical Sys., Inc. v. Neopath, Inc., 1998 WL 264845, at \*14-16 (S.D.N.Y. May 26, 1998)

(refusing injunction against tests for early detection of cervical cancer); Scripps Clinic &

Research Found. v. Genentech, Inc., 666 F. Supp. 1379, 1401 (N.D. Cal. 1987), aff'd in part,

rev'd in part, and vacated in part, 927 F.2d 1565 (Fed. Cir. 1991) (refusing preliminary

injunction that would bar sale of a blood clotting protein having potentially important advantages

in the treatment of hemophiliacs).

In light of the clear evidence—both from Globus and from Dr. Bianco's trial witnesses—

that the Caliber products are superior to any other interbody implants available on the market at

present, the Court concludes that the public interest would not be served by removing those

products from the market.  To be sure, the products at issue in this case are not life-saving, like

the products and drugs at issue in some of the cases cited above.  Nonetheless, the products are

used in a type of surgery that is important to the large number of patients who have to undergo

spinal implant procedures, and the evidence establishes that it is important for surgeons to have

the Caliber products available to them as an option in performing such surgeries.  Accordingly, it

is the Court's judgment that the public interest factor weighs significantly in favor of denying

injunctive relief in this case.

24

To sum up the conclusions reached in the three preceding sections of this opinion, each of the factors in the four-factor test for permanent injunctions favors denial of Dr. Bianco's motion for an injunction. Dr. Bianco's motion for a permanent injunction is therefore denied.

## II. Ongoing Royalties

Dr. Bianco has requested that the Court direct the parties to attempt to negotiate an ongoing royalty rate for the future use of Dr. Bianco's trade secrets in connection with the Caliber, Caliber-L, and Rise products. That procedure has been approved for patent cases in which the future royalties have not been adjudicated at trial. See Paice v. Toyota Motor Corp., 504 F.3d 1293, 1313-16 (Fed. Cir. 2007); see also Telecordia Techs., Inc. v. Cisco Sys., Inc., 612 F.3d 1365, 1378-79 (Fed. Cir. 2010). The Court agrees with Dr. Bianco that the Paice procedure is the appropriate course to follow in this case. The Court rejects Globus's arguments that Dr. Bianco is not eligible for ongoing royalties because he failed to prove the right to such royalties at trial. The Court made clear during the trial proceedings that if Dr. Bianco prevailed on his trade secret claim, he would be permitted to seek prospective relief, either in the form of an injunction or in the form of future damages based on the jury's verdict. The Court adheres to that position and directs the parties to engage in good-faith negotiation directed at reaching an agreement as to the rate for ongoing royalties in the event that the jury's verdict as to past royalties is sustained.

The parties will be given 30 days to attempt to come up with an agreed-upon royalty rate. If, at that time, the parties have made progress toward agreement, they may ask the Court for additional time to reach agreement if both parties agree that the additional time would likely be productive. Of course, any agreement that the parties may reach as to the royalty rate will not

25

A71

bar either party from challenging any other aspect of the proceedings, either in a Rule 50(b) motion after judgment or on appeal.  If the parties are unsuccessful in reaching agreement as to a suitable ongoing royalty rate, Dr. Bianco will be permitted to file a motion requesting that the Court adopt an ongoing royalty rate to be imposed in lieu of an injunction.  See Paice, 504 F.3d at 1315.

IT IS SO ORDERED.

SIGNED this 17th day of March, 2014.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Following the trial in this case, the jury found that defendant Globus Medical, Inc., had

misappropriated trade secrets belonging to the plaintiff, Sabatino Bianco, M.D. The trade secrets

in question consisted of ideas for the design of a medical device known as an adjustable

intervertebral spacer or implant. Intervertebral spacers are used in spinal surgery to replace

damaged discs in patients' spines. In assessing damages, the jury rejected Dr. Bianco's request

for disgorgement of Globus's profits on the devices that allegedly embodied the misappropriated

trade secrets, but awarded him reasonable royalty damages in the amount of $4,295,760. That

sum constituted 5% of the total "net sales" that Globus had earned prior to trial on the three

intervertebral spacers that were the subjects of the litigation, the Caliber, Caliber-L, and Rise

devices.[1]

---

[1] The evidence at trial showed that Globus used the term "net sales" to refer to total sales
minus several categories of variable costs, including the cost of the goods, sales commissions,
taxes, transportation and related charges, rebates, discounts, and license fees.

1

In response to post-trial motions, the Court denied Dr. Bianco's request for a permanent injunction but granted his request that the Court consider an ongoing royalty on the Caliber, Caliber-L, and Rise products in lieu of an injunction (Dkt. No. 269). The Court gave the parties 30 days within which to attempt to agree on an appropriate ongoing royalty rate. When that 30-day period expired, the parties notified the Court that they had reached impasse. The Court then held an evidentiary hearing on the issue of the ongoing royalty sought by Dr. Bianco. After analyzing the evidence at trial and at the evidentiary hearing, and after reviewing post-hearing briefs submitted by the parties, the Court now grants Dr. Bianco an ongoing royalty of 5% on Globus's future sales of its Caliber, Caliber-L, and Rise products for a maximum  period of 15 years from July 1, 2007.

I

In patent cases in which a permanent injunction is sought, the Federal Circuit has held that a district court may impose a reasonable royalty on the defendant for future use of the patented invention in lieu of an injunction. Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1315 (Fed. Cir. 2007); see also Telcordia Techs., Inc. v. Cisco Sys., Inc., 612 F.3d 1365, 1378-79 (Fed. Cir. 2010). Before setting an ongoing royalty rate for future infringement, however, the district courts have been instructed to allow the parties time to negotiate an ongoing royalty amongst themselves. See Paice, 504 F.3d at 1315 & n.15; id. at 1316-17 (Rader, J., concurring); see also Telcordia, 612 F.3d at 1379. If those negotiations fail, the district court is permitted, in the exercise of its discretion and in light of its equitable powers, to assess a reasonable royalty in lieu of an injunction. Paice, 504 F.3d at 1315; see also Presidio Components, Inc. v. Am. Technical Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012); Whitserve, LLC v. Computer

2

Packages, Inc., 694 F.3d 10, 35 (Fed. Cir. 2012). Although this case involves trade secret misappropriation rather than patent infringement, the two torts are sufficiently analogous that the Federal Circuit's decision in Paice, as supplemented by cases from the Federal Circuit and from this district that have applied Paice, provide an appropriate starting point for this Court in deciding whether to grant an ongoing royalty and what the amount of that royalty should be.

The Federal Circuit in Paice stated that calculating a reasonable royalty would be a matter for the sound discretion of the district court, but the circuit court has not had occasion to address in detail how a district court should go about exercising that discretion in setting an ongoing royalty. In Amado v. Microsoft Corp., 517 F.3d 1353 (Fed. Cir. 2008), the district court had set a reasonable royalty to be paid by an adjudged infringer during the period that a permanent injunction was stayed pending appeal. The district court in Amado had trebled the royalty found by the jury because, in the district court's view, any postjudgment infringing conduct would be willful. The Federal Circuit rejected that analysis, however, holding that "willfulness . . . is not the inquiry when the infringement is permitted by a court-ordered stay." Id. at 1362. The court of appeals also rejected the defendant's argument that the royalty rate set for the period of the stay should be the same royalty rate that the jury found for past damages. Id. at 1361-62. Citing Judge Rader's concurrence in Paice, the court stated that "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." Id. at 1361. The court noted that once a judgment of patent validity and infringement has been entered against a defendant, the nature of the hypothetical negotiation between the parties is different because much of the uncertainty regarding infringement and patent validity has been resolved. See id. at 1362.

3

Amado was an unusual case, as it involved an injunction that was issued but was stayed

pending appeal. However, in ActiveVideo Networks, Inc. v. Verizon Communications, Inc., 694

F.3d 1312 (Fed. Cir. 2012), the court of appeals applied the principles discussed in Amado in a

more conventional setting. In that case, the court ruled that Amado's holding "that an

assessment of prospective damages for ongoing infringement should take into account the

change in the parties' bargaining positions, and the resulting change in economic circumstances,

resulting from the determination of liability. . . . applies with equal force in the ongoing royalty

context." Id. at 1343 (internal quotation marks omitted). The ActiveVideo court, however, did

not offer guidance as to the factors a district court should consider when setting an ongoing

royalty or the factors that should lead a district court to depart from the ongoing royalty set by a

jury for past damages.

Courts in the Eastern District of Texas have applied the Paice approach to setting ongoing

royalty rates in several patent cases. They have consistently looked to the jury's verdict as the

"starting point" for determining postjudgment damages. See, e.g., VirnetX Inc. v. Apple Inc.,

No. 6:13-cv-211, slip op. at 5 (E.D. Tex. Feb. 25, 2014), ECF No. 53; Internet Machs. LLC v.

Alienware Corp., No. 6:10-cv-23, 2013 WL 4056282, at *19 (June 19, 2013); Mondis Tech. Ltd.

v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 645-46 (E.D. Tex. 2011); Affinity Labs of

Texas, LLC v. BMW N. Am., 783 F. Supp. 2d 891, 900 (E.D. Tex. 2011). They have then

addressed how the changed circumstances would affect the royalty rate selected for purposes of

calculating future damages. In so doing, the courts have often used the so-called Georgia-Pacific

factors in assessing how the changed circumstances would produce a royalty rate in a

hypothetical post-verdict licensing negotiation that was different from the royalty rate the jury

4

selected based on a hypothetical licensing negotiation at the outset of infringement.[2]  See, e.g.,

VirnetX Inc., slip op. at 5-9 (considering changed circumstances with respect to plaintiff's

increased commercial success and defendant's noninfringing alternatives); Internet Machs., 2013

WL 4056282, at *19-20 (considering new evidence of a shareholder letter dated 13 days after

trial that the plaintiff argued was probative of the value of the patented invention); Mondis Tech.

Ltd., 822 F. Supp. 2d at 647 ("[T]he Court focuses on any new evidence that was not before the

jury and additionally any changed circumstances . . . between a hypothetical negotiation that

occurred in 2005 (which the jury determined) and a hypothetical negotiation that would occur in

2011 after the judgment . . . .").  In addition, courts in this district typically consider whether

continued infringement would be willful and thereby call for enhanced damages.  See, e.g.,

Internet Machs., 2013 WL 4056282, at *19; Mondis, 822 F. Supp. 2d at 646.

     Based on the Paice decision and the cases that have followed it, Dr. Bianco argues that he

is entitled to an ongoing royalty of 6% of net sales on the three products in dispute.  He contends

that the proper way to calculate the ongoing royalty under the Paice precedents is to begin with

the jury's royalty rate for past damages as a floor and then to determine how much of an increase

in that level would result from a hypothetical negotiation taking place after the jury's verdict.

The increase in the royalty rate directed by the Paice line of cases, he argues, is based on the fact

that the jury's verdict has eliminated much of the uncertainty about the likelihood of liability that

would have accompanied a pre-verdict negotiation.  Moreover, he argues that an increase in the

royalty rate is justified by analogy to patent cases, in which post-verdict infringement is regarded

---

[2]  The "Georgia-Pacific factors," taken from the decision in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), are the factors frequently considered in determining the royalty rate that would likely have been agreed upon at the conclusion of a hypothetical negotiation between the parties.

as willful and thus subjects the defendant to enhanced damages for willfulness based on the defendant's continuing acts of infringement.

## II

Globus argues that because this case is a trade secret case and not a patent case, the Paice decision and its progeny do not apply, either directly or by analogy. Globus further contends that Dr. Bianco is not entitled to any future damages because the amount the jury has awarded him is more than sufficient to compensate him for the misappropriation, if any, of his trade secrets. The Court will first address Globus's argument that Dr. Bianco is not entitled to any further damages at all and will then turn to the question whether, and in what way, the Paice analysis applies to this case and what royalty rate should be adopted for post-trial sales of the disputed products.

## A

The jury's finding that a reasonable royalty rate is the proper method of measuring Dr. Bianco's damages provides the starting point for the Court's determination of how future damages should be calculated. Absent a showing to the contrary, the clear implication of the jury's verdict is that the royalty rate the jury selected for the entire period up to trial would continue into the period following trial.

Globus argues that the jury's assessment of a 5% royalty rate for past sales of the accused products should not apply to future sales. Its principal argument is that the evidence at trial and at the post-trial hearing showed that Globus's misappropriation of Dr. Bianco's trade secrets at most gave Globus a "head start" in its effort to produce an adjustable intervertebral spacer. However, according to Globus, any such "head start" did not last into the period after the trial. Therefore, Globus contends, because the effects of the trade secret misappropriation had

6

dissipated by the time of the trial, the Court should not assess any damages for the post-verdict period.

Because the award of an ongoing royalty is a form of equitable relief, Texas case law pertaining to injunctive relief in trade secret cases is relevant to the issue of future damages in this case. Under Texas law, a court may impose perpetual injunctive relief that continues even past the time when a trade secret is publicly disclosed. See Hyde Corp. v. Huffines, 314 S.W.2d 763, 772-76 (Tex. 1958). Such perpetual relief, however, is not mandated. A court is free to award equitable relief for a limited term if the circumstances warrant such relief. See Bryan v. Kershaw, 366 F.2d 497, 499, 501-02 (5th Cir. 1966) (affirming the grant of a limited-duration injunction that was based on the amount of time "necessary to remove the competitive advantage gained through the illegally used trade secrets," id. at 499). It is Globus's burden, however, "to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection." Hyde, 314 S.W.2d at 776.

Additionally, the Fifth Circuit has affirmed an award of reasonably royalty damages that extended beyond the head start period gained by the defendant. In Sikes v. McGraw-Edison, 665 F.2d 731 (5th Cir. 1962), the defendant agreed to a two-year period of confidentiality and the defendant's own product was two years away from being finalized when the plaintiff disclosed his idea. Id. at 732-33. The court affirmed an award of reasonable royalty damages extending beyond two years, however. The court reasoned that if the parties had agreed to a royalty, it was "exceedingly unlikely that any such per-unit royalty . . . would have been so arranged as to terminate after two years or have been payable for any term other than the life of" the offending products. Id. at 737. Therefore, it is appropriate under Texas law for the court to consider a

7

reasonably ongoing royalty "by reference to the most likely period for which it would have been paid," id., had Dr. Bianco and Globus come to an agreement when Dr. Bianco first disclosed his ideas to Globus at the end of June 2007 or at some point thereafter.

Globus's "head start" theory suffers from several flaws. First, at trial Globus did not present evidence regarding that theory. Nor did it ask for a jury instruction embodying that theory. Instead, Globus's principal argument at trial was that there was no misappropriation at all. The jury, however, rejected the "no misappropriation" argument. In the event that the jury found that Globus had misappropriated Dr. Bianco's trade secrets, Globus argued that the remedy should be in the form of a royalty for past damages up to the date of trial, but only in the amount of 0.5% of Globus's net sales of the three products at issue. Globus did not offer evidence or argue that the damages, whether in the form of a royalty or otherwise, should have been terminated at some earlier point because any advantage Globus obtained from the misappropriation of Dr. Bianco's trade secrets had ended by the time of trial. Thus, Globus did not present at trial the argument that all it obtained from the misappropriation, if anything, was a "head start" in developing the Caliber and Rise line of products.

In particular, the "head start" theory was not set forth in any of Globus's experts' reports, even with respect to the issue of post-trial damages. To the contrary, at trial Globus's damages expert testified that if Dr. Bianco was entitled to damages, it should be in the form of a royalty. Although he argued that the royalty rate should be much lower than the rate awarded by the jury, at no point did he suggest that the royalty payment should terminate because any "head start" gained by Globus would have come to an end at some point.

8

Globus cannot claim that it has been unfairly deprived of an opportunity to put forward a "head start" theory despite its failure to present that theory to the jury. That might have been the case, for example, if Globus had withheld its head-start theory from the jury because the facts only supported a head-start advantage that ceased to exist on or after the date of trial and Globus had no reason to present a defense against future damages at trial. Globus, however, was prepared to try future damages to the jury. The only reason future damages was not tried to the jury was because the Court determined shortly before trial that Dr. Bianco's damages expert had used an unreliable method for calculating the total amount of Dr. Bianco's future damages. Because Globus was prepared to try future damages as part of its case and never pursued a head-start theory to limit damages—at trial or in its expert reports—it is appropriate for the Court to consider Globus's failure to pursue that theory in determining the ongoing royalty rate.

Globus sought to make up for the absence of evidence as to the "head start" issue through evidence offered at the hearing on future damages, but its effort in that regard was unavailing. The evidence Globus introduced at the hearing consisted largely of testimony from the engineers who were principally responsible for designing the Caliber and Rise line of products for Globus. They testified, as they had at trial, that they developed those products independently, without any direct or indirect influence from Dr. Bianco's trade secrets (as embodied in the drawings he gave to Globus in June 2007). At the hearing, the engineers added that even if they had been exposed to Dr. Bianco's drawings, the drawings would not have had any effect on the progress of their development of those products.

The problem with that evidence is that it is at odds with the jury's verdict. The jury found that Globus misappropriated Dr. Bianco's trade secrets and that Globus's use of those

9

A81

trade secrets entitled him to an award of a 5% royalty on the net sales of those products. Under the principles of Beacon Theatres, Inc. v. Westover, 359 U.S. 500 (1959), and Dairy Queen, Inc. v. Wood, 369 U.S. 469 (1962), those findings are binding on this Court as a starting point in making the equitable determination of what ongoing royalty rate should be adopted in lieu of an injunction. Indeed many of Globus's arguments are, in effect, challenges to the jury's finding of trade secret misappropriation and its choice of a royalty rate. Those arguments are proper subjects for a motion for judgment as a matter of law, but they are not appropriate in a proceeding directed at setting an ongoing royalty rate, in which the Court is bound by the jury's verdict.

Significantly, the report and testimony of Globus's damages expert, Keith R. Ugone, was inconsistent with the "head start" theory that Globus raised in the course of the ongoing royalty proceedings. Dr. Ugone stated in his report, and acknowledged on cross-examination at the evidentiary hearing, that the proper approach to calculating an ongoing royalty for trade secret misappropriation would be to continue the rate found applicable in measuring past damages.

He stated that "the royalty rate, if any, decided by the trier of fact at trial would also be the ongoing royalty rate for claimed future damages." (Dkt. No. 296, at 115, 117). To be sure, he proposed a much lower rate for past damages than the jury awarded. But as to the relationship between the rate for past damages and the rate for future damages, his testimony was that they should be the same. That evidence further underscores the point that Globus committed itself to a royalty-based theory of damages at trial. Its effort to raise a "head start" theory during the ongoing royalty proceedings thus was not supported by its own evidence at either trial or at the post-trial evidentiary hearing.

10

A82

By separate motion (Dkt. No. 289), Dr. Bianco challenged portions of the evidentiary hearing testimony of one of the Globus engineers, Chad Glerum, on the ground that it constituted opinion testimony that was barred by a pretrial stipulation entered into by the parties. The Court granted the motion to exclude opinion testimony from Mr. Glerum at the evidentiary hearing, subject to the issue being re-raised in the briefs. The Court then allowed Globus to offer the challenged testimony as a proffer. The Court now reaffirms its decision that Mr. Glerum's opinion testimony is barred by the stipulation.

At the evidentiary hearing, the parties disputed the meaning of the stipulation, in which the parties agreed that Globus "will not offer opinions" from seven identified "non-retained experts . . . outside of what the witnesses testified to in their depositions." (Dkt. No. 138). The Court concluded at the time of the hearing, and reaffirms now, that the stipulation barred Mr. Glerum from giving any opinion testimony other than testimony that he gave in his deposition. Accordingly, the Court has excluded Mr. Glerum's testimony that prior knowledge of Dr. Bianco's trade secrets would not have assisted him in designing the Caliber devices. Even if that testimony had been admitted, however, it would not have changed the Court's judgment on this issue for the reasons set forth above.

Mark Weiman, a Globus engineer who was principally responsible for the Rise project, testified to the same effect as Mr. Glerum with regard to the Rise device. His testimony was not subject to the stipulation and therefore was not excludable on that ground. Dr. Bianco argues that Mr. Weiman's testimony should have been precluded because it is expert testimony, and that Globus did not give Dr. Bianco advance notice of that testimony under Fed. R. Civ. P. 26(a)(2)(C). The Court concludes, however, that Mr. Weiman's testimony to which Dr. Bianco

11

objected at the evidentiary hearing was not excludable, because it did not constitute expert opinion testimony under Fed. R. Evid. 702, 703, or 705, and therefore was not subject to Rule 26(a)(2). See Fed. R. Civ. P. 26(a)(2)(A). In any event, as in the case of Mr. Glerum's testimony, Mr. Weiman's testimony did not affect the Court's decision that Globus failed to support its "head start" theory for rejecting Dr. Bianco's request for future royalty damages. For the foregoing reasons, the Court agrees with Dr. Bianco that the evidence does not support a ruling limiting the post-verdict damages to some "head start" period enjoyed by Globus, and that instead the calculation of future damages must be conducted by determining an appropriate ongoing royalty rate, starting with the rate embodied in the jury's verdict.

B

The Fifth Circuit has noted that it is generally accepted that the proper measure of damages in cases of trade secret misappropriation is determined by reference to the analogous line of cases involving patent infringement. Univ. Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 535 (5th Cir. 1974). Nonetheless, the Court recognizes that there are differences between Texas trade secret law and patent law that require distinctions be drawn between the method to be used in calculating an ongoing royalty in patent cases and the method to be used in trade secret cases.

First, Texas trade secret law, unlike patent law, does not provide for an award of enhanced damages based on a finding of willfulness. Instead, in order to be entitled to an enhancement in the form of punitive damages, Texas law requires a plaintiff to prove, by clear and convincing evidence, that the defendant acted with malice, i.e., with specific intent "to cause

12

substantial injury [or harm] to the claimant."   See Wellogix, Inc. v. Accenture, L.L.P., 716 F.3d

867, 883 (5th Cir. 2013), quoting Bennett v. Reynolds, 315 S.W.3d 867, 872 (Tex. 2010).

The Court need not determine whether malice can take the place of willfulness when

setting an ongoing royalty, because during trial the Court granted judgment as a matter of law in

favor of Globus on the issue of exemplary damages.   The Court concluded that Dr. Bianco did

not introduce sufficient evidence to support a finding of malice.   See Dkt. No. 235, at 126:10-18.

Nor is there any evidentiary basis from which to conclude that Globus's post-verdict conduct

would justify enhanced damages.   Dr. Bianco has not made any effort to show that Globus's

conduct in continuing to market the subject products following the trial has been animated by a

specific intent to harm Dr. Bianco.

A second difference between patent cases and trade secret cases that bears on the ongoing

royalty analysis is that trade secret misappropriation under Texas law is not a continuing tort.

Tex. Civ. Prac. & Rem. Code § 16.010(b).   Instead, the tort of misappropriation, as viewed

under Texas law, occurs at the moment of misappropriation.   See Gen. Universal Sys., Inc. v.

HAL, Inc., 500 F.3d 444, 451-52 (5th Cir. 2007).   Thus, while a patent infringer commits a new

tort of infringement each time it makes, uses or sells the patented product, a trade secret

misappropriator commits only a single tort at the time of misappropriation.   For that reason, it

makes more sense to view the royalty-based damages model by looking to a single hypothetical

negotiation occurring at the time of the initial misappropriation, rather than, as in the Paice line

of cases, determining the ongoing royalty rate based on a second hypothetical negotiation

occurring immediately after the verdict.   See University Computing Co., 504 F.2d at 537,

quoting Egry Register Co. v. Standard Register Co., 23 F.2d 438 (6th Cir. 1928) (reasonable

13

royalty is calculated by determining what the price would be for a license "granted at the time of beginning the infringement").

A single hypothetical negotiation, taking place at the time of the misappropriation, would provide the best model for determining what the parties would have agreed to as a royalty at the time of the misappropriation if the parties had reached an agreement after good faith negotiations at that time. That model also comports with the evidence at trial and at the hearing on future damages as to Globus's typical practices for negotiating royalties with surgeons and other third parties who contribute to the development of Globus products. That evidence showed that Globus's royalty agreements are typically set to last for 15 year from the date of agreement; they do not contemplate re-negotiation of the royalty rate at a future time in order for the parties to take into account changed market and economic circumstances, or changes in the relative bargaining positions of the parties to the agreement. See Sikes v. McGraw-Edison Co., 665 F.2d 731, 737 (5th Cir. 1962) (affirming reasonable royalty damages spanning a period of time that the evidence suggested the parties would have agreed to).

Although Dr. Bianco suggests that the Court should enhance the royalty rate in order to deter trade secret misappropriation in general, the Court is not persuaded that deterrence of such conduct is a valid justification for enhancement of the ongoing royalty rate. Texas trade secret law already provides adequate remedies to deter trade secret misappropriation in the first instance. A defendant who misappropriates a trade secret under Texas law not only faces the potential for liability calculated as a reasonable royalty, but also faces the risk of a judgment requiring disgorgement of up to all the profits gained as a result of that misappropriation. See Univ. Computing Co., 504 F.2d at 536. Indeed, the jury in this case was given the opportunity to

14

award Dr. Bianco disgorgement of some or all of Globus's profits resulting from its misappropriation of Dr. Bianco's trade secrets, but it declined to do so.

III

In seeking to determine the proper rate for ongoing royalties, the Court begins its inquiry with the jury's verdict. The verdict of $4,295,760 in past damages represents a royalty rate of 5% of the past net sales of the Caliber, Caliber-L, and Rise products.

The evidence at trial showed that a royalty arrangement was exactly what Dr. Bianco hoped to obtain in exchange for disclosing his ideas to Globus in 2007. There was no evidence that either party contemplated that Globus would be forced to re-negotiate any license granted by Dr. Bianco in order to continue selling its Caliber and Rise products.

The jury found that the most equitable result in this case was to award Dr. Bianco exactly what he expected in the first place—a reasonably royalty, and not disgorgement of Globus's profits. While the jury's selection of a 5% royalty rate on net sales is near the high end of the royalty rates Globus has historically negotiated for use of an idea, it is within the range of those royalty rates. Put simply, the jury found that the proper measure of damages was what Dr. Bianco lost as a result of Globus's misappropriation of his trade secrets. The jury accordingly awarded Dr. Bianco a reasonable royalty that put him in the position he would have been in had Globus negotiated a licensing agreement with him, as Dr. Bianco originally wanted. Based on the evidence at trial and the royalty structure that Globus has employed in the past, the Court finds that there is no reason to award a royalty rate for post-verdict sales of the disputed products that is different from the royalty rate used by the jury in determining past damages.

15

The Court recognizes that in patent cases, the Federal Circuit has directed courts considering an award of ongoing royalties to "take into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability." ActiveVideo, 694 F.3d at 1343 (internal quotation marks omitted). Accordingly, in the event that the Federal Circuit regards that principle as extending to trade secret cases such as this one, the Court will undertake an analysis of whether the parties' bargaining positions have changed and how those changes might affect a post-verdict hypothetical negotiation directed to setting an ongoing royalty rate for the future sales of the products at issue.

Pursuant to the line of cases applying Paice and its progeny, the Court will use the 5% royalty rate found by the jury as the starting point. The Court will then analyze the specific circumstances of this case to determine whether that royalty rate should be modified. Although individual considerations may weigh in favor of decreasing the ongoing royalty rate relative to that awarded by the jury, the Court notes that pursuant to Amado the ultimate ongoing royalty rate should not be lower than the rate awarded by the jury for pre-verdict damages. See Amado, 517 F.3d at 1362 n.2.

A primary difference between a hypothetical post-verdict negotiation between Dr. Bianco and Globus and a hypothetical negotiation in July 2007 after Globus received Dr. Bianco's drawings, is that the verdict eliminated most of the legal uncertainty about whether Dr. Bianco's idea constituted a trade secret along with most of the legal uncertainty about whether Globus used that idea by pursuing the development and commercial sale of the Caliber and Rise products. Although the resolution of those uncertainties might suggest that Dr. Bianco would

16

have obtained a higher royalty rate in a post-verdict hypothetical negotiation compared to what he would have obtained prior to the verdict, the Court finds that no such increase is warranted in this case given the evidence and argument presented at trial.

Neither party presented evidence or offered argument that would have allowed the jury to determine how the parties in a hypothetical negotiation would have initially discounted the value of Dr. Bianco's ideas based on legal uncertainty over whether those ideas were entitled to trade-secret status or whether commercialization of the Caliber and Rise line of products would amount to use of Dr. Bianco's ideas. Instead, the parties focused on the significance of Dr. Bianco's ideas relative to the products that Globus ultimately developed. They presented evidence and argument about how Dr. Bianco's contribution to the development of those products compared to the contributions of other surgeons or companies with whom Globus entered into consulting or licensing agreements with royalty rates ranging from 0.5% to 6% of net sales. The jury was instructed that in setting a reasonable royalty it could consider "any other factors that might affect the rate that the parties would choose," Final Jury Instructions, Dkt. No. 226, at 7. However, the jury was not explicitly instructed to assume that the parties in the hypothetical negotiation would have assumed that Dr. Bianco's idea was a trade secret that Globus would use in the legal sense if it pursued the development and commercial sale of the Caliber and Rise products. Under these circumstances, the Court concludes that it is highly unlikely that the jury discounted its royalty determination based on legal uncertainties, without evidence or argument about how the hypothetical negotiation would have been affected by such uncertainties.

17

To the extent that the resolution of legal uncertainties might bear on the amount of the ongoing royalty, some of the uncertainties have been resolved in Globus's favor. Thus, prior to trial, Globus faced the risk of disgorgement of some or all of its profits and the risk of a permanent injunction if it proceeded to build the Caliber and Rise line of products without an agreement with Dr. Bianco. The jury, however, determined that disgorgement was not the appropriate remedy, and the Court ruled that Dr. Bianco was not entitled to exemplary damages and that a permanent injunction against the sale of the disputed Globus devices was not warranted (Dkt. No. 269). Those circumstances offset the potential improvement in Dr. Bianco's post-verdict negotiating position attributable to the portion of the jury's verdict that was in his favor. That is, the jury's verdict resolved some of the legal uncertainties in a way that strengthened Dr. Bianco's negotiating position from what it would have been in July 2007 (such as the risk that Dr. Bianco's idea would not be found to constitute a trade secret or would not be found to have been be used in the Caliber and Rise devices). The verdict, however, resolved other uncertainties in a way that strengthened Globus's negotiating position (such as the elimination of the risk of an order of disgorgement of profits, an award of exemplary damages, an injunction, and a judgment declaring Dr. Bianco to be a co-inventor on several of Globus's patents). The Court finds that with respect to the issue of the effect of the legal uncertainty that existed in 2007 on the royalty rate, the changed legal positions of the parties post-verdict roughly offset each other.

The Georgia-Pacific factors also do not support a royalty rate in excess of 5% for the invention. The Georgia-Pacific factors that the Court regards as pertinent to this case are: (1) royalty rates paid by the defendant or others in the industry for similar inventions (here, trade

18

secrets) under similar circumstances; (2) the profitability of the products; (3) the extent to which the products use or embody the invention or trade secret; and (4) the extent to which the profitability of the products is attributable to the invention or trade secret.

One of those factors, the profitability of the products, may cut in favor of an enhanced royalty rate, as the evidence shows that the Caliber and Rise products have been highly profitable. Other factors, however, suggest an ongoing royalty rate at the lower end of the 5% to 6% range. First, on only one other occasion has Globus paid a royalty rate in excess of 5%, and on that occasion, Globus points out, the payment was for more than an idea: it was for a product that had already been patented and prototyped. Second, while the products in dispute in this case embody the general idea of Dr. Bianco's trade secrets, the designs of those products differ in significant ways from the design depicted in the drawings that Dr. Bianco provided to Globus. Third, and relatedly, as to the extent to which the profitability of the products is attributable to Dr. Bianco's contribution, the evidence shows that the engineering of the products, including the use of a ramp-based expansion mechanism, involved substantial departures from the mechanisms depicted in the relatively crude drawings supplied by Dr. Bianco, which included a scissor-jack expansion mechanism. In particular, the combination of features that made it possible for the Caliber and Rise products to be both small and robust were contributed by Globus's engineers, and were not part of any specific suggestions contributed by Dr. Bianco. That factor cuts against selecting a royalty rate at the high end of the range under consideration. Weighing those factors together, the Court concludes that a rate at the lower end of the range between 5% and 6% is the appropriate ongoing royalty rate in this case.

A further component of the ongoing royalty award is the length of time for which royalty payments will be due. The evidence at trial showed that Globus's consulting and licensing agreements with physicians and others for product ideas and suggestions typically have a maximum term of 15 years. Dr. Bianco's damages expert, Stephen L. Becker, testified at the post-trial evidentiary hearing that, consistent with other royalty agreements entered into by Globus, the length of the period of ongoing royalties for Dr. Bianco should be 15 years. In his brief on the ongoing royalties issue, Dr. Bianco stated that he "does not make any claim to royalties accruing beyond that [15-year] period." (Dkt. No. 301, at 11 n.4).

Based on Dr. Becker's testimony, the other licensing agreements entered into by Globus, and Dr. Bianco's concession limiting his claim, the Court adopts 15 years as the maximum period for which Globus will be required to pay royalties to Dr. Bianco. Although Dr. Becker took the position that the 15-year period should run from the date of the post-verdict hypothetical negotiation, the Court has rejected Globus's argument that the ongoing royalty rate should be determined by reference to a second hypothetical negotiation. Accordingly, the Court considers the proper model for the beginning of the 15-year period to be the consulting agreements entered into by Globus with surgeons, a number of which are in the record. In those agreements, which typically run for 15 years, the 15-year period begins when the agreement is executed, not when the products begin to be sold. Since the agreements are designed to obtain input from the physicians as to the design of the devices in question, they are typically entered well before the instrument or device at issue is produced or sold. Applying the same principle to the hypothetical agreement with Dr. Bianco suggests that the 15-year period for which Globus is liable for royalty payments to Dr. Bianco should run from July 1, 2007, immediately after Dr.

Bianco provided his drawings to Globus, not the date of the verdict in or the judgment in this case.[3]

The evidence at trial provides further support for that conclusion. Dr. Bianco testified that when he gave his drawings to Globus he expected to enter into a compensation agreement if Globus decided to produce an adjustable intervertebral spacer based on his design. The evidence shows that shortly thereafter Globus began exploring the possibility of making an adjustable intervertebral spacer, although the actual engineering work on the Caliber device did not begin until early 2009. Under these circumstances, it was reasonable for Dr. Bianco to expect—and the evidence at trial shows that he did expect—that Globus would act fairly promptly on his suggestion and reach an agreement with him on compensation. For those reasons, the Court holds that July 1, 2007, is the appropriate starting date for the 15-year royalty period.

As a further component of the ongoing royalty award, Dr. Bianco requests that the Court's order regarding royalty payments be made applicable not only to the Caliber, Caliber-L,

---

[3] Prior to trial, Globus successfully moved to exclude Dr. Becker's testimony about future damages because Dr. Becker sought to quantify the future damages by estimating future sales of the accused products and extending that projection over a period of 15 years. Globus now objects to Dr. Becker's testimony at the evidentiary hearing about the 15-year period for the license on the ground that Dr. Bianco is attempting to use that period in order to obtain "damages in the form of a lump sum projected to compensate for sales 15 years from the date [of] a hypothetical re-negotiation." (Dkt. No. 302, at 10). At this point, however, Dr. Bianco is no longer requesting a lump sum award as future damages, but instead is seeking an ongoing royalty. Therefore, evidence that such a royalty award should last a maximum of 15 years is not objectionable, because it was not based on an unreliable projection of future sales of the accused products. As for Globus's argument that striking the evidence regarding the 15-year period would "leave[] Dr. Becker with no opinion as to a time frame for future damages," that argument again misses the point. Dr. Becker's evidence introduced at the evidentiary hearing was directed to establishing a royalty rate on the ongoing sales of the Caliber and Rise products. Because Dr. Bianco's proof at the evidentiary hearing was directed only at the appropriate royalty rate to be used with regard to future sales, there was no need for him to establish a fixed "time frame" for the award of damages.

21

and Rise products, but also to products not colorably different from those products. Globus disagrees and contends that there is no justification for including such a provision in the Court's judgment.

An order basing ongoing royalty payments on future sales of those three products implicitly extends to any products that are not colorably different from those products. See Soverain Software LLC v. Newegg Inc., 836 F. Supp. 2d 462, 484 (E. D. Tex. 2010); Creative Internet Adver. Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847, 853-55 (E.D. Tex. 2009). Globus cannot avoid its royalty obligations simply by renaming its products or making some trivial and immaterial change in the products. In order to avoid any possible misunderstanding of the scope of the judgment in that respect, the Court will make it explicit that the royalty obligation applies to products that are not colorably different from the Caliber, Caliber-L, and Rise products that were the subjects of the jury's finding of misappropriation.

Dr. Bianco further requests that the ongoing royalty payments be made on a quarterly basis with a right to periodic accounting of the royalty-bearing sales. Globus has not responded to that request, and as the Court regards the request as reasonable, it will be made part of the Court's judgment when the final judgment is entered.

In conclusion, the Court finds that Dr. Bianco is entitled to an ongoing royalty rate equal to that determined by the jury for past damages. In the final judgment, to be entered separately, the Court will therefore order that Globus pay Dr. Bianco 5% of the future "net sales" (as defined in the exemplary Globus royalty agreements considered by the damages experts in this case) of Globus's Caliber, Caliber-L, and Rise products, or products not colorably different from those products, with the royalty payment period terminating 15 years after July 1, 2007.

22

III

Before entering final judgment in this case, the Court must determine whether Dr. Bianco

should be awarded prejudgment interest and the amount of costs that should be taxed under Fed.

R. Civ. P. 54(d) and 28 U.S.C. § 1920.  Accordingly, the Court orders the parties to file a joint

notice setting out their positions as to (1) whether the judgment should contain an award of

prejudgment interest; (2) if so, how prejudgment interest should be calculated and what the

amount of the prejudgment interest award should be; (3) the amount of taxable costs; (4) how

those costs should be allocated, given that neither party prevailed on all of the issues in this case;

and (5) the definition of "net sales" that the Court should incorporate in the ongoing royalties

portion of the judgment.  The parties' joint notice should contain legal analysis explaining their

respective positions, but should be no more than 15 pages in length.  The joint notice shall be

filed on or before July 15, 2014.

IT IS SO ORDERED.

SIGNED this 1st day of July, 2014.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

23

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| SABATINO BIANCO, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2:12-CV-00147-WCB |
| | § | |
| GLOBUS MEDICAL, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

### I. Background

Globus Medical, Inc., the defendant in this case, manufactures and sells medical devices, including spinal implants that surgeons use to perform spinal fusion surgery. Spinal fusion is a type of surgery that is often performed on patients with degenerative disc disease, which causes the space between two adjacent vertebrae in the spine to become compressed. In patients with that condition, the relatively soft disc material between the bony vertebrae of the spine can bulge out or rupture, pinching the nerves that extend from the spinal column and causing significant pain. The goal of spinal fusion surgery is to remove the compressed disc material, restore the distance between the two vertebrae, and cause new bone material to grow between the vertebrae so that they ultimately form one fused vertebral bone. To accomplish that goal, surgeons remove the compromised disc material and place small implants, sometimes referred to as "spacers" or "interbody spacers," between the two adjacent vertebrae where the removed disc material used to

1

be.  The spacers remain in the patient's body to maintain the separation between the two adjacent vertebrae while the new bone grows and ultimately fuses the two vertebrae together.

Prior to the commercialization of the Globus products at issue in this case, most of the spinal implants available for fusion surgeries were of fixed sizes.  A surgeon using that type of implant would have to select the appropriate size for a particular patient and then force the spacer into the space between the adjacent vertebrae.  That procedure required the surgeon to apply considerable force to "wedge" or "hammer" the spacer between two adjacent vertebrae in order to obtain the desired separation.  One type of spacer that predated the Globus products (the Spine Wave StaXx XD) was expandable, but it was only expandable in discrete increments and could not be reduced in height once it was expanded.

The products at issue in this case are three devices produced by Globus that are implanted in patients during fusion surgery: Globus's Caliber, Caliber-L, and Rise products (collectively, the "Caliber and Rise products").  The Caliber and Rise products are continuously adjustable and reversible interbody spacers.  Because they are continuously adjustable, a surgeon can insert the spacer between two vertebrae while the spacer is at its minimum height and then expand the spacer to the precise height required for a particular patient when the spacer is in the appropriate position.  Likewise, the surgeon can alter the initial positioning of the spacer during surgery by simply reducing the height of the spacer, moving it to a new position, and re-extending it to the required height.  As a result, the patient is subject to less trauma during surgery than with a nonadjustable (or nonreversible) spacer, and successful fusion is more likely in view of the customized fit of the implant.  The Caliber and Rise line of products have been a commercial

success for Globus. In addition, Globus has obtained patents that cover adjustable interbody spacers similar in design to the Caliber, Caliber-L, and Rise products.

The plaintiff in this case, Dr. Sabatino Bianco, filed this suit against Globus alleging, among other claims, that by developing and commercializing the Caliber and Rise products, Globus misappropriated trade secrets he had disclosed in confidence to Globus. The case was tried to a jury between January 13 and January 17, 2014. At the conclusion of the trial, the jury returned a verdict finding Globus liable for trade secret misappropriation, but not liable for breach of contract. The jury awarded Dr. Bianco $4,295,760 in damages for past trade secret misappropriation, which was five percent of the profits that Globus earned on the products up to the original trial date, as calculated by Globus's expert.[1]

After trial, the Court denied Dr. Bianco's request for a permanent injunction. However, following the procedure approved by the Federal Circuit in Paice v. Toyota Motor Corp., 504 F.3d 1293, 1313-16 (Fed. Cir. 2007), the Court granted Dr. Bianco's request that the Court consider directing Globus to pay an ongoing royalty on the Caliber, Caliber-L, and Rise products in lieu of an injunction. Dkt. No. 269. The Court held an evidentiary hearing on the ongoing royalty issue and ultimately awarded Dr. Bianco a royalty of five percent of net sales—consistent with the rate awarded by the jury for past damages—on future sales of the Caliber, Caliber-L, and Rise products for a maximum period of 15 years from July 1, 2007. Dkt. No. 311. The Court entered final judgment in the case on July 17, 2014. Dkt. No. 315.

---

[1] The two damages experts expressed their conclusions regarding damages in terms of what Globus referred to as "net sales." The net sales of a product is Globus's way of calculating profits on the product. Globus used net sales to calculate royalty payments that it made to surgeons who were members of its product design teams. As used here, the term "profits" will refer to net sales, as determined by Globus in calculating royalty payments.

3

Globus now moves for judgment as a matter of law on the issue of trade secret misappropriation under Federal Rule of Civil Procedure 50(b). Globus asserts that Dr. Bianco's evidence was insufficient to establish trade secret misappropriation. In support of that assertion, Globus makes three arguments. First, Globus asserts that the ideas depicted in the drawings that Dr. Bianco provided to Globus were not trade secrets. Second, even if Dr. Bianco's ideas for an adjustable interbody spacer constituted trade secrets, Globus denies that it acquired those trade secrets through improper means or through the breach of a confidential relationship. Finally, Globus asserts that even if Dr. Bianco's ideas constituted trade secrets and Globus obtained them improperly, the evidence was insufficient to prove that Globus made any use of those trade secrets, as required to support a claim of trade secret misappropriation.

Globus has also challenged the damages award, arguing that the Court should reduce the amount of the jury's award of past damages or order a new trial on the issue of damages. On the issue of past damages, Globus argues that the evidence does not support the royalty rate used by the jury and that the jury should have apportioned the royalty base according to Dr. Bianco's contributions to the Caliber and Rise products, rather than using as the royalty base the profits made on the Caliber and Rise line of products as a whole. In addition, Globus has moved to amend the judgment to omit the award of future royalties to Dr. Bianco on the ground that Texas trade secret law does not permit the award of future royalties in a case such as this one.

## II. The Evidence

### A. Dr. Bianco's Ideas as Trade Secrets

Dr. Bianco testified at trial that the concept of an adjustable interbody spacer with certain features that could be used in fusion surgeries was his idea. He claimed that he submitted that

4

idea to Globus in confidence before Globus initiated its efforts to develop the Caliber and Rise line of products. According to Dr. Bianco, that idea and its components constituted trade secrets, which Globus misappropriated by developing and commercializing the Caliber and Rise line of adjustable interbody spacers for fusion surgeries.

The evidence at trial, viewed most favorably to Dr. Bianco, showed that in early 2007, Globus invited Dr. Bianco to its headquarters in the Philadelphia area for a "VIP trip" to meet Globus's executives and learn about the company's new ideas. During that visit, Dr. Bianco told Globus representatives that he had some new ideas for implants for spinal surgery that he wanted Globus to consider. 1/13/14 PM Tr. 70-71. At that time, Globus sold a non-movable interbody spacer, but it did not sell an expandable interbody spacer product. Id. at 73. At the meeting, Globus representatives explained to Dr. Bianco the protocol for physicians to submit new ideas to the company. Id. at 75. Globus had him sign a non-disclosure agreement that prohibited him from disclosing any of Globus's ideas and prohibited Globus from disclosing any of his ideas without his input. Id. at 71-72.

Dr. Bianco testified that after the VIP meeting, he told Globus area director (and later regional vice-president) Gregg Harris about an idea he had for a new product. Harris responded that if Dr. Bianco had drawings of his new idea, he should have them notarized to protect both Dr. Bianco and Globus, "so we make sure we don't have problems afterwards." 1/13/14 PM Tr. 75, 85. Another Globus representative made a similar request by email that Dr. Bianco notarize his drawings. Id. at 85. After notarizing the drawings that depicted his ideas, Dr. Bianco met with Mr. Harris to explain his ideas and give him the drawings. Id. at 75-78.

5

The set of drawings that Dr. Bianco gave to Globus was entitled "Adjustable Interbody Spacer." 1/13/14 PM Tr. 78. The drawings depicted a spacer element connected to a long shaft with a dial on the end of the shaft opposite the spacer element. Along with a few other features, the drawings depicted the spacer element with a "scissor-jack" mechanism for increasing or decreasing the height of the spacer in the range of 6 to 14 millimeters. PX33; 1/13/14 PM Tr. 78-81. A scissor jack is a mechanism frequently used in automobile jacks. In its simplest form, a scissor jack consists of two metal arms that are rotatably attached at the centerpoint of each, as in a pair of scissors. As the arms move from a horizontal to a vertical position (as in the case of an upright pair of scissors that is moved from a fully open to a fully closed position), the rotation of the arms will cause an increase in the distance between two plates that are attached to the ends of the arms.

Dr. Bianco contends that his trade secrets are not limited to the particular scissor-jack design of the adjustable interbody spacer depicted in his drawings. Instead, he contends that his trade secrets included the general idea for a continuously expandable, reversible spacer for fusion surgeries that could be inserted between two vertebrae at a minimum height and then expanded to the precise height required for the particular patient.

Dr. Bianco testified that he met with Mr. Harris of Globus for at least an hour to discuss his idea for the adjustable interbody spacer. He gave Mr. Harris his drawings at that time. 1/13/14 PM Tr. 85-86. According to Dr. Bianco, Mr. Harris said he would present the drawings to a committee at Globus known as the "new products committee," which met monthly, and that a decision regarding the new idea would take two to four months. Mr. Harris added that as soon as the committee made a decision, he would let Dr. Bianco know, and that if the company

6

A112

decided to use his idea, Dr. Bianco would be compensated in an amount that would be "standard for a doctor presenting a new idea." Id. at 86, 89, 255.  Mr. Harris asked Dr. Bianco to fill out a Globus "new idea submission form" to submit his proposal.  A few days later, another Globus representative sent Dr. Bianco an email confirming that Mr. Harris had conveyed Dr. Bianco's "New Idea Submission Forms" and adding that "Globus Product Development engineers will review the ideas and sketches."  PX33.

Dr. Bianco testified that before his meeting with Mr. Harris, he took steps to ensure the secrecy of his ideas and thereby preserve their status as trade secrets.  In particular, he testified that before meeting with Mr. Harris he kept his drawings in a safe in his office.  1/13/14 PM Tr. 84.

Over the next two and a half years, Dr. Bianco asked Mr. Harris on multiple occasions about whether Globus had made a decision regarding the development of his idea.  1/13/14 PM Tr. 89-90.  Each time, Mr. Harris told him that it was a complex project, that the company had to consider resources and potential return on investment, and that the company needed more time before letting Dr. Bianco know whether it was interested in his proposal.  Id. at 90.

In the fall or winter of 2009-2010, according to Dr. Bianco, Mr. Harris returned Dr. Bianco's drawings to him.  Mr. Harris told Dr. Bianco at that time that Globus was "not interested in this technology."  1/13/14 PM Tr. 89-90, 93-95; 1/14/14 AM Tr. 98-99.  Although Dr. Bianco visited Globus's headquarters on several occasions between 2007 and 2010, and had provided input to Globus on other types of medical implants during that period, Globus did not advise Dr. Bianco that it was working on the Caliber and Rise line of products or that it had filed a patent application for an adjustable interbody spacer.  Id. at 95-96.

7

In early 2011, Globus began marketing its Caliber product. Dr. Bianco learned about the Caliber device for the first time when a Globus representative showed him a sample of the Caliber spacer and tried to sell it to him. 1/13/14 PM Tr. 103. When he saw the Caliber spacer, Dr. Bianco was upset, as he believed the Caliber device embodied the basic concept and significant elements that were derived from his drawings. Id. at 103-04; 1/14/14 AM Tr. 100. Dr. Bianco confronted Mr. Harris regarding the Caliber device. 1/13/14 PM Tr. 107-10. Dr. Bianco reminded Mr. Harris that he had said the company was not interested in this technology, and he added, "I had no clue that you guys were doing this, and what's going on?" Id. at 111. Mr. Harris responded that he was sorry and that "[h]e understood that [Dr. Bianco] had intellectual property in this implant and that the company would make it right." Id.

### B. Globus's Use of Dr. Bianco's Trade Secrets

Dr. Bianco's theory of how Globus used his trade secrets is essentially that he provided the motivation for Globus to make an adjustable interbody spacer as well as the core concepts underlying the design of such a device. In particular, Dr. Bianco asserts that he was the source of the idea to make an adjustable interbody spacer that would be continuously expandable and reversible within a range of distraction heights, that his ideas prompted Globus to pursue the detailed design and development work to bring such a product to fruition, that his design facilitated Globus's development work, and that the final products marketed by Globus contained many of the features of the trade secrets that Dr. Bianco had disclosed in confidence to Globus.

The evidence at trial showed that, shortly after receiving Dr. Bianco's drawings, Globus circulated them to several Globus executives responsible for product development and

8

fabrication. Within a few months of receiving Dr. Bianco's drawings, Globus started its first-ever project to design and manufacture an adjustable interbody spacer. In October 2007, Globus executive Bill Rhoda assigned engineer Ed Dwyer the task of coming up with concepts for a way to expand an implant. 1/16/14 AM Tr. 153. The natural inference from the timing of those events, Dr. Bianco argues, is that the submission of his ideas to Globus was the motivating factor behind Globus's decision to begin that project, which ultimately led to the Caliber program that was started in early 2009. The fact that the designs that ultimately emerged from Globus's efforts were more fully developed and were significantly different from the relatively crude drawings made by Dr. Bianco is of no import, according to Dr. Bianco, because the Caliber and Rise products still embodied his idea for an adjustable interbody spacer for use in fusion surgeries and contained many of the features depicted in his drawings.

Dr. Bianco asserted at trial that in addition to motivating Globus to pursue the development of an adjustable spacer for fusion surgeries, his drawings accelerated the product development process by indirectly providing the basic concepts of an adjustable interbody spacer to the engineers responsible for the designs of the Caliber and Rise products. Two of the Globus senior executives who saw Dr. Bianco's drawings after he submitted them—Andy Lee and Bill Rhoda—met in 2007 to discuss what to do with Dr. Bianco's proposals. During that meeting, Mr. Lee came up with a ramp-based concept as a potential way to implement Dr. Bianco's ideas and sketched a simple version of that concept on the back of the sheet of paper containing Dr. Bianco's drawings. 1/14/14 AM Tr. 36-57; PX37. Globus built a prototype of Mr. Lee's ramp concept. That prototype was later shelved, but the ramp-based expansion mechanism was ultimately used in the Caliber and Rise products.

9

In its simplest form, a ramp-based expansion mechanism consists of two ramps or inclined planes within the implant that can move laterally with respect to one another. Rotation of an actuator drives one of the ramps forward against the other. The forward motion of the ramp drives the top plate of the implant up and the bottom plate down, increasing the height of the implant. The height of the implant can be reduced by rotating the actuator in the opposite direction.

Chad Glerum, the engineer who ultimately designed Caliber and Caliber-L, was assigned to the Caliber project in early 2009. Mr. Rhoda discussed the Caliber project with Mr. Glerum soon after Mr. Glerum was assigned to the project. Based on Mr. Rhoda's previous discussion of Dr. Bianco's drawings with Mr. Lee, Dr. Bianco asserts that his drawings contributed to accelerating Mr. Glerum's design and development efforts on the Caliber project. Dr. Bianco traces a similar path from his drawings to the design and development efforts of Mark Weiman, the lead engineer on the Rise project.

### C. Dr. Bianco's Evidence and Theory of Damages

At trial, Dr. Bianco argued that if the jury should find that Globus had misappropriated his trade secrets, the remedy should be disgorgement of all of Globus's profits on the Caliber, Caliber-L, and Rise products. Alternatively, Dr. Bianco asked the jury to award him a royalty of between five and six percent of the profits it earned on those products, by awarding him that percentage share of the net sales of those products, as defined in various royalty agreements that Globus entered into with surgeons who worked on Globus design teams. 1/15/14 AM Tr. 46; 1/17/14 AM Tr. 202. Dr. Bianco argued that a royalty in the range of five to six percent of the

10

net sales of the Caliber and Rise line of products was consistent with the royalty rates that Globus paid in other settings when it purchased an entire product or product line.

The evidence showed that Globus typically assembles design teams of surgeons to test and comment on product designs that Globus is developing. Globus ordinarily pays a royalty of one-half of one percent of the net sales of each product to each surgeon-member of those design teams, although some surgeons have received twice that amount or more. Dr. Bianco contended that his contribution of an idea for an entirely new product was much greater than the minor contributions and feedback normally provided by the design-team surgeons and therefore warranted a much higher royalty rate. He argued that his contributions were at least equivalent to the sum total of all of the contributions provided by the Caliber design team surgeons and that the royalty rate to which he was entitled was therefore at least on par with the sum-total of the royalty rates paid to all the surgeons on the Caliber design team, which was four percent of net sales.

### III. Discussion

#### A. Legal Standards Applicable to Post-Trial Motions

Judgment as a matter of law under Rule 50(b) is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury" to have found as it did with respect to a particular issue. Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235 (5th Cir. 2001). The Court is required to "consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." Id.

A new trial may be granted in cases in which the district court "finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or

11

A117

prejudicial error was committed in its course." <u>Smith v. Transworld Drilling Co.</u>, 773 F.2d 610, 612-13 (5th Cir. 1985).  However, "[a] motion for a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely against the preponderance of the evidence." <u>Dahlen v. Gulf Crews, Inc.</u>, 281 F.3d 487, 297 (5th Cir. 2002); <u>see also</u> <u>Laxton v. Gap Inc.</u>, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater weight of the evidence.").  In passing on a motion for a new trial, the trial court "need not take the view of the evidence most favorable to the verdict winner, but may weigh the evidence." <u>Shows v. Jamison Bedding, Inc.</u>, 671 F.2d 927, 930 (5th Cir. 1982); <u>see</u> <u>Whitehead v. Food Max of Miss., Inc.</u>, 163 F.3d 265, 270 n.2 (5th Cir. 1998).

A court will not reduce a damages award "unless the award 'clearly exceeds that amount that any reasonable man could feel the claimant is entitled to.'" <u>Wackman v. Rubsamen</u>, 602 F.3d 391, 404-05 (5th Cir. 2010).  "To overturn or reduce a damages award, the 'extent of distortion [must] . . . be so large as to shock the conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate[] bias, passion, prejudice, corruption, or other improper motive." <u>Id.</u> at 405 (alteration and omission in original).

### B. Motion for Judgment as a Matter of Law: Trade Secret Misappropriation

#### 1. Disclosure of Trade Secrets

Globus first argues that Dr. Bianco presented insufficient evidence at trial from which a reasonable jury could have found that Dr. Bianco disclosed a trade secret or secrets to Globus. According to Globus, Dr. Bianco defined his trade secret as a combination of distinct features identified by his technical expert, Dr. Carl McMillin.  Globus asserts that the drawings Dr. Bianco gave to Globus do not disclose the combination of all of those features, and that Dr.

Bianco did not offer sufficiently detailed evidence to show that he disclosed the combination of all of those features either through his drawings or through his interactions with Globus representatives.

Globus did not raise that specific argument in its pre-verdict Rule 50(a) motion for judgment as a matter of law. Globus has therefore waived the right to make that argument as part of its renewed motion for judgment as a matter of law under Rule 50(b). See Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 238 (5th Cir. 2001); Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1107-08 (Fed. Cir. 2003); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2537 (3d ed. 2008) ("[T]he district court only can grant the Rule 50(b) motion on the grounds advanced in the pre-verdict motion, because the former is conceived as only a renewal of the latter.").

In its Rule 50(a) motion, Globus argued that Dr. Bianco's ideas did not constitute a trade secret or secrets, for three reasons. First, Globus argued that Dr. Bianco's ideas were not secret because all of the components of his ideas were already known. Second, Globus argued that a trade secret must be more than "a mere idea," and that it was not enough that his idea may have inspired Globus to use ramps as the expansion mechanism in its intervertebral spacers. Third, Globus argued that Dr. Bianco failed to show that the combination of features he claimed as his trade secret were entitled to protection, because the combination was obvious in light of the prior art Scissor Jack instrument made by Medtronic, Inc., another manufacturer of medical devices. Dkt. No. 221, at 3-6; see also 1/15/14 AM Tr. 114. Globus did not argue that Dr. Bianco failed to disclose to Globus all the components that he or his expert claimed to constitute his trade secret, which is the argument Globus has made for the first time in his post-verdict Rule 50(b)

13

motion.[2]  Hence, because Globus's current argument that Dr. Bianco failed to disclose all the components of his trade secret to Globus was not raised in Globus's Rule 50(a) motions, it is waived.

Even if that argument were not waived, the Court would reject it on the merits.  Globus's argument that Dr. Bianco did not offer sufficient evidence to show that he disclosed all of the features that comprised his trade secret conflates trade secret law and patent law principles.  Dr. Bianco did not limit his trade secret claim to the specific combination of those features that his expert identified as having been disclosed to Globus.  That is, by identifying at trial all the features of the idea he disclosed to Globus, Dr. Bianco was not describing "narrowing limitations" that defined his trade secrets in the same manner that such limitations define the scope of patent claims.

Trade secret law generally does not require that a trade secret be defined by way of such limitations.  See Restatement (Third) of Unfair Competition § 40 cmt. (1995) ("The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability.  Similarly, the actor need not use the trade secret in its original form.").  The purpose of Dr. Bianco's identification of the various features of his disclosure to Globus was to show a connection between his disclosure and the

_____

[2]  In its reply memorandum in support of its Rule 50(b) motion, Globus argues that it raised the argument that Dr. Bianco failed to show that he disclosed all of the elements of his trade secret or secrets to Globus.  Dkt. No. 334, at 1-2.  In support of that contention, however, Globus cites to a portion of its Rule 50(a) motion in which it contended that Dr. Bianco did not disclose a "workable device" to Globus.  Dkt. No. 221, at 9.  Besides being a different argument, that argument was made as part of Globus's contention that Dr. Bianco failed to prove that Globus used his trade secrets, not as part of an argument that Dr. Bianco did not disclose any trade secret or secrets to Globus.  Globus has failed to show that it preserved the argument it now raises.

14

Caliber and Rise products. Even if the jury concluded that not all of the features identified by

Dr. Bianco's expert were shown in his drawings or otherwise disclosed to Globus, it could have

found the features allegedly omitted from Dr. Bianco's drawings—such as the presence of

radiographic markers and the use of particular materials in construction—were ancillary to the

core idea of a continuously adjustable and reversible interbody spacer for use in fusion surgeries.

Thus, it was not necessary for the jury to conclude that every feature identified by Dr. Bianco's

expert was disclosed in the drawings Dr. Bianco gave to Globus in order for the jury to find that

Dr. Bianco conveyed the concept of an adjustable interbody spacer to Globus and that his idea

for such a spacer was a trade secret.

In its post-trial brief, Globus has not argued that the idea for a continuously adjustable

interbody spacer was already in the public domain and therefore could not be a trade secret.[3]

Instead, Globus makes the argument that "a trade secret must be more than a mere idea." That

argument is unconvincing.

The authority cited by Globus does not establish that, as a matter of Texas law, "a trade

secret must be more than a mere idea." Globus relies on Gonzales v. Zamora, 791 S.W.2d 258

(Tex. App. 1990), in which a Texas court of appeals stated that "[w]e do not consider the

statement that a trade secret may be only an idea to be a correct statement of the law." Id. at 264.

The court in Gonzales, however, was making the point that trade secret law does not create a

---

[3] Nor would such an argument succeed. While a trade secret must be kept secret in order
to be eligible for protection, and while knowledge in the trade "is an important inquiry,
uniqueness in the patent law sense is not an essential element of a trade secret. . . .   As
distinguished from a patent, a trade secret need not be essentially new, novel or unique."
Cataphote Corp. v. Hudson, 422 F.2d 1290, 1293 (5th Cir. 1970) (quotation omitted); Ultraflo
Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935, 960 (S.D. Tex. 2013) ("Novelty and
uniqueness are not prerequisites for a trade secret."), citing Gonzales v. Zamora, 791 S.W.2d
258, 264 (Tex. App. 1990).

right to exclude based on a property right in the idea itself, as is the case in patent law.  Instead,

trade secret law protects an idea only if the idea is kept secret, and liability flows only from

improper conduct in obtaining or using that idea.  The Gonzales court made that point clear by its

reliance on the First Restatement of Torts, which states:

> The suggestion that one has a right to exclude others from the use of his trade
> secret because he has a right of property in the idea has been frequently advanced
> and rejected.  The theory that has prevailed is that the protection is afforded only
> by a general duty of good faith and that the liability rests upon breach of this duty,
> that is, breach of contract, abuse of confidence or impropriety in the method of
> ascertaining the secret.  Apart from breach of contract, abuse of confidence or
> impropriety in the means of procurement, trade secrets may be copied as freely as
> devices or processes which are not secret.

Restatement (First) of Torts § 757 cmt. a (1939).

Neither Gonzales nor the Restatement stands for the proposition that a trade secret must

be more than just an idea.  What those authorities stand for is that the idea that is claimed as a

trade secret is not a protected property right in the abstract, but is protected only as long as it is

kept secret and only against appropriation by improper means.  Thus, both Gonzales and the

Restatement would support liability in the case of misappropriation of a "mere idea," if the idea

had been kept secret and liability were premised on a breach of confidence, as it was in this case.

Globus also relies on Numed, Inc. v. McNutt, 724 S.W.2d 432 (Tex. App. 1987).  That

case is inapposite.  Numed concerned claims of trade secret status for "customer lists, contract

renewal dates, price lists, and marketing research" that were allegedly misappropriated by a

former employee of the plaintiff.  Id. at 434.  The court found that the defendant had not taken or

copied any of the plaintiff's information when his employment with the plaintiff was terminated

and that "the skills acquired by [the former employee] . . . which he later used to market his own

product, were derived from his own expertise, not the property of [the plaintiff]."  Id. at 435.

16

The court stated that a former employee does not commit trade secret misappropriation when he "use[s] the general knowledge, skills, and experience acquired during his prior employment to compete with a former employer and even do business with the former employer's customers, provided that such competition is fairly and legally conducted." Id. Numed therefore relied on a line drawn in the law to discern when former employees misappropriate their former employer's trade secrets, as opposed to merely using knowledge and experience obtained in the course of their prior employment.    Ideas, whether "mere" or otherwise, are protected from misappropriation as long as they provide an opportunity to obtain a business advantage over competitors and are maintained in secret.  Hyde Corp. v. Huffines, 314 S.W.2d 763, 776-77 (Tex. 1958).

The evidence at trial was sufficient to show that Dr. Bianco maintained his ideas in secret, except to the extent that he disclosed them to Globus subject to an understanding that he would be fairly compensated if Globus were to use them.  The Court therefore rejects Globus's argument that Dr. Bianco's ideas were not entitled to trade secret protection because they were "mere ideas."

Globus next argues that Dr. Bianco changed his theory of liability at trial by seeking to define his trade secrets not only as the specific combination of particular elements identified by his expert, but also as the "core idea" for a continuously expandable interbody spacer for use in fusion surgeries.  Globus asserts that Dr. Bianco was "foreclosed" from changing his theory of liability at trial in that way.  Dr. Bianco, however, did not change his theory of liability.  Dr. Bianco's amended complaint alleged that he "possessed valuable trade secrets in the design of the expandable interbody spacer device."  Dkt. No. 103, at 6.  At trial, Dr. Bianco presented

17

evidence that his drawings disclosed such a device along with several key features also found in Globus's Caliber and Rise products.  1/14/14 PM Tr. 71-84.  Neither in his complaint nor at trial did Dr. Bianco suggest that his trade secret or secrets were limited to the precise combination of features found in his drawings or the exact design of the device depicted in the drawings.

Dr. Bianco's theory all along has been that his drawings disclosed an implant for use in fusion surgeries, along with certain key features, and that Globus used his trade secret when it developed such an implant with many of the same features.  Dr. Bianco has never claimed that his drawings disclosed the complete design of the Caliber and Rise devices; rather, his consistent claim has been that his drawings disclosed the fundamental concept for the implant along with several of its key features.

The jury was instructed, without objection, that a trade secret of the sort claimed in this case "consists of a combination of information" and that a "trade secret must be secret."  Dkt. No. 226, at 3.  The Court instructed the jury that "[t]here is no precise definition or formula for determining whether Dr. Bianco's disclosure actually constituted a trade secret."  Id. at 4.  The Court provided the jury with six factors that "may be relevant to determining whether Dr. Bianco's disclosures constituted a trade secret":

> (1)  The extent to which the information is known outside Dr. Bianco's business;
> (2)  The extent to which others involved in Dr. Bianco's business knew the information;
> (3)  Measures taken by Dr. Bianco to guard the secrecy of the information;
> (4)  The value of the information to Dr. Bianco and his competitors;
> (5)  The amount of effort or money expended by Dr. Bianco in developing the information; and
> (6)  The ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. at 4.

18

A124

Given those instructions and the evidence in this case, the jury could reasonably have found that Dr. Bianco's idea for a continuously expandable spacer for use in fusion surgeries was a trade secret. First, the idea for such a device and a description of its key features is a "combination of information." Second, the evidence showed that Dr. Bianco kept his ideas secret, and in particular that he kept his drawings in a safe in his office. 1/13/14 PM Tr. 84. In discussing the amount of effort that he expended in developing the information, Dr. Bianco relied on his years of experience in the field spine surgery. Dr. Bianco testified that he performs between 250 and 300 fusion surgeries per year, id. at 65-66, and that he has been practicing as a neurosurgeon since at least 2005, id. at 56. Dr. Bianco also offered evidence that, at the time of his 2007 disclosure to Globus, there were no other products on the market that embodied his idea. 1/14/14 PM Tr. 93. The only expandable interbody spacer that existed at that time was a product known as StaXx, which expanded in discrete increments, instead of continuously, and could not be retracted once it was expanded. Id. at 72-73. The jury could therefore reasonably have found that Dr. Bianco's ideas were not well known at the time of his disclosure. Finally, the jury could have inferred that his trade secret had value, based on the commercial success of the Caliber and Rise products and the evidence of the advantages conferred by a continuously adjustable and reversible spacer for fusion surgeries.

One of the main factual disputes at trial was whether Dr. Bianco's disclosure related to a custom instrument that was to be made for him, or instead to an implant to be developed as a new Globus product. Globus contended at trial that Dr. Bianco submitted his drawings as part of a request for Globus to prepare a customized instrument that he could use in spinal surgeries, and that his drawings did not relate to an implant at all. Dr. Bianco, on the other hand, claimed he

19

intended his drawings to be a design for an adjustable implant and that Globus understood his ideas to be for an implant, not a surgical instrument.   Instruments, unlike implants, are not left in a patient's body after surgery and can be used in multiple surgeries on multiple patients.   There was conflicting evidence on this issue at trial, but the evidence was sufficient to allow the jury to conclude that Globus understood Dr. Bianco's drawings to relate to a spacer rather than an instrument.   In particular, Dr. Bianco's ideas were submitted on a form intended for new ideas, not for custom instruments; Mr. Rhoda directed Mr. Harris to have Dr. Bianco use the form for new ideas in submitting his proposal, not the form for custom instruments (PX107); Dr. Bianco's proposal was repeatedly referred to both by Dr. Bianco and by Globus employees as relating to a "spacer," not an "instrument" or "trial" (a term of art for a surgical instrument); and Mr. Harris told Dr. Bianco that his ideas would be submitted to Globus's "new products" committee, which met once a month to consider proposals for new products.

In sum, the evidence was sufficient to support the jury's conclusion that the ideas that Dr. Bianco submitted to Globus in July 2007 for an adjustable interbody spacer constituted trade secrets that were subject to protection under Texas trade secret law.

### 2. Breach of a Confidential Relationship

Globus next argues that, even if it used Dr. Bianco's ideas in connection with the Caliber and Rise products, Dr. Bianco failed to prove that Globus breached a confidential relationship with Dr. Bianco when it did so.   Globus points out that the jury found in Globus's favor on Dr. Bianco's breach of contract claim.   According to Globus, the jury's rejection of Dr. Bianco's breach of contract claim necessarily meant that Globus did not breach a confidential relationship

20

with him. Therefore, Globus asserts, an essential element of a claim for trade secret misappropriation is missing in this case.

Globus's argument on that point is entirely without merit. First, the jury's verdict was not inconsistent. Texas law makes it clear that an express confidentiality agreement is not required for liability in a trade secret misappropriation case, and that a duty of confidentiality can be implied from all the circumstances even when those circumstances do not give rise to a claim for breach of contract. See Hyde Corp. v. Huffines, 314 S.W.2d 763, 769-70 (Tex. 1958) (quoting Restatement (First) of Torts § 757 cmt. j (1939)) ("[W]hether or not there is a breach of contract, the rule . . . subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him."); Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131 151 nn.54-55 (citing cases); Phillips v. Frey, 20 F.3d 623, 631 (5th Cir. 1994) (express agreement need not be shown "where the actions of the parties and the nature of their relationship, taken as a whole, established the existence of a confidential relationship"); Zoecon Indus. v. Am. Stockman Tag Co., 713 F.2d 1174, 1178 (5th Cir. 1983) ("A confidential employment relationship can be established expressly by contract or can be implied from the nature of the relationship."); Zinco-Sherman, Inc. v. Adept Food Solutions, Inc., 2006 WL 1061917, at *2 (S.D. Tex. Apr. 21, 2006).

Texas law has identified two types of fiduciary relationships. "The first is a formal fiduciary relationship . . . . The second is an informal fiduciary relationship, which may arise from 'a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.'" Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 508 (Tex. App. 2003). When a claim of improper disclosure or use of trade secrets arises from a

21

A127

confidential relationship, "the injured party is not required to rely upon an express agreement that the offending party will hold the trade secret in confidence." T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App. 1998); see Restatement (Third) of Unfair Competition § 41 (1995) ("A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret [if] . . . (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality."); Restatement (First) of Torts § 757 cmt. j (1939) ("The question is simply whether in the circumstances [the defendant] knows or should know that the information is [the plaintiff's] trade secret and that its disclosure is made in confidence.").

The holder of a trade secret may disclose it to others "to further the holder's economic interests" without "destroying its status as a trade secret. Metallurgical Indus. Inc. v. Fourtek, Inc., 790 F.2d 1195, 1200 (5th Cir. 1986); Ultraflo Corp. v. Pelican Tank Parts, Inc., 926 F. Supp. 2d 935, 959 (S.D. Tex. 2013) (owner of a trade secret may disclose it to others "in furtherance of business transactions from which the owner expects to profit without losing trade secret protection."). If a voluntary disclosure occurs in a context "that would not ordinarily occasion public exposure and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained." Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1124 (5th Cir. 1991); see also Cloud v. Standard Packaging Corp., 376 F.2d 384, 388-89 (7th Cir. 1967) ("Where the facts show that a disclosure is made in order to further a particular relationship, a relationship of confidence may

22

be implied, e.g. disclosure to a prospective purchaser to enable him to appraise the value of the secret.").

In this case, the circumstances under which Dr. Bianco disclosed his ideas to Globus, including Globus's use of confidentiality agreements and Mr. Harris's recommendation that Dr. Bianco notarize his drawings for the protection of both parties provided an ample basis for concluding that the parties understood that they were entering into a confidential relationship. The jury was therefore entitled to find that Globus had an implied duty of confidentiality with respect to Dr. Bianco's disclosures, even if there was no express contractual undertaking between the parties. Likewise, the jury could reasonably find that the circumstances of Dr. Bianco's disclosure of his ideas to Globus did not result in a loss of their status as trade secrets.

Texas law makes clear that the very circumstance of disclosing an idea with the hope of generating interest in producing a new product is enough to create an obligation of confidentiality. For example, in Phillips v. Frey, 20 F.3d 623 (5th Cir. 1994), the defendant had entered into negotiations to purchase the plaintiff's hunting-stand business. During negotiations, the plaintiff disclosed his trade-secret manufacturing process to the defendant even though the parties never entered into an express confidentiality agreement. Id. at 625-26. After negotiations broke down, the defendant began using the plaintiff's manufacturing process without permission. The jury found that the defendant had misappropriated the plaintiff's trade secret. The court of appeals affirmed the jury's verdict and rejected the defendant's argument that there was insufficient evidence of a confidential relationship. The court held:

> Although [the plaintiff] never explicitly requested that the secret of his manufacturing process . . . be held in confidence, both parties mutually came to the negotiation table, and the disclosure was made within the course of

23

> negotiations for the sale of a business. The jury could validly accept such
> evidence that the defendants knew or should have known that the information was
> a trade secret and the disclosure was made in confidence.

Id. at 632. The facts of this case are quite similar to those of Phillips. Given the circumstances

surrounding Dr. Bianco's disclosures, including the fact that he notarized his drawings, at Mr.

Harris's urging, so as to protect both Dr. Bianco and Globus, see 1/13/14 PM Tr. 75, the jury

could reasonably have found that Globus knew or should have known that Dr. Bianco's

disclosure was a trade secret and that it was made in confidence. See also Hyde Corp. v.

Huffines, 314 S.W.2d at 769; Restatement (First) of Torts § 757 cmt. j (describing how a duty of

confidence may exist in a situation in which "A discloses [his] secret to B solely for the purpose

of enabling him to appraise its value").

The Court further notes that the breach of contract claim submitted to the jury related to

the alleged promise made by Mr. Harris that Globus would not use Dr. Bianco's idea without

compensating him. The Court granted Globus judgment as a matter of law on Dr. Bianco's other

breach of contract claim that Globus violated a nondisclosure agreement that allegedly protected

Dr. Bianco's ideas. The Court found that under the Texas lost-document rule, there was

insufficient evidence that the nondisclosure agreement, a copy of which neither party could

locate, protected Dr. Bianco and not just Globus. 1/17/14 AM Tr. 104-05. The breach of

contract claim submitted to the jury, therefore, did not involve an alleged contract that required

confidentiality or nondisclosure, but only related to an alleged promise by Globus to compensate

Dr. Bianco if it used his ideas. Although the Court found the evidence on that claim sufficient to

submit the issue to the jury, it is entirely possible that the jury found that the evidence failed to

show that Globus made a sufficiently concrete agreement to compensate Dr. Bianco at a

24

particular level and that it based its verdict on the breach of contract claim on that ground.  For each of those reasons, there is no inconsistency between the jury's verdict on the breach of contract claim and its verdict on the trade secret claim, despite Globus's contention to the contrary.

Even if the jury's verdict were considered inconsistent, Globus cannot take advantage of that inconsistency now, because Globus failed to raise the inconsistency issue at trial.  In the case of an inconsistent verdict there is no way of knowing, after the fact, which way the jury would have resolved the inconsistency if it had been required to do so.  In this case, for example, requiring the jury to cure the alleged inconsistency would not necessarily have led to a different verdict on the trade secret misappropriation claim; it could just as well have led to a different verdict on the breach of contract claim.  It is for that reason that courts have held, in cases such as this one, that a party waives its challenge to alleged inconsistencies in the verdict if it fails to raise them before the court discharges the jury.  Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 534-35 (5th Cir. 1974); see L&W, Inc. v. Shertech, Inc. , 471 F.3d 1311,  1318-19 (2006).  Therefore, even if the Court concluded that the jury's verdict in this case was inconsistent, the verdict would stand because of Globus's failure to raise the issue of inconsistency before the jury was discharged.

### 3. Use of the Trade Secrets

Globus next argues that there is insufficient evidence from which the jury could reasonably find that Globus used Dr. Bianco's trade secrets, as is required for a claim of trade secret misappropriation.  Globus first asserts that Dr. Bianco considered the use of a scissor-jack expansion mechanism with his spacer to be "an element of his trade secret combination."  Dkt.

25

A131

No. 316, at 8. As noted, the Caliber and Rise products use a ramp-based mechanism for expansion, not a scissor-jack mechanism. Therefore, according to Globus, those products did not embody Dr. Bianco's trade secrets. Again, however, Globus inappropriately seeks to import patent law concepts into Texas trade secret law. As noted, Dr. Bianco did not limit his trade secret claims to the precise combination of features in his drawings. Given that Dr. Bianco's trade secrets included the idea for a continuously adjustable interbody spacer with certain key features, the jury was entitled to find that Globus used that trade secret when it began pursuing the development and marketing of such a device with many of the features identified in Dr. Bianco's drawings. See Dkt. No. 226, at 5 (jury instructions) (defining "use" of a trade secret to include "any exploitation of the trade secret that is likely to result in injury to the trade-secret owner or enrichment of the defendant" and "marketing goods that embody the trade secret").

Globus asserts that "Dr. Bianco testified that a scissor-jack mechanism was an element of his trade secret combination." But in the portion of his testimony on which Globus relies, Dr. Bianco was merely responding to the question whether "one of your trade secrets was a scissor-jack mechanism?" 1/13/14 PM Tr. 146-47. By responding affirmatively to that question, Dr. Bianco did not limit his claimed trade secrets in the way Globus suggests. Instead, he merely indicated that the use of a scissor-jack expansion mechanism in an adjustable interbody spacer was one of his trade secrets.

Globus argues that in light of the substantial differences between the final Globus products and Dr. Bianco's drawings it was unreasonable for the jury to find that Globus used Dr. Bianco's trade secrets. But the fact that Globus's final products differ in important ways from the device depicted in Dr. Bianco's drawings does not mean that Globus did not use any of Dr.

26

Bianco's trade secrets. Dr. Bianco's trade secrets were not limited to devices with scissor-jack

expansion mechanisms, but were defined more broadly by the overall idea for a product with

several key features that were eventually implemented in the Globus devices. Accordingly, it

was reasonable for the jury to find that Globus used Dr. Bianco's ideas when it began to develop

those devices. The jury's finding in that regard was consistent with the Court's instruction (not

objected to by Globus) that "'[u]se' does not require that a party use another's trade secret in the

form in which it received it." Dkt. No. 226, at 4.

Globus next asserts that the evidence at trial did not show that Globus relied on Dr.

Bianco's trade secrets "to accelerate or assist its research or development." Dkt. No. 316, at 8.

In support of that contention, Globus points to the fact that Dr. Bianco did not participate in

Globus's development efforts and to the lack of evidence that the lead engineers on the Caliber

and Rise projects ever saw Dr. Bianco's drawings, were told about his disclosures, or even met

Dr. Bianco.

Dr. Bianco does not dispute those facts. Instead, the theory of use that Dr. Bianco

presented to the jury, and that the jury could reasonably have accepted, was that his disclosures

were the source of the basic product idea for Caliber and Rise. That theory does not depend on

proof that the Caliber and Rise engineers were directly exposed to Dr. Bianco's disclosures or

Dr. Bianco himself. Nor does that theory depend on proof that Dr. Bianco participated in the

development process. Instead, Dr. Bianco relies on evidence that his drawings were circulated

among some of the senior executives at Globus shortly before Globus made plans to develop an

adjustable interbody spacer. That evidence includes evidence that senior Globus executives had

Dr. Bianco's drawings before them when Mr. Lee sketched a rough design of a ramp-based

27

expansion mechanism on the back of the sheet of paper containing Dr. Bianco's drawings. From that evidence, the jury could readily have concluded that the Globus executives who were responsible for planning the development of new products relied on Dr. Bianco's concept when they decided to develop a continuously expandable spacer, a decision that ultimately led to the Caliber and Rise projects, even though they decided to use a ramp-based expansion mechanism instead of the scissor-jack mechanism depicted in Dr. Bianco's drawings.

Finally, Globus points to the evidence that the contributions of the lead engineers on Caliber and Rise—Mr. Glerum and Mr. Weiman—were essential to producing a commercially viable product. The evidence showed that the ramp-based expansion concept was important in making the Caliber and Rise products both compact and physically strong, as is required for a successful spinal fusion implant. The evidence further showed that the ramp-based adjustment mechanism was devised by Globus's engineers, not by Dr. Bianco.

The verdict reflects the jury's recognition of the substantial contribution that Globus and its engineers made to the development of Caliber and Rise, since the jury refused to grant Dr. Bianco disgorgement of all of Globus's profits, as he requested. The jury instead awarded Dr. Bianco significantly less by way of a royalty equivalent to five percent of Globus's profits from the Caliber and Rise products. The fact that Globus's contributions to the development of Caliber and Rise were substantial, however, does not mean that Globus did not use Dr. Bianco's trade secrets by developing the product he proposed with many of the key features depicted in his drawings. The Globus engineers did not claim that they were responsible for the overall concept of a continuously expandable and reversible interbody spacer for use in fusion surgeries. Nor has Globus pointed to any evidence that it independently came up with the idea for such a

28

device. The Court therefore concludes that there was sufficient evidence from which the jury could have found that Globus used Dr. Bianco's trade secrets when it set out to design and develop the Caliber and Rise products.

### C. Motion for Remittitur or a New Trial on Damages

#### 1. Sufficiency of the Evidence Supporting the Jury's Damages Award

Globus argues that the evidence at trial did not justify the award of reasonable royalty damages equivalent to five percent of Globus's profits on the Caliber and Rise products. Globus asserts that the jury's $4,295,760 award of a reasonable royalty on past sales was excessive and asks the Court for remittitur of the damages award or a new trial on the issue of damages.

The Court concludes that the jury's damages award was supported by the evidence at trial and that Globus has not satisfied the high burden required to justify remittitur or a new trial on damages. Although the jury's damages award is toward the high end of royalties that Globus has paid in the past, it is not unreasonable. To support his argument that a royalty in the range of five to six percent was reasonable, Dr. Bianco pointed to other royalty agreements Globus had entered into in that range. Given that the evidence supported a finding that Dr. Bianco contributed the core idea for the Caliber and Rise products, including several of those products' essential features, the jury could reasonably find that Dr. Bianco's contributions were analogous to the contributions of those who had received such royalty rates from Globus in the past.

In large part, Globus's arguments about damages are an attack on Dr. Bianco's theory of liability. Globus argues that Dr. Bianco failed to prove two assumptions that his damages expert, Dr. Stephen Becker, relied on in forming his opinion that a hypothetical royalty negotiation between Dr. Bianco and Globus would have resulted in a royalty of five percent. 1/15/14 AM

Tr. at 46.  Globus first argues that the evidence failed to support Dr. Becker's assumption that "Dr. Bianco's alleged trade secrets led to the invention" of the Caliber and Rise products.  Dkt. No. 316, at 11.  The Court has already determined, however, that there was sufficient evidence from which the jury could find that Globus used Dr. Bianco's trade secrets in exactly the way Dr. Becker assumed.

Globus's second argument is that the evidence did not support Dr. Becker's assumption that other surgeons on the design teams for the Caliber and Rise products "provided only incremental improvements to the products."  Dkt. No. 316, at 11.  Globus's argument is that the five percent royalty the jury awarded to Dr. Bianco is excessive, in that it is significantly higher than the one-half of one percent royalty received by most of the surgeons who were members of product development design teams at Globus, including the product development teams for the Caliber and Rise products.  Globus asserts that Dr. Bianco's contributions, if any, were relatively minor and unimportant and therefore do not warrant a royalty in excess of one-half of one percent.  Dr. Bianco responds that because his trade secrets included the overall product itself, along with most of its essential features, his ideas were extremely important to the development of Caliber and Rise, much more so than the contributions of the surgeons on Globus's design teams.  On Dr. Bianco's theory, his ideas provided the impetus, or the "sparkle" as he put it, 1/13 PM Tr. 50, for the development of Caliber and Rise at Globus.

Globus asserts that it typically used what it calls the "industry standard royalty rate" of one-half of one percent of profits to compensate surgeons on its design teams who served as consultants in the development of medical devices, although some of the surgeon members of Globus design teams received significantly more than that.  Of the four agreements in evidence

30

A136

in which Globus granted a royalty rate greater than two percent to individuals or entities, see

1/15/14 AM Tr. 74, Globus argues that three of those agreements involved instances in which

Globus purchased "a completed product owned by companies that Globus acquired." Dkt. No.

316, at 12. Globus therefore asserts that the royalty agreements paying royalties between five

and six percent of Globus's profits did not arise from situations that were sufficiently comparable

to the hypothetical royalty negotiation at issue in this case. See LaserDynamics, Inc. v. Quanta

Computer, Inc., 694 F.3d 51, 79 (Fed. Cir. 2012) (requiring, in the patent context, that licenses

relied on by a patentee to prove damages be "sufficiently comparable to the hypothetical license

at issue in suit"). For that reason, Globus asserts, the evidence of comparable royalty agreements

shows that Dr. Bianco is entitled to no more than the one-half of one percent royalty rate that

Globus typically paid to each design team doctor.

The jury, however, was presented with evidence that Dr. Bianco's contributions were

different in kind from those of the ordinary design team doctors. Dr. Bianco's evidence

suggested that design team doctors typically provided merely "refinements" to already existing

ideas, not proposals for a whole new product. 1/13/14 PM Tr. 91-92, 131-32 (Dr. Bianco);

1/15/14 AM Tr. 69-70 (Dr. Becker); 1/15/14 PM Tr. 48-49 (Mr. Glerum). A number of doctors

on the design teams for the Caliber products submitted affidavits that were read to the jury, in

which they stated that although they did not significantly contribute to the conception of the

patent related to the Caliber insert, they participated in the design and development of the Caliber

products and believed that their participation was significant. None of the doctors' affidavits

described the nature of their contributions, however. 1/14/14 AM Tr. 194-214. The jury was

therefore faced with the task of resolving factual disputes over how to characterize Dr. Bianco's

31

A137

contributions and how his contributions compared to the contributions of those who were the beneficiaries of the various Globus royalty agreements in evidence.   Based on Dr. Bianco's theory that his ideas led to the development of the Caliber and Rise products, the jury could reasonably find that Dr. Bianco's contributions were greater than the contributions of the physicians on the Caliber and Caliber-L design teams and were similar in kind to the contributions provided by those who had previously received royalty rates in the range of five to six percent from Globus.

In several of those instances, as noted, Globus procured the rights to products or product ideas that would have been unavailable to Globus without the contribution of the licensor.   In another instance, a  six percent royalty was paid to a physician who, as Globus explained, was "a world-renowned doctor who was the sole surgeon on the design team."   Dkt. No. 316, at 12; 1/15/14 AM Tr. 74; 1/17/14 AM Tr. 38-39.   Although Globus paid royalty rates as high as five to six percent in only a few instances, the jury was entitled to conclude from the evidence at trial that Dr. Bianco's contribution of the concept and basic design for the adjustable interbody spacer was analogous to the contributions of those who had received royalties in that range.   Based on that evidence, the jury could permissibly find that a royalty of five percent of Globus's profits on the Caliber and Rise products was appropriate.

Globus takes further issue with Dr. Becker's reasonable royalty analysis because Dr. Becker used as a starting point a four percent royalty, based on an aggregation of the total royalty rate paid to the surgeons on the Caliber design team.   Globus asserts that the four percent rate is arbitrary because, if Dr. Becker had used the combined design team royalty rates from Caliber-L or Rise, he would have arrived at a different starting point rate.   Globus adds that there is "no

32

evidence that any other agreements were based on an aggregated royalty rate." Dkt. No. 316, at 13.

Globus's arguments as to Dr. Becker's methodology have little force. The Court rejected similar arguments when it addressed Globus's pretrial Daubert motion. Dkt. No. 196. As the Court noted at that time, Dr. Becker's principal assumption was that "Dr. Bianco's contribution to the development of the devices was much greater than that of the other surgeons, even viewed in the aggregate." Id. at 4. Given the evidence that the suggestions provided by design team doctors about a product already in development are different in kind from the ideas disclosed by Dr. Bianco for a whole new product that was not yet being developed, the jury could reasonably have accepted Dr. Becker's assumption. Furthermore, Dr. Becker testified that his starting-point royalty rate was supported by the existence of the Globus royalty agreements that paid between five and six percent. 1/15/14 AM Tr. 74. His selection of a four percent starting-point rate was therefore supported by the evidence and was not arbitrary.

Relatedly, Globus challenges Dr. Becker's opinion that his four-percent starting point for calculating the hypothetical royalty should be adjusted upward by one percent to account for the particular facts of this case. That opinion, according to Globus, was "based on nothing more than his unsubstantiated judgment." Dkt. No. 316, at 14. Dr. Becker, however, explained the one-percent increase by noting that many of the features that Globus has touted as important advantages of Caliber and Rise were in fact found in Dr. Bianco's July 2007 disclosure to Globus. 1/15/14 AM Tr. 76. Additionally, Dr. Becker pointed to evidence that Caliber is a "key differentiating product for Globus" that has proved highly profitable. Id. at 77. Dr. Becker's

33

opinion therefore was not unsubstantiated, but was explained to the jury and based on his opinion as a qualified expert.

Globus argues that Dr. Becker "wrongly assumed that Dr. Bianco singlehandedly conceived of the inventions embodied" in the Caliber and Rise products and that Dr. Becker's assumption "is entirely refuted" by the Court's reasoning in denying Dr. Bianco's claim to be named as an inventor on Globus's patents on adjustable interbody spacers. Dkt. No. 316, at 13 n.2. Dr. Becker, however, made no such assumption. Dr. Becker simply assumed that Globus used Dr. Bianco's trade secrets. See 1/15/14 AM Tr. 65. As the Court explained in its order on inventorship, "[t]here is no inconsistency between the jury's finding that Globus misappropriated Dr. Bianco's trade secrets and the Court's ruling that Dr. Bianco is not entitled to be named as an inventor" on Globus's patents. Dkt. No. 262, at 20. The requirement in patent law that an inventor contribute the "conception" of an invention has no parallel in the law of trade secrets. Compare Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227 (Fed. Cir. 1994) ("Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice."), with In re Bass, 113 S.W.3d 735, 739 (Tex. 2003) ([A] trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." (emphasis added)).

Finally, Globus argues that "Dr. Becker's opinions about the proper royalty rate were all based on the flawed assumption that 'a hypothetical negotiation over the future royalty rate would have occurred after the success of Globus's expandable spacer products had been established.'" Dkt. No. 316, at 14. That assumption was not warranted, Globus asserts, because

34

the 2007 hypothetical negotiation between Dr. Bianco and Globus would have occurred before

Caliber and Rise were developed and therefore before it was known that those products would be

successful. Globus's argument in that regard fails for several reasons.

First, Globus waived any argument about Dr. Becker's assumptions with respect to the

commercial success of the Caliber and Rise products. Although Globus challenged the reliability

of Dr. Becker's opinions on other grounds prior to trial, it never challenged his opinions as being

unreliable because they took into account the commercial success of the Caliber and Rise

products. See Dkt. No. 110 (Globus motion to strike); Dkt. No. 164 (supplemental motion to

strike). Nor did Globus object to Dr. Becker's testimony at trial on that ground. Globus cannot

raise what is essentially an objection to the admissibility of Dr. Becker testimony under Federal

Rule of Evidence 702 at this late stage as part of a motion for remittitur or a new trial on

damages. See Fed. R. Evid. 103(a); Perdue v. Nissan Motor Co., 2009 WL 2460988, at *2 (E.D.

Tex. Aug. 10, 2009); z4 Techs., Inc. v. Microsoft Corp., 2006 WL 2401099, at *9 (E.D. Tex.

Aug. 18, 2006); Estate of Bynum v. Magno, 55 F. App'x 811, 813 (9th Cir. 2003) ("A party who

fails to make a contemporaneous objection to the introduction of testimony at trial forfeits its

right to contest the use of that evidence in a motion for judgment as a matter of law."); New Mkt.

Inv. Corp. v. Fireman's Fund Ins. Co., 774 F. Supp. 900, 917-18 (E.D. Pa. 1991) ("[I]t is well-

settled under the caselaw and clear under Rule 103(a)(1) . . . that the failure to timely object to

the admission of evidence constitutes a 'waiver' of such objection for purposes of post-trial

review.").

On the merits, Dr. Becker's decision to take into account the commercial success of the

Caliber and Rise products in his "hypothetical negotiation" analysis did not render his opinion as

35

A141

to the reasonable royalty legally deficient. Courts, including the Supreme Court, have recognized in the analogous patent-law context "that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1333 (Fed. Cir. 2009), citing Sinclair Ref. Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933); see also Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1276-77 (Fed. Cir. 1999) (noting that Federal Circuit case law requires neither the admission nor the exclusion of post-infringement evidence); Fromson v. W. Litho Plate & Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1988) (stating that a reasonable royalty "speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators"), overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp, 383 F.3d 1337 (Fed. Cir. 2004).

Such post-infringement developments have been referred to as a "book of wisdom" on which a finder of fact may rely. Sinclair, 289 U.S. at 698. "The jury may consider the infringer's actual sales and revenue up to the date of trial as part of the 'book of wisdom.'" Ariba, Inc. v. Emptoris, Inc., 567 F. Supp. 2d 914, 917 (E.D. Tex. 2008); see Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1210 (Fed. Cir. 2010) (use of actual profit margins probative of profits anticipated by the parties in a hypothetical negotiation); Trell v. Marlee Elecs. Corp., 912 F.2d 1443, 1446 (Fed. Cir. 1990) ("[I]n determining the result of . . . a hypothetical negotiation, the district court may consider the infringer's anticipated profits, as indicated by evidence of actual profits."); Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552, 1568 (Fed. Cir. 1984) ("Evidence of the infringer's actual profits generally is

36

admissible as probative of his anticipated profits" at the time of a hypothetical negotiation.); z4
Techs., 2006 WL 2401099, at *10 ("Evidence of an infringer's actual profits [is] generally
admissible when calculating a 'reasonable royalty.'").

The Court thus rejects Globus's argument that it was improper for Dr. Becker to take into
account the commercial success of the Caliber and Rise products when determining a reasonable
royalty. The commercial success and the importance of Caliber and Rise to Globus is probative
of what the parties could reasonably have anticipated to be the prospective value of Dr. Bianco's
trade secrets in a 2007 hypothetical negotiation. Given the probative value of that evidence and
Globus's failure to raise an objection to the admissibility of Dr. Becker's opinion before or
during trial on that ground, this case is similar to Finjan, in which the Federal Circuit stated:

> [The plaintiff's] use of the actual profit margins that both [defendants]
> experienced on products after that date was simply as a reflection of the profits
> the parties might have anticipated in calculating a reasonable royalty in the
> hypothetical negotiation. [The plaintiff's] testimony was subject to cross-
> examination, and the Defendants did not object to the use of actual profits in
> general as a basis on which to gauge expected profits in the hypothetical
> negotiation.

626 F.3d at 1210.

In sum, the jury's award of a reasonable royalty equivalent to five percent of Globus's net
sales from the Caliber and Rise products is supported by the evidence at trial and cannot be said
to be against the great weight of the evidence. The Court therefore rejects Globus's argument
that the jury's award of damages should be overturned and a new trial granted on the issue of
damages based on the insufficiency of the evidence to support the jury's damages award.

## 2. Apportionment of the Royalty Base

Globus argues that a new trial should be ordered on the issue of damages because the jury

failed to apportion the royalty base it used to calculate damages after it had selected five percent

as the appropriate royalty rate.  Based on its contention that Dr. Bianco's contributions to the

Rise and Caliber products were minor at best, Globus asserts that Dr. Becker and the jury should

have taken into account the fractional value of Dr. Bianco's contributions to the Caliber and Rise

products both in calculating the royalty rate and in calculating the royalty base to which that rate

was applied.  Globus's argument, however, is based on a view of Dr. Bianco's trade secrets that

the jury rejected when it found Globus liable for misappropriation.   Moreover, Globus's

argument is not supported by the Federal Circuit cases on which it relies and is contrary to

Globus's own licensing practices.

Globus's apportionment argument is based on the "entire market value rule," which the

Federal Circuit has applied in patent cases.  The entire market value rule provides that if a

patentee seeks a royalty base equivalent to the entire market value of the accused product, the

patentee must prove that "the patent-related feature is the basis for customer demand." Rite-Hite

Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc) (citations omitted).  If the

patented feature is not the basis for customer demand, the royalty base must be apportioned

according to the value of the portion of the accused product that infringes the patent.  Thus, "in

any case involving multi-component products, patentees may not calculate damages based on

sales of the entire product, as opposed to the smallest salable patent-practicing unit, without

showing that the demand for the entire product is attributable to the patented feature."

LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67-68 (Fed. Cir. 2012); see also

A144

Lucent Techs., 580 F.3d at 1336 ("For the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand.") (emphasis in original); Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320-21 (Fed. Cir. 2011) (same). Where the smallest salable unit is "a multi-component product containing several non-infringing features with no relation to the patented feature," the patentee must apportion damages only to the patented feature or features. VirnetX, Inc. v. Cisco Sys., Inc., No. 2013-1489 (Sept. 16, 2014), slip op. 29-32.

The entire market value rule is designed to deal with cases in which infringement by a multicomponent device relates to only one sub-component of that device. Such a situation might arise, for example, where the owner of a patent for an inventive electronic component sues an automobile manufacturer for infringement because that manufacturer's automobiles include CD players that use the accused electronic component. In such cases, there is a substantial risk that a jury will overcompensate the plaintiff if the royalty base is derived from, for example, the sales of the entire product (e.g., the automobile), as opposed to sales of the "smallest salable patent-practicing unit" (e.g., the electronic component within the CD player). See VirnetX, slip op. 14-15; LaserDynamics, 694 F.3d 51, 67 (Fed. Cir. 2012).

As a matter of logic, there is nothing inherently wrong with using the entire market value of a product as the royalty base, as long as the royalty rate is selected appropriately. See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1338-39 (Fed. Cir. 2009) ("[T]he base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence)."). The problem is that in complex products with hundreds or thousands of component

39

parts, the royalty rate that would be reasonable when the entire market value is used as the royalty base may be an extremely small fraction of a percentage, which a jury would be unlikely to choose after finding a defendant liable for infringement. See Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1320-21 (Fed. Cir. 2011) (plaintiff's attack on defendant's expert for proposing a reasonable royalty of 0.00003 percent of the entire market value of Microsoft software products for the accused product-activation feature "may have inappropriately contributed to the jury's rejection of his calculations"). When the entire market value is used as the royalty base, the Federal Circuit views the risk of prejudice to the defendant as sufficiently serious that the court has held that "the requirement to prove that the patented feature drives demand for the entire product may not be avoided by the use of a very small royalty rate." LaserDynamics, 694 F.3d at 67.

This case is not like the Federal Circuit cases that have found fault with a jury's award of a reasonable royalty based on the entire market value of a product. Those cases have all dealt with the prototypical fact pattern in which the infringing feature in the accused product is a minor subcomponent of, or makes a minor contribution to, the overall product. See VirnetX, slip op. 32 (plaintiff failed "to apportion the royalty down to a reasonable estimate of the value of its claimed technology"); LaserDynamics, 694 F.3d at 68 (plaintiff failed to show that patented method for discriminating between the types of discs inserted into an optical disc reader drove demand for laptop computers); Uniloc, 632 F.3d at 1320 (infringing software activation feature in accused Microsoft software products); Lucent, 580 F.3d at 1332, 1336-39 (accused date-picker feature in Microsoft Outlook software was "but a tiny feature of . . . an enormously complex software program comprising hundreds, if not thousands or even more, features.").

In this case, however, Dr. Bianco's trade secret was the idea for the adjustable interbody

spacer itself. Dr. Bianco's trade secrets did not relate to only a single subcomponent or feature

of the Caliber and Rise products; instead, they related to the overall idea for a continuously

adjustable and reversible interbody spacer for use in fusion surgeries and included many of the

key features disclosed in Dr. Bianco's drawings. Therefore, even assuming that the Federal

Circuit's strict requirements for applying the entire market value rule apply in this case under

Texas trade secret law, Dr. Bianco met his burden of proof when he presented the jury with

sufficient evidence to support his theory of trade secret misappropriation. In other words, the

Caliber and Rise products are the "smallest salable units" that reflect the use of Dr. Bianco's

trade secrets.

In a notice of supplemental authority submitted after its motion, Globus argues that the

recent decision of the Federal Circuit in VirnetX demonstrates that Dr. Bianco's "damages model

cannot support a reasonable royalty award." Dkt. No. 336. VirnetX, however, simply applied

the principles of the entire market value rule to a situation in which the smallest salable unit

contains significant unpatentable features. VirnetX, slip op. 32. In that situation, the scope of

the defendant's infringement cannot fairly be said to extend to the entire accused product, or

even the smallest salable unit of that product. In the present case, by contrast, the jury was

entitled to find that the scope of the appropriation extended to the entire Caliber and Rise line of

products, since what was alleged to have been appropriated was the idea for an adjustable

interbody spacer and the combination of the basic features of such a spacer, which were

incorporated in the Caliber and Rise devices. In that setting, the entire market value rule does

not require that the royalty base be apportioned among features of the device in question. <u>See</u>

<u>Univ. of Pittsburgh v. Varian Med. Sys., Inc.</u>, 561 F. App'x 934, 946-47 (Fed. Cir. 2014).[4]

The justification for treating the Caliber and Rise products as the fruit of the appropriated

trade secrets (or, in the terms used in the patent context, the "smallest salable units" that

represent what Globus appropriated) is not undercut by the fact that Globus and its engineers

contributed substantially to the design and development of those products. Nor is the jury's

finding undercut by the fact that Globus implemented Dr. Bianco's trade secrets with an

expansion mechanism different from the one depicted in Dr. Bianco's drawings. The jury took

into account the relative contributions of Dr. Bianco and Globus when it awarded Dr. Bianco a

five percent royalty. Given that the jury declined to award Dr. Bianco complete disgorgement of

all of Globus's profits from the Caliber and Rise products, the jury's verdict is best viewed as

based on a conclusion that Globus's contributions to the development and commercialization of

those products were important enough that Dr. Bianco's share of the profits on those products

should be limited to five percent. Because the jury's choice of a royalty rate was reasonable,

there is no reason to doubly discount Dr. Bianco's contributions to the overall product

---

[4] Globus points to other cases that, like <u>VirnetX</u>, recognize that further apportionment of
the royalty base beyond the base associated with the smallest salable unit is required when the
patent relates to something less than the smallest salable unit. <u>See</u> <u>Dynetix Design Solutions,
Inc. v. Synopsys, Inc.</u>, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013); <u>Personalized Media
Commc'ns, LLC v. Zynga, Inc.</u>, 2013 WL 5979627, at *2 (E.D. Tex Nov. 8, 2013). That
proposition, however, does not apply to a case such as this one in which the smallest salable unit
embodying a use of protected intellectual property is the entire product itself. In fact, the
decision in <u>Personalized Media</u> makes precisely that point. The court in that case found that the
entire market value of the products accused of patent infringement was an appropriate royalty
base because plaintiff's theory was that "each accused [product], as a whole, infringes the
patents-in-suit." 2013 WL 5979627, at *2.

development of Caliber and Rise by further reducing the royalty base by apportionment, as Globus requests.

Globus's practice of routinely using the profits on its devices as the royalty base in its royalty agreements provides further support for the royalty base applied in this case. Unlike in the Federal Circuit cases dealing with the entire market value rule, in this case the evidence showed that Globus's regular practice was to grant royalties based on the net sales of its products. For example, all of the royalty agreements between Globus and the surgeons on the design teams for Caliber, Caliber-L, and Rise used as the royalty base the full net sales of the respective product. Dr. Becker testified that he reviewed more than 200 Globus royalty agreements and found that "the running royalty structure is standard" in those agreements and that all of the agreements were "of this rate-times-base structure." 1/15/14 AM Tr. 67-68. The parties have not pointed to any Globus royalty agreement providing for a royalty base of anything less than the net sales of the entire product in question. Dr. Becker testified that "[i]n Globus' case, when they do royalty agreements, we've actually looked at the agreements and see that they define the thing that you—where you multiply the rate times something called net sales." Id. at 79; see also id. at 84. The jury's choice of net sales as the royalty base was therefore entirely consistent with the evidence as to the manner in which Globus typically compensates those who contribute to the development of its products.

As part of its apportionment argument, Globus contends that the royalty base should have been apportioned because all of the individual elements of Dr. Bianco's trade secrets are in the public domain. According to Globus, Dr. Bianco's trade secrets amounted to nothing more than ideas to improve upon spacers already found in the market at the time Dr. Bianco disclosed his

ideas to Globus.  Therefore, Globus asserts, Dr. Bianco is entitled to only the incremental value provided by that improvement.  As noted, however, Dr. Bianco's idea for an improvement over already-existing spacers took the form of an idea for a complete product with certain key features.  To the extent that Dr. Bianco's ideas represent mere improvements over already existing technology, the same could be said about the Caliber and Rise products themselves, as well as countless other inventions.  Globus's argument does not lead to the conclusion that the royalty base must be apportioned.

Globus next asserts that "the sole difference" between the spacer shown in Dr. Bianco's drawing and the intervertebral spacers that were commercially available when Dr. Bianco disclosed his drawing to Globus in 2007 was the use of a scissor-jack expanding mechanism. Dkt. No. 316, at 18.  That assertion, however, is not supported by the evidence.  Instead, the evidence established that most commercially available spacers were static, i.e., not expandable, and that the only available expandable spacer—StaXx XD—was not continuously expandable or reversible.  1/14/14 PM Tr. 72-73.  Dr. Bianco therefore disclosed ideas for improvements to existing spacer technology beyond the mere use of a scissor-jack mechanism.

In support of its argument that Dr. Bianco's disclosures contained nothing new, Globus argues that Dr. Bianco's disclosures added nothing of substance to the features found in the preexisting Medtronic Scissor Jack surgical instrument.  As explained above, however, the jury rejected Globus's theory that Dr. Bianco disclosed an instrument to Globus, not an implant.  The jury therefore found that Dr. Bianco's disclosure was of a product fundamentally different from the Medtronic Scissor Jack instrument.

44

A150

Relatedly, Globus contends that "[t]he damages model that Dr. Becker presented to the jury did not value Dr. Bianco's trade secret information in the context of an improvement of readily available public information in 2007." Dkt. No. 316, at 19. However, Dr. Becker stated that in forming his opinion on damages he considered the advantages that Dr. Bianco's ideas provided relative to preexisting spacers on the market, as explained by Dr. Bianco's technical expert. See 1/15/14 AM Tr. 75-76 (Dr. Becker); 1/14/14 PM Tr. 72-74 (Dr. McMillin). Globus's contention about Dr. Becker's damages model is therefore inaccurate.

Accordingly, the Court concludes that the use of the net sales of the Caliber and Rise products as the royalty base for calculating damages without further apportionment was legally appropriate and was supported by the evidence at trial. The Court therefore denies Globus's motion to overturn the verdict or grant a new trial on the ground that apportionment of the royalty base was required beyond the apportionment reflected in the jury's decision to award Dr. Bianco five percent of the net sales of the Caliber and Rise products.

### 3. Future Royalties

Globus argues that the Court erred when it granted Dr. Bianco an ongoing royalty of five percent of Globus's profits on the post-verdict sales of the Caliber and Rise products and products not colorably different from those products. See Dkt. No. 311, at 22. According to Globus, there is no authority under Texas law for such a remedy in a trade secret case. Globus's argument is unpersuasive.

Globus argues that because trade secret misappropriation under Texas law is not a continuing tort, see Tex. Civ. Prac. & Rem. Code § 16.010(b), Texas law does not support the award of an ongoing royalty. The law is clear, however, that ongoing or continuing damages can

45

result from a tort that is not a continuing tort, including the tort of trade secret misappropriation.
See Gen. Universal Sys., Inc. v. HAL, Inc., 500 F.3d 444, 452 (5th Cir. 2007); Daboub v.
Gibbons, 42 F.3d 285, 291 & n.9 (5th Cir. 1995). Under Globus's theory, the reasonable royalty
damages to which Dr. Bianco would be entitled would depend arbitrarily on the date of the jury's
verdict. If the trial had occurred earlier—if, for example, Dr. Bianco had filed his lawsuit
earlier—Globus's theory would limit Dr. Bianco to a reduced damages award because there
would have been fewer sales of the Caliber and Rise devices to account for in the calculation of a
reasonable royalty. The damages suffered by Dr. Bianco, however, are not dependent on the
date that the jury rendered its verdict. The Court sees no basis under Texas law to arbitrarily
limit Dr. Bianco's damages in that way just because the tort of trade secret misappropriation is
not a continuing tort.

Providing for an ongoing royalty was the only way, under the circumstances, for the
Court to ensure that Dr. Bianco would receive fair compensation for his loss. At trial, neither
party argued or presented evidence that a hypothetical negotiation between Globus and Dr.
Bianco would have resulted in a one-time lump sum royalty payment to Dr. Bianco. Instead, the
evidence and argument at trial with respect to reasonable royalty damages focused exclusively
on running royalties. See 1/15/14 AM Tr. 67-68 (Dr. Becker testifying that a running royalty
method was used in all of Globus agreements he reviewed). An ongoing royalty award was
therefore the only practical means to ensure that Dr. Bianco would be fully compensated for the
injury the jury found he suffered.

Globus argues that the Court erred in relying on Hyde Corp. v. Huffines, 314 S.W.2d 763
(Tex. 1958), and Bryan v. Kershaw, 366 F.2d 497 (5th Cir. 1966), when it ruled that Texas law

46

A152

supports the award of an ongoing royalty. According to Globus, those cases are not suitable precedents for an award of ongoing royalties because they involved injunctions, not the grant of future damages. That argument, however, misses the point. The Court relied on Hyde and Bryan because those cases show that under Texas law, courts fashioning equitable relief for trade secret misappropriation have the discretion to award such relief perpetually, that is, beyond the date of the verdict and even beyond the date when the trade secret is no longer a secret. In fact, under Texas law, it is Globus's burden "to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection." Hyde, 314 S.W.2d at 776. If Texas law allows courts to grant prospective equitable relief that would have completely and permanently barred Globus from continuing to sell the Caliber and Rise products, then it is surely permissible for a court to grant equitable relief that is significantly less burdensome, in the form of an ongoing royalty with a cut-off date. The reason why Dr. Bianco was not awarded a permanent injunction in this case was because the Court found that monetary relief would be adequate to compensate Dr. Bianco for his injuries. See Dkt. No. 269, at 17 (no irreparable injury because monetary damages would be sufficient); id. at 18-19 (availability of monetary relief for Dr. Bianco "largely decides" the balance of hardships). It would be perverse for the Court to hold that, having denied injunctive relief because of the availability of a monetary award for future injuries, such a monetary award is not available after all.

Globus also asserts that in its decision awarding future royalties, the Court erred by relying on Sikes v. McGraw-Edison, 665 F.2d 731 (5th Cir. 1982). In Sikes, the Fifth Circuit applied Texas law and awarded reasonable royalty damages extending beyond the period of the "head start" gained by the defendant through its trade secret misappropriation. The Court cited

47

A153

the case in response to Globus's argument that damages in a trade secret case are limited to the "head start" that the defendant gained by misappropriating the plaintiff's trade secret. Sikes thus shows that Globus's "head start" theory of damages is not mandated by Texas law.

In reaching that conclusion, the Sikes court relied on the fact that the circumstances suggested that a reasonable royalty negotiation would likely have resulted in a royalty payable for the life of the defendant's product, not just for a "head start" period. See Sikes, 665 F.2d at 737. Therefore, although Sikes does not explicitly stand for the proposition that equitable relief in the form of a reasonable royalty is authorized under Texas law, it stands for the unremarkable proposition that relief in a reasonable royalty case under Texas law should be based on what the evidence suggests the parties would have agreed to in a hypothetical negotiation. See University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538-39 (5th Cir. 1974). In this case, the evidence of Globus's royalty practices is that Globus pays royalties for the life of a product, subject to a fifteen-year maximum period starting from the date of the agreement. In exercising its discretion to award equitable relief, the Court therefore deemed it fair and equitable to award Dr. Bianco ongoing royalties that would ensure that his total compensation would be consistent with the jury's verdict and with the evidence of what he would have received had he reached an agreement with Globus regarding the use of his trade secrets in 2007. Globus's assertion that reasonable royalties are not appropriate for torts that are not "continuing" is simply not grounded in law, logic, or principles of equity.

Globus next argues that if the Court decides to let its award of future royalties stand, it should reduce the ongoing royalty rate to one-half of one percent. That argument simply reprises Globus's argument that the jury's award of damages equivalent to a five percent ongoing royalty

is not supported by the evidence. The Court therefore rejects Globus's argument with respect to ongoing royalties for the same reasons that it rejected Globus's argument with respect to past damages.

Finally, Globus argues that the Court's award of an ongoing royalty to Dr. Bianco should be confined to Globus's sales of Caliber, Caliber-L, and Rise, and that the award should not extend to products that are not colorably different from those products. According to Globus, the concept of colorable differences is a concept from patent law that "has no relevance to a trade secret case." Dkt. No. 316, at 24. That is so, Globus argues, because trade secrets are "defined by the use made of information, and not by the metes and bounds of the underlying subject matter." Id. That distinction has no force in this context, however. If Globus were to start selling products virtually identical to the Caliber, Caliber-L, and Rise devices, but under a different name, those sales would still be the products of the misappropriation of Dr. Bianco's trade secrets. There is no reason to create such a glaring loophole in the Court's remedial order. See Reingold v. Swiftships, Inc., 126 F.3d 645, 651 (5th Cir. 1997) ("If the trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that the law provides would be hollow indeed."). Equity demands that Globus cannot escape liability by making trivial changes to the Caliber and Rise products as an end run around this Court's judgment. The Court will therefore deny Globus's motion to amend the judgment with respect to future royalties.

The "colorably different" clause that the Court has included in the remedial order is similar to the "colorably different" standard that is frequently used in connection with injunctions in patent cases. In that context, the clause has been found necessary to an effective

injunctive order and has been upheld against challenges that it is impermissibly vague. <u>See</u> <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d 1331, 1346 (Fed. Cir. 2003); <u>Additive Controls &</u> <u>Measurement Sys., Inc. v. Flowdata, Inc.</u>, 986 F.2d 476, 479-80 (Fed. Cir. 1993); <u>KSM</u> <u>Fastening Sys., Inc. v. H.A. Jones Co.</u>, 776 F.2d 1522, 1526 (Fed. Cir. 1985). The clause is equally necessary in this context, and it similarly not subject to challenge on grounds of undue vagueness. The Court therefore concludes that the order regarding future royalties is not contrary to law or unsupported by the evidence introduced at trial and in the proceedings before the Court regarding the future royalties award.

For the reasons set forth above, the Court DENIES Globus's motion for judgment as a matter of law, for a new trial, and for remittitur.

IT IS SO ORDERED.

SIGNED this 27th day of October, 2014.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

A156